# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT TACOMA

| | |
|---|---|
| AIR TRANSPORT ASSOCIATION OF AMERICA, dba AIRLINES FOR AMERICA, | NO. 3:18-cv-05092-RBL |
| Plaintiff, | DEPARTMENT'S MOTION FOR SUMMARY JUDGMENT |
| v. | NOTED FOR CONSIDERATION: AUGUST 23, 2019 |
| WASHINGTON DEPARTMENT OF LABOR & INDUSTRIES and JOEL SACKS, in his official capacity as Director of the Department of Labor & Industries, | ORAL ARGUMENT REQUESTED |
| Defendants, | |
| & | |
| ASSOCIATION OF FLIGHT ATTENDANTS-COMMUNICATION WORKERS OF AMERICA, AFL-CIO, a labor organization, | |
| Intervener. | |

ATTORNEY GENERAL OF WASHINGTON
LABOR & INDUSTRIES DIVISION
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7740

**TABLE OF CONTENTS**

I.   INTRODUCTION & RELIEF REQUESTED.................................................................... 1

II.  FACTS .................................................................................................................... 1

     A.   Overview....................................................................................................... 1

     B.   In 2016, Washington Voters Enacted a Paid and Protected Sick Leave Law,
          Which Advances Public Health, Family Stability, and Economic Security............. 2

     C.   Paid and Protected Sick Leave Laws Applied to the Airline Industry Provide
          Critical Benefits to Workers and Society ...................................................... 4

     D.   Washington's Sick Leave Law Applies to Washington-Based Employees
          Only; Here Only Alaska Has Washington-Based Employees ................................. 6

     E.   Paid and Protected Sick Leave Laws Have Minimal Adverse Effects on the
          Airline Industry ............................................................................................ 7

          1.   Airlines follow other paid and protected sick leave laws.......................... 7

          2.   Minimal negative effects occur to airlines, including Alaska, because of
               paid and protected sick leave ............................................................. 10

III. STANDARD OF REVIEW ........................................................................................ 11

IV.  ARGUMENT ........................................................................................................ 12

     A.   Washington's Sick Leave Law Is a Legitimate Exercise of Police Power
          Under the Dormant Commerce Clause Because It Advances Important Public
          Interests With Little Effect on Interstate Commerce ................................... 12

          1.   Congress has authorized the states to have local and state leave laws............ 13

          2.   The Washington paid and protected sick leave law regulates
               evenhandedly to effectuate the legitimate local public interest of
               promoting public health, family stability, and economic security ................. 14

          3.   A4A shows no burden on interstate commerce; it shows only a
               speculative incidental effect on Alaska's operations ......................... 15

               a.   Operational inconvenience shows no dormant Commerce Clause
                    violation under *Exxon*, *CTS*, *Burlington Northern*, *Pacific Merchant*,
                    and *Bernstein* ........................................................................ 15

               b.   A4A's claim of increased delays demonstrates no commerce clause
                    claim because consumer inconvenience is not a significant burden on
                    interstate commerce ................................................................. 21

DEPARTMENT'S MOTION FOR
SUMMARY JUDGMENT --
NO. 3:18-cv-05092-RBL

ii

ATTORNEY GENERAL OF WASHINGTON
LABOR & INDUSTRIES DIVISION
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7740

        c.     Airlines, including Alaska, routinely and effectively operate under many jurisdictions' laws ....................................................................... 22

        d.     A4A shows no conflict with another state's law, or that Alaska could not manage any difference in laws ......................................................... 25

    4.    The benefits of paid and protected sick leave outweigh any putative burdens ................................................................................................... 27

  B.    Washington's Sick Leave Law Does Not Violate the Airline Deregulation Act Because It Does Not Bind Airlines to Any Rate, Route, or Service ....................... 28

  C.    Washington's Sick Leave Law Satisfies Due Process Because Washington Regulates Only Those Airlines With a Significant Connection to Washington ...... 29

V.      CONCLUSION ............................................................................................. 30

ATTORNEY GENERAL OF WASHINGTON
LABOR & INDUSTRIES DIVISION
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7740

## I.     INTRODUCTION & RELIEF REQUESTED

Washington's sick leave law ensures Washington-based employees receive paid sick leave and prevents employers from punishing workers who take leave when they or their families are sick. This law is critical to advancing public health, family stability, and economic security. Despite this, Air Transportation Association dba Airlines for America (A4A) sues to enjoin Washington's sick leave law as applied to flight attendants and pilots, claiming violations of the dormant Commerce Clause, the Airline Deregulation Act, and the Fourteenth Amendment.

These arguments lack merit. The benefits of Washington's sick leave law in promoting important health, welfare, and economic policy goals far outweigh any putative burden on interstate commerce in having airlines comply with the law, so the law does not violate the dormant Commerce Clause. Nor is the Airline Deregulation Act violated because the sick leave law binds no carrier to a rate, route, or service. And although the law has extraterritorial effect, the Due Process Clause permits this when both the employee and the airline have significant contacts with Washington. Because A4A can show no reason to enjoin Washington's sick leave law, this Court should grant summary judgment to the Washington State Department of Labor & Industries (L&I) and uphold the statute. Fed. R. Civ. P. 56(a).

## II.     FACTS

### A.     Overview

The people of Washington enacted through the initiative process a law requiring employers to provide a limited amount of paid sick leave without disciplining their employees for taking the leave. RCW 49.46.200, .210. This leave law serves an important function in advancing the public health and welfare by preventing the spread of disease and the economic loss and family disruption associated with the inability to take leave. RCW 49.46.200. The law applies to the airline industry, but A4A contests its application to flight crew (flight attendants

DEPARTMENT'S MOTION FOR
SUMMARY JUDGMENT --
NO. 3:18-cv-05092-RBL

1

ATTORNEY GENERAL OF WASHINGTON
LABOR & INDUSTRIES DIVISION
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7740

and pilots). Dkt. 1, p. 1; Johnson Decl. 2.

Alaska, for reasons explained below, is the only A4A airline operating in Washington with flight crew affected by Washington's paid and protected sick leave law. Johnson Decl. 5.[1] For the leave covered by the sick leave law, the law prohibits Alaska's practice of assessing disciplinary points if a flight attendant calls in sick. Johnson Decl. 10. Although A4A claims that applying this requirement will cause operational inconvenience, including increased costs and flight delay, Alaska has complied with the sick leave provisions of the Washington Family Care Act, which requires Alaska to allow flight attendants to take leave to care for sick family members without assessing disciplinary points. Decl. of Anastasia Sandstrom Ex. 13 at 13-14 ("AS Ex."); AS Ex. 14 at 10; *see also* Johnson Decl. 10; RCW 49.12.270. Alaska has claimed no discernible flight delay. It reports no disruption to operations, has closed no flight crew base, changed no route, and increased no fare because of the family care sick leave requirements. AS Ex. 13 at 14, 19. Other airlines have reported the ability to comply with other states' paid sick leave laws, including adapting their computer systems. AS Ex. 10 at 7, 9-10; AS Ex. 15 at 12-13, 17-19; AS Ex. 16 at 7-12.

## B. In 2016, Washington Voters Enacted a Paid and Protected Sick Leave Law, Which Advances Public Health, Family Stability, and Economic Security

Washington State voters adopted Initiative 1433 to allow for a paid and protected sick leave benefit for Washington employees under Washington's Minimum Wage Act. RCW 49.46.200, .210. Under the law, employees accrue one hour of paid sick leave for every forty hours worked. RCW 49.46.210(1)(a). Although employers may discipline employees for abuse of sick leave, employers may not discipline workers for the mere fact of taking protected leave. RCW 49.46.210(3); WAC 296-128-770; Johnson Decl. at 10.

When adopting the sick leave law, Washingtonians found "[t]he demands of the

---

[1] This is based on facts reflected by the parties' stipulation. AS Ex. 3. If these facts change, L&I's opinion could change. *See* AS Ex. 35 at 21-22. Although Alaska complies with Washington law for ground crew, it does not comply with RCW 49.46.200 and .210. Johnson Decl. 7-8; O'Brien Decl. 6.

DEPARTMENT'S MOTION FOR
SUMMARY JUDGMENT --
NO. 3:18-cv-05092-RBL

2

ATTORNEY GENERAL OF WASHINGTON
LABOR & INDUSTRIES DIVISION
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7740

1 workplace and of families need to be balanced to promote public health, family stability, and

2 economic security. It is in the public interest to provide reasonable paid sick leave for

3 employees to care for the health of themselves and their families." RCW 49.46.200.

4 Paid and protected sick leave, which workers may freely take without fear of reprisal,

5 provides at least five significant benefits. First, it benefits public health by reducing the number

6 of people coming to work sick and thus prevents the spread of disease. Watkins Decl. Ex. 1 at

7 7. Because of a lack of protected leave, workers commonly work sick. Twenty-six percent of

8 American workers go to work when sick, and another 34% go to work on the days before their

9 symptoms fully peak. *Id*. at 8. A full 37% reported going to work sick because they cannot

10 afford to miss work, and 25% reported working because their bosses expect them to work

11 through illness. *Id.* This causes serious public health problems. For example, of the

12 approximately 26 million employed Americans infected at the height of the 2009 worldwide

13 H1N1 pandemic, only 18 million took time off from work and 7 million U.S. workers were

14 infected with the H1N1 flu virus by co-workers coming to work sick during the pandemic. *Id.*

15 at 9. Contracting the flu may result in serious consequences. During the 2017-2018 flu season,

16 there were about 79,000 deaths in the country from the flu. *Id.* There were 296 laboratory-

17 confirmed influenza associated deaths in Washington State alone. AS Ex. 34 at 8.

18 Second, paid and protected sick leave laws that allow workers to take leave without

19 fear of economic reprisal economically and qualitatively benefits workers. Watkins Ex. 1 at 4,

20 7. These laws promote family stability because workers do not bring illnesses home from sick

21 co-workers and can recover quicker from illnesses to care for their families. *See id.* at 7, 13.

22 Third, Washington's paid and protected sick leave law balances the reduction of

23 economic strain and distress on workers with Washington employers' business needs. For

24 example, the law allows employers to require verification from absent ill employees after a

25 short time (three days). RCW 49.46.210(1)(g); Johnson Decl. 10. It allows employers to

26 request variances to allow longer increments of sick-leave use. WAC 296-128-640(1); *see also*

DEPARTMENT'S MOTION FOR
SUMMARY JUDGMENT --
NO. 3:18-cv-05092-RBL

3

ATTORNEY GENERAL OF WASHINGTON
LABOR & INDUSTRIES DIVISION
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7740

1  WAC 296-128-630(4). And it requires workers to give reasonable notice before taking leave.

2  RCW 49.46.210(1)(f). This balancing of employers' and employees' needs economically

3  benefits employers—several studies have found that providing paid and protected sick leave

4  leads to higher morale and productivity, less absenteeism, and lower rates of turnover. Watkins

5  Ex. 1 at 7, 14-15. Providing adequate sick leave also leads to better employee retention and

6  increased firm profits. *See id*.

7  Fourth, allowing workers the right to take sick leave without the fear of reprisal also

8  benefits state and local governments by reducing health care costs for consumers, businesses,

9  and taxpayers. Workers with illnesses not only infect others, they incur costs for doctor visits,

10  hospitalizations, and the purchase of medications and other treatments, which are avoided

11  when Washington residents can take time off to receive preventive or early intervention care.

12  *Id.* at 13-14.

13  And finally, paid and protected sick leave laws promote safety in the work place. Ill or

14  distracted employees not only operate below par, they put their coworkers at greater risk of on-

15  the-job injuries. *Id.* at 16.

16  **C.      Paid and Protected Sick Leave Laws Applied to the Airline Industry Provide Critical Benefits to Workers and Society**

17  Washington's sick leave law applies to the airline industry. Johnson Decl. 2. As noted

18  above, workplace sick leave laws are critical to public safety, a principle that applies with

19  special force to airlines. Pilots report that they must be fit to fly and that flying sick can reduce

20  their concentration and endanger passengers. *Id.*; Moynihan Decl. 2-4. Washington's sick law

21  thus helps ensure flight crews fly planes safely.

22  Preventing the spread of illness in the airline industry is likewise of utmost importance.

23  Medical professionals and public health experts consistently recommend that sick people stay

24  home until their symptoms subside, or sometimes longer. Watkins Decl. Ex. 1 at 4, 10. The

25  European Centre for Disease Prevention and Control concluded that air travel caused the

26

1  spread of SARS (the severe acute respiratory syndrome caused by a coronavirus first reported

2  in Asia) in 2003 and of H1N1 between countries in 2009. Watkins Decl. Ex. 1 at 10-11. The

3  CDC advises people with flu-like symptoms not to travel. *Id*. at 10. Failing to follow this

4  advice prolongs recovery and spreads disease. *Id*. at 4.

5       The flu and RSV (respiratory syncytial virus, which causes bronchitis) are both

6  commonly transmitted through tiny droplets in the air when someone coughs, sneezes, or talks.

7  *Id.* at 8. Tuberculosis, meningococcal disease, and measles, are also transmitted through

8  respiratory droplets. *Id*. The airborne droplets spread easily in workplaces and public spaces,

9  including airplanes. *Id*. Flight attendants move throughout the aircraft and handle items also

10  handled by passengers, which increases both theirs and passengers' exposure. *Id*. at 11. A

11  recent study suggests that flight crewmembers are far more likely to infect someone else on the

12  flight (6.6 times more likely) than a sick passenger, and are themselves at higher risk for

13  developing illness in the first place. *Id.* at 4.

14       Although airlines often provide sick leave benefits beyond the 40 hours required by

15  Washington's law, Alaska's policies discourage its workers from taking sick leave. Dkt. 1, p.

16  8; AS Ex. 4 at 3; AS Ex. 5 at 3; AS Ex. 6 at 3; AS Ex. 13 at 51-52; Andrew Decl. 2; Levin

17  Decl. 2; Rafferty Decl. 2-3; Ruiz Decl. 2. If an Alaska flight attendant takes a day of sick leave

18  for the flight attendant's own illness, Alaska will assess the flight attendant at least a one-half

19  disciplinary point, and up to a two-and-a-half disciplinary point maximum. AS Ex. 6 at 3; AS

20  Ex. 13 at 52. If a flight attendant gets sick at the last moment, Alaska assesses the flight

21  attendant two disciplinary points. AS Ex. 6 at 3; AS Ex. 13 at 51. Accumulating points may

22  lead to discipline, and even termination. AS Ex. 6 at 3. Flight attendants report working sick

23  because they are afraid they will accumulate disciplinary points. Andrew Decl. 2; Levin Decl.

24  2; Rafferty Decl. 2-3; Ruiz Decl. 2. Alaska does not assess points on pilots. Ex. 38 at 44.

25

26

**D.    Washington's Sick Leave Law Applies to Washington-Based Employees Only; Here Only Alaska Has Washington-Based Employees**

A4A retained Darin Lee, PhD, to support its complaint, and he based his analysis on the assumption that Washington law requires employers to comply with sick leave laws "by virtue of an airline's pilots and flight attendants performing work in the airspace above their state." Lee Rep. 28, 30. This is not Washington's practice, however. Johnson Decl. 3-5, 10-11.

Washington's paid sick leave law does not apply to all flight attendants and pilots flying in and out of Washington. *Id.* at 4-5. As L&I's program manager for employment standards, David Johnson, explains, Washington instead looks to see if the flight attendant or pilot is Washington-based. *Id.* at 3. This determination is based on choice of law principles as directed by the Washington Supreme Court. *Id.*; *Bostain v. Food Exp., Inc.*, 153 P.3d 846, 855-56 (Wash. 2007) (holding that RCW 49.46 "regulates only employers who are doing business in Washington and who have hired Washington-based employees.").

In determining whether an employee is Washington-based, L&I looks to whether the employee has, among the states, the most significant relationship with Washington. Johnson Decl. at 3; AS Ex. 27 at 3; Restatement (2nd) of Conflicts of Law § 9 (1971); *see Burnside v. Simpson Paper Co.*, 864 P.2d 937, 940-41 (Wash. 1994); *also Dow v. Casale*, 989 N.E.2d 909, 913-14 (Mass. App. Ct. 2013). L&I does not consider flight crewmembers Washington-based just because they are domiciled in Washington.[2] Johnson Decl. at 4. And if an employee's only relationship with Washington State is that the employee flies in and out of Washington, that would not alone make the employee Washington-based either. Johnson Decl. at 4-5. Instead of looking to those factors in isolation, L&I looks to the totality of the employee's Washington contacts—including the connections the employer has with Washington—to determine whether the sick leave law applies. AS Ex. 27 at 3.

---

[2] Flight crews generally work out of a "base" airport or "domicile" airport and flight crews bid for flight segments that begin and end at their domicile airports. Johnson Decl. 4. For example, Alaska domiciles flight crew at SeaTac International Airport. AS Ex. 13 at 5-6.

DEPARTMENT'S MOTION FOR
SUMMARY JUDGMENT --
NO. 3:18-cv-05092-RBL

6

ATTORNEY GENERAL OF WASHINGTON
LABOR & INDUSTRIES DIVISION
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7740

1    A4A has nine member airlines. Dkt. 1, p. 4. The parties limited the airlines of interest

2    to Alaska (and Virgin America Airlines, which Alaska now owns), American Airlines,

3    Southwest Airlines, and United Airlines. The airlines stipulated to the contacts they have with

4    Washington. AS Ex. 3. American Airlines, Southwest Airlines, and United Airlines have no

5    flight crew domiciled in Washington; nor do they have bases of operations in Washington. AS

6    Ex. 3 at 4-5. In contrast, Alaska has flight crewmembers domiciled in Washington; it has its

7    corporate headquarters in Washington; it has a physical work site in Washington; and it pays

8    Washington unemployment and workers' compensation obligations. AS Ex. 3 at 3. Because

9    Washington regulates only employees with significant relationships to Washington, L&I

10   employment standards manager Johnson concluded that, of A4A's airlines, only Alaska has

11   Washington-based employees subject to the sick leave law. Johnson Decl. at 5.

12       Once subject to Washington's law, Washington law covers all the Washington-based

13   flight crew's hours worked. *See Bostain*, 153 P.3d at 855 (noting "[e]mployers will need to

14   identify those employees who are subject to Washington's MWA and keep track of total

15   hours"); AS Ex. 35 at 5. And there is no need to track time spent in specific jurisdictions

16   provided Alaska tracks the total hours worked. For its flight attendants, Alaska pays work by

17   the trip. One way L&I allows companies that pay by piecework to comply is to convert to an

18   hourly amount by a conversion formula. AS Ex. 35 at 6-8, 12-19. According to a Southwest

19   insider, such conversions are easy to perform. AS Ex. 16 at 33. In any event, Alaska tracks

20   pilots and flight attendants' work by their hours. AS Ex. 14 at 7-9; AS Ex. 26 at 31-32; AS Ex.

21   30 at 20-25; AS Ex. 37 at 29-31, 33, 35; AS Ex. 38 at 3-7, 33-35, 40-41, 51, 56-57.

22   **E.    Paid and Protected Sick Leave Laws Have Minimal Adverse Effects on the Airline
23          Industry**

24       **1.    Airlines follow other paid and protected sick leave laws**

25   The sick leave law adopted in Initiative 1433 is not Washington's only sick leave law.

26   The Washington Legislature adopted the Family Care Act in 1988. RCW 49.12.270. This law

requires employers, including Alaska, to allow their employees to use their existing leave to take care of a sick family member. *Id.* Alaska has long allowed its crew to use paid sick leave to care for sick family members without assessing disciplinary points. AS Ex. 13 at 14; AS Ex. 14 at 10.[3] Alaska's rule 30(b)(6) representative, managing director of labor relations Elizabeth Ryan, admitted that following this law has caused no operational difficulties for Alaska and that it has closed no flight crew base, changed no route, and increased no fare because of following the law. AS Ex. 13 at 14, 19.

Alaska has addressed a situation, in which different states have different family-care-law requirements, by adopting from among their flight attendants' domiciles, the laws most flight-attendant favorable and applying those laws system wide. AS Ex. 1 at 2-17; AS Ex. 2 at 3; AS Ex. 13 at 13; *see also* Watkins Ex. 1 at 18. Or an airline may use the law of the employee's domicile, as Alaska does for its workers' compensation program. AS Ex. 25 at 5-6; *see* AS Ex. 31 at 2-4. Following applicable laws, Southwest and American use the place of the domicile when complying with paid sick leave laws. AS Ex. 10 at 18; AS Ex. 19 at 8-9; *see also* AS Ex. 15 at 18-19; AS Ex. 16 at 32.

American Airlines has a system of tracking the requirements of paid sick leave laws. AS Ex. 10 at 7, 9. For example, it applies Massachusetts' leave law to flight attendants based in Massachusetts. AS Ex. 10 at 18. And even though it has a disciplinary points system, the airline assesses no points to Massachusetts flight crew for sick leave use. AS Ex. 10 at 26-27.

According to American's vice president of operations and crew performance Charles Schubert, American does not consider the economics of sick leave when deciding where to fly. "It is not germane to the conversation. It's not going to have an impact as to where we fly or where we don't fly." AS Ex. 8 at 25. Schubert was unaware of sick leave usage causing the

---

[3] The Ninth Circuit held that federal collective bargaining laws do not preempt Washington's requirement that flight crew be able to use vacation leave for family care purposes. *Alaska Airlines Inc. v. Schurke*, 898 F.3d 904, 926-28 (9th Cir. 2018), *cert. denied* 139 S. Ct. 1445 (2019).

DEPARTMENT'S MOTION FOR
SUMMARY JUDGMENT --
NO. 3:18-cv-05092-RBL

8

ATTORNEY GENERAL OF WASHINGTON
LABOR & INDUSTRIES DIVISION
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7740

1  airline to close a flight crew base or change a route or fare. AS Ex. 9 at 25-26.

2        Southwest has also developed the tools to handle compliance with multiple

3  jurisdictions' laws. Its record-keeping system tracks leave in different jurisdictions for many

4  local laws. AS Ex. 15 at 19; AS Ex. 16 at 7-10. The airline is complying with Baltimore,

5  Oakland, Atlanta, and Los Angeles laws, and its senior director of crew support and in-flight

6  operations, Wayne Shaw, is unaware of any operational impacts related to compliance with

7  sick leave laws. AS Ex. 15 at 5, 13; *see also* AS Ex. 16 at 11-13. Shaw was unaware of any

8  decision by Southwest not to fly any particular route because of a paid sick leave law. AS Ex.

9  15 at 18. He noted that Southwest had recently expanded in Los Angeles, which has a sick

10  leave law. AS Ex. 15 at 18. Southwest has no plan to close flight crew bases. AS Ex. 16 at 11-

11  13; AS Ex. 17 at 9. The airline has a significant presence at Baltimore, which has sick leave

12  laws, and has not changed routes in Maryland because of sick leave laws. AS Ex. 16 at 11.

13        United abides by California's kin care law. *See* AS Ex. 19 at 8-9. It attributes no flight

14  crew base closures, fare changes, or route changes to compliance with paid sick leave laws. AS

15  Ex. 20 at 5-6; AS Ex. 7 at 13; Ex. 19 at 11. United does not supply data about sick leave to

16  those in charge of setting fares. AS Ex. 19 at 6-7; AS Ex. 20 at 7.

17        After reviewing the data from several airlines, airline expert Robert Mann concluded

18  airlines "are successfully managing crew resources under the auspices of differing state and

19  local leave laws." Mann Ex. 1 at 62. He observes that "airlines operate across the nation and

20  the world, and have adapted to many different wage and hour laws, labor protection practices,

21  minimum wage, and taxing laws across those jurisdictions. Yet the airline industry continues to

22  thrive . . . ." Mann Ex. 1 at 58; *see also id.* at 8.

23        The airlines often replace sick crewmembers with healthy flight crew from their

24  reserves and other sources, and they use sophisticated tools to anticipate reserve levels and

25  manage scheduling demands. Mann Ex. 1 at 7-8, 31-33, 55-57; Tregillis Ex. 1 at 66-67; AS Ex.

26  8 at 29-58; AS Ex. 10 at 12-15; AS Ex. 13 at 47-48; AS Ex. 15 at 7-9; AS Ex. 16 at 22-30; AS

Ex. 17 at 10-12; AS Ex. 19 at 14; AS Ex. 20 at 7-22; AS Ex. 21 at 20-34; AS Ex. 26 at 10-30. They have dealt with increasing use of sick leave and sick leave abuse, regardless of sick leave laws, for years. Mann Ex. 1 at 55-57; AS Ex. 9 at 24-25; AS Ex. 11 at 6-10; AS Ex. 15 at 20-21; AS Ex. 18 at 5-8.

> **2.      Minimal negative effects occur to airlines, including Alaska, because of paid and protected sick leave**

Despite the industry's record of successfully complying with state and local sick leave laws and managing crew absences, Dr. Lee opined that paid sick leave laws cannot work in the airline industry. He posits that flight attendants likely will take leave if not assessed disciplinary points leading to flight delays, which will somehow destabilize the airline industry. Tregillis Ex. 1 at 13 (citing Lee report). But A4A offers little evidence of these purported effects. In fact, Dr. Lee's report confirms that the effects of sick leave laws on the flow of goods are minimal. Looking at Virgin and its compliance with New York's sick leave law starting in April 2015, Dr. Lee found no statistically significant increase in flight delays in Virgin's year ending March 2016 or March 2017. Tregillis Ex. 1 at 32-33, 37; Lee Ex. 21; AS Ex. 28 at 7-8. And in 2017, in the seven months before the closure of the JFK flight attendant base, Dr. Lee found only a 1.20 percentage-point increase in delays of at least 15 minutes, from April through October 2017. Tregillis Ex. 1 at 24, 32-33.[4]

Likewise, JetBlue, an airline that did not follow New York's law had more delays than Virgin. Dr. Lee calculated the delay rate on high sick days in two airlines that operated in New York and found that JetBlue, which did not follow the New York sick leave law, had a 2.5% increase in delay rate, while Virgin, which followed the New York law, had only a 2.4% increase in delay rate. Mann Ex. 2 at 3; AS Ex. 22 at 3; AS Ex. 29 at 3.[5]

---

[4] The U.S. Department of Transportation considers a flight late if it is late by 15 minutes or more. Mann Ex. 1 at 17.

[5] Alaska and Southwest had the same .9% delay increase even though Southwest fully complies with sick leave laws and Alaska does not.

DEPARTMENT'S MOTION FOR
SUMMARY JUDGMENT --
NO. 3:18-cv-05092-RBL

10

ATTORNEY GENERAL OF WASHINGTON
LABOR & INDUSTRIES DIVISION
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7740

1    Even so, the minimal increase in delays, alleged by Dr. Lee to be linked to sick leave

2    laws or with sick leave taken in general, would have little effect on the airline industry.

3    Airlines contemplate an 80% to 85% on-time performance rate. Mann Ex. 1 at 6, 16-31; AS

4    Ex. 8 at 59. Thus, as airline expert Mann pointed out, Dr. Lee's suggested increase in delay is

5    indistinguishable from all other delays and would be "virtually imperceptible." Mann Ex. 2 at

6    3; *see also* Mann Ex. 1 at 6-7, 11, 15, 24, 27, 31; AS Ex. 21 at 4-5, 9; Tregillis Ex. 1 at 33-34.

7    And according to Mann, there is no evidence that a slight increase would affect U.S. passenger

8    flight habits and experience. Mann Ex. 1 at 6-7, 11, 31; Mann Ex. 2 at 3. "Over a period of

9    decades, the American flying public has become habituated and conditioned to airline flight

10    delays, and tolerates flight delays for all sorts of reasons, with wide variability in flight-by-

11    flight on-time performance, and airlines thrive." Mann Ex. 2 at 4; Mann Ex. 1 at 53-55. In

12    recent years, the number of passengers went up despite an industry average of 79% on-time

13    performance, with high customer satisfaction. AS Ex. 24 at 6, 11, 44-45; AS Ex. 33 at 3.

### III.    STANDARD OF REVIEW

15    Under Rule 56(a), the court grants summary judgment "if the movant shows that there

16    is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

17    of law." The moving party has the initial burden to prove the lack of any genuine issue of

18    material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001). When the nonmoving

19    party has the burden of proof at trial, the moving party may carry this burden without

20    introducing any affirmative evidence (such as declarations or deposition excerpts), and may

21    simply point out the lack of evidence to support the nonmoving party's case. *Id.*; *Celotex Corp.*

22    *v. Catrett*, 477 U.S. 317, 325 (1986); CR 56(c)(1)(B). Upon meeting its burden, the moving

23    party is entitled to judgment as a matter of law when the nonmoving party fails to make a

24    sufficient showing on an essential element of a claim for which the nonmoving party has the

25    burden of proof. *Celotex*, 477 U.S. at 323. The nonmoving party may not rely on mere

26    allegations or denials in the pleadings, but must set forth facts showing that there is a genuine

1     issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

2                         **IV.  ARGUMENT**

3        States have broad authority to regulate employment relationships to protect workers,

4 including using wage and hour laws. *De Canas v. Bica*, 424 U.S. 351, 356 (1976). Courts

5 presume that they will not disturb the states' police powers unless Congress clearly showed an

6 intent to do so. *See Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). Consistent with

7 these principles, Washington has a significant interest in regulating the employment

8 relationship of employers and employees with significant contacts with Washington. Alaska

9 and other airlines have followed other paid sick leave laws, and A4A shows no reason

10 Washington cannot apply its sick leave law to Washington-based flight crews.

11 **A.  Washington's Sick Leave Law Is a Legitimate Exercise of Police Power Under the**
**Dormant Commerce Clause Because It Advances Important Public Interests With**
12 **Little Effect on Interstate Commerce**

13        The Commerce Clause provides that "Congress shall have Power . . . [t]o regulate

14 Commerce . . . among the several States." U.S. Const., art. I, § 8, cl. 3. The clause protects

15 against economic protectionism, but allows state laws directed toward legitimate local

16 concerns such as public health. *City of Philadelphia v. New Jersey*, 437 U.S. 617, 623-24

17 (1978).

18        In analyzing dormant Commerce Clause claims, courts first look to see if Congress

19 authorized the state law. *W. & S. Life Ins. Co. v. State Bd. of Equalization*, 451 U.S. 648, 652-

20 53 (1981). If Congress did, then the dormant Commerce Clause does not apply and the analysis

21 ends. *Id*. If Congress did not expressly authorize the law, courts next ask whether it

22 discriminates against interstate commerce on its face. *S. Dakota v. Wayfair, Inc.*, 138 S. Ct.

23 2080, 2091 (2018). If it does, the state law cannot stand. *Id*. But if the law "regulates

24 evenhandedly to effectuate a legitimate local public interest," courts will uphold the law

25 "unless the burden imposed on such commerce is clearly excessive in relation to the putative

26 local benefits." *Pike v. Bruce Church, Inc*., 397 U.S. 137, 142 (1970).

DEPARTMENT'S MOTION FOR
SUMMARY JUDGMENT --
NO. 3:18-cv-05092-RBL

12

ATTORNEY GENERAL OF WASHINGTON
LABOR & INDUSTRIES DIVISION
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7740

Washington's sick leave law easily survives this analysis. Through the Family Medical Leave Act (FMLA), Congress expressly authorized states to enact laws that are more protective than federal sick leave laws. 29 U.S.C. § 2651(b). Because Congress has so acted, the dormant Commerce Clause analysis ends there.

But even if Congress had not acted, A4A does not contend that Washington's law discriminates against out-of-state firms. Dkt. 1, p. 1-3, 15-16. And, the sick leave law's manifest benefits to Washingtonians vastly outweigh the incidental and speculative burdens claimed by A4A. Thus, Washington's sick leave law easily survives dormant Commerce Clause scrutiny.

## 1.    Congress has authorized the states to have local and state leave laws

Congress rejected the airline industry's attempt to evade state sick leave laws, and has expressly authorized local laws that are stronger than federal protections. "If Congress ordains that the States may freely regulate an aspect of interstate commerce, any action taken by a State within the scope of the congressional authorization is rendered invulnerable to Commerce Clause challenge." *W. & S. Life Ins. Co.*, 451 U.S. at 652-53; *see also Ne. Bancorp, Inc. v. Bd. of Gov'rs of Fed. Res. Sys.*, 472 U.S. 159, 174 (1985) ("Congress's commerce power in such instances is not dormant, but has been exercised."). This is no less true when state regulation affects the airline industry. *See Hirst v. SkyWest, Inc.*, 910 F.3d 961, 967 (7th Cir. 2018), *cert. denied*, 2019 WL 861245 (Mem). In *Hirst*, the court rejected an airline's argument that the dormant Commerce Clause precluded a state's wage and hour law's application. *Id*. Because Congress's savings clause expressly authorized state wage regulations that exceed the protections of the Fair Labor Standards Act, the state law's effect on interstate commerce was irrelevant. *Id*.

The same reasoning applies here. Congress expressly permits local sick leave laws that exceed federal protections. The FMLA provides for unpaid time off from work for illness and allows states to have stronger laws. 29 U.S.C. § 2651(b) ("Nothing in this Act or any

DEPARTMENT'S MOTION FOR
SUMMARY JUDGMENT --
NO. 3:18-cv-05092-RBL

13

ATTORNEY GENERAL OF WASHINGTON
LABOR & INDUSTRIES DIVISION
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7740

amendment made by this Act shall be construed to supersede any provision of any State or

local law that provides greater family or medical leave rights than the rights established under

this Act or any amendment made by this Act."). Washington's law does not violate the

dormant Commerce Clause because Congress acted and authorized the states to adopt and

provide stronger protections. *See Hirst*, 910 F.3d at 967. And, the FMLA shows that Congress

knows how to adopt federal regulation about sick leave in the airline industry and has chosen

not to give airlines an exception from providing sick leave benefits. 29 U.S.C. § 2611(2)(D)

(flight crews covered based on hours of service).

> **2.    The Washington paid and protected sick leave law regulates evenhandedly to effectuate the legitimate local public interest of promoting public health, family stability, and economic security**

Even if Congress did not expressly authorize state sick leave laws such as

Washington's, A4A's dormant Commerce Clause challenge still fails. The dormant Commerce

Clause allows state laws that address public health and labor standards concerns. *Nat'l Ass'n of

Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1148 (9th Cir. 2012). It should not "be

used to bar a state from exercising its own police powers in order to combat" pressing concerns

of its citizens. *Pac. Merch. Shipping Ass'n v. Goldstene*, 639 F.3d 1154, 1182 (9th Cir. 2011).

Washington's law advances legitimate local interests. Washington voters have

determined that "reasonable paid sick leave" is an important employee right, necessary to

balance "[t]he demands of the workplace and of families" with "public health, family stability,

and economic security." RCW 49.46.200. In enacting its paid and protected sick leave law,

Washington has acted within the traditional scope of its police powers to protect important

health and welfare interests of its workers.

Washington's sick leave law rationally promotes the public interest in many ways. *See*

Part II.B *supra*. It also provides a significant public benefit when applied to flight crews. *See*

Part II.C *supra*. Sick pilots and flight attendants lead to unsafe flights and the spread of

disease. Moynihan Decl. 2-4; Johnson Decl. 5; Watkins Ex. 1 at 4. Yet Alaska flight attendants

DEPARTMENT'S MOTION FOR
SUMMARY JUDGMENT --
NO. 3:18-cv-05092-RBL

14

ATTORNEY GENERAL OF WASHINGTON
LABOR & INDUSTRIES DIVISION
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7740

report flying sick because they fear disciplinary points, which is precisely the harm that Washington's law seeks to address. Andrew Decl. 2; Levin Decl. 2; Rafferty Decl. 2-3; Ruiz Decl. 2. Washingtonians should not face unnecessary exposure to unsafe flights and disease because Alaska discourages flight crew from staying home when they are sick. AS Ex. 6 at 3. And, Washington is rightly concerned with the financial and emotional toll on its citizens from a disciplinary policy that punishes the use of sick leave. *See* Watkins Ex. 1 at 4, 7; RCW 49.46.200. Even Alaska agrees that flight crew should not fly sick because safety is Alaska's number one concern. AS Ex. 13 at 20-22.

> **3.** **A4A shows no burden on interstate commerce; it shows only a speculative incidental effect on Alaska's operations**

A4A alleges effects of the sick leave law that do not meet the legal standard to show a commerce clause burden. If anything, it shows only an incidental burden on commerce. But an incidental burden is not enough. Instead, "[a] critical requirement for proving a violation of the dormant Commerce Clause is that there must be a *substantial burden* on *interstate commerce.*" *Nat'l Ass'n of Optometrists & Opticians*, 682 F.3d at 1148 (emphasis original). Because it mainly protects against discrimination and economic protectionism, "it is not surprising that a state regulation does not become vulnerable to invalidation under the dormant Commerce Clause merely because it affects interstate commerce." *Id.*

A4A's claims of interstate burden are speculative and include burdens that only affect one firm, Alaska. A single-firm effect shows no constitutional violation and, even assuming there is an incidental effect on interstate commerce, there is no substantial burden.

> **a.** **Operational inconvenience shows no dormant Commerce Clause violation under *Exxon, CTS, Burlington Northern, Pacific Merchant,* and *Bernstein***

Additional sick leave use may cause increased operational inconvenience, including increased costs, but such effects do not implicate the dormant Commerce Clause under well-established case law. The critical question is whether the law substantially burdens the free

DEPARTMENT'S MOTION FOR
SUMMARY JUDGMENT --
NO. 3:18-cv-05092-RBL

ATTORNEY GENERAL OF WASHINGTON
LABOR & INDUSTRIES DIVISION
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7740

flow of goods in the market as a whole, not whether it merely affects a company's operations. The impact on an individual company's structure or operations (or even an industry's structure), is not the standard.

The Court has rejected the "notion that the Commerce Clause protects the particular structure or methods of operation in a retail market." *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 127 (1978). And "the Clause protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations." *Id.* at 127-28. In *Exxon*, Maryland prohibited refineries from operating retail gas stations in Maryland, forcing Exxon to close 36 retail stores and causing three refineries to not sell in Maryland. *Exxon*, 437 U.S. at 122-23. Despite the closures, the Supreme Court held that affecting the market structure and an individual firm constituted no burden on interstate commerce. *Id.* at 127-28. In *CTS Corp. v. Dynamics Corp. of America*, the Court cited *Exxon* and held that even though the state law could make corporate mergers harder, this did not offend the dormant Commerce Clause. 481 U.S. 69, 93-94 (1987) ("Accordingly, even if the Act should decrease the number of successful tender offers for Indiana corporations, this would not offend the Commerce Clause."). As these cases show, operational inconvenience to a company in complying with a law establishes no burden. *See Brown v. Hovatter*, 561 F.3d 357, 364-65 (4th Cir. 2009) (inconvenience to a firm does not show dormant Commerce Clause violation).

The airlines report operational inconvenience in four ways, none of which is a substantial burden under *Exxon* and *CTS*. In all ways, the airlines mistake a regulatory obligation on a business (which is constitutionally acceptable), with a burden on interstate commerce. First, the increased use of sick leave does not implicate the dormant Commerce Clause even if it makes coverage of flights harder—states may impose a regulatory requirement that makes business operations harder without running afoul of the dormant Commerce Clause. *See, e.g.*, *CTS*, 481 U.S. at 93-94. It is reasonable that if sick leave were available without discipline, more employees may feel empowered to use it when sick. After

DEPARTMENT'S MOTION FOR
SUMMARY JUDGMENT --
NO. 3:18-cv-05092-RBL

16

ATTORNEY GENERAL OF WASHINGTON
LABOR & INDUSTRIES DIVISION
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7740

all, flight attendants report flying sick now, but Washingtonians intended that workers not come to work sick. Andrew Decl. 2; Levin Decl. 2; Rafferty Decl. 2-3; Ruiz Decl. 2; RCW 49.46.200. That Alaska must find coverage for sick workers shows no constitutional violation. Airlines already must manage sick leave with and without reference to sick leave laws. Yet the airlines successfully fly countless passengers each year even though sometimes their employees get sick. Airlines, including Alaska, have sophisticated systems in place to predict absences to determine reserve levels and to cover absences. Part II.E.1 at 9, *supra*.

A4A argues that because airlines cannot use doctor's notes for shorter absences (*i.e.* less than three days), or use points systems for statutory leave, flight attendants will improperly use the law and call in sick when they are not sick.[6] It might well be true that someone could misuse the new law, but A4A can only offer speculation about the frequency of such occurrences, which does not meet A4A's burden of proof on summary judgment. *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) ("Mere allegation and speculation do not create a factual dispute for purposes of summary judgment."). Nor does A4A show why the airlines' sophisticated skills in predicting patterns of leave, including time periods when misuse traditionally occurs, would not allow for enough reserves. *See* 2d Ryan Decl. 14. In any event, the voters made the decision that even though there could be misuse, this possibility was outweighed by the law's important benefits. *See* RCW 49.46.200. This sort of legislative weighing is not second-guessed by the courts in a dormant Commerce Clause case. *See Exxon Corp.*, 437 U.S. at 128 (in commerce clause inquiry court does not question "wisdom of the statute"); *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 355 (2008) (judiciary does not supplant legislative decisions under dormant Commerce Clause).

Second, A4A makes arguments about updating Alaska's computer systems. *E.g.*,

---

[6] For flight attendants, Alaska's current policy allows minimal use of doctor's notes, so it is difficult to see what difference this would make. AS Ex. 12 at 25; AS Ex. 13 at 53. Employers may still discipline crewmembers who abuse sick leave. Johnson Decl. 10. Sick leave abuse is something the airlines have dealt with for years. *See* AS Ex. 9 at 24-25.

DEPARTMENT'S MOTION FOR
SUMMARY JUDGMENT --
NO. 3:18-cv-05092-RBL

17

ATTORNEY GENERAL OF WASHINGTON
LABOR & INDUSTRIES DIVISION
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7740

O'Brien Decl. That one airline must update its systems does not violate the dormant

Commerce Clause. *See Exxon Corp.*, 437 U.S. at 127-28 (the dormant Commerce Clause does

not protect particular interstate firms from regulation). Alaska argues it would be hard for it to

change its computer system to adapt to Washington's law. 2d Ryan Decl. 5; Jain Decl. 6-7;

O'Brien Decl. 10.[7] But this is a concern peculiar to Alaska. American and Southwest could

change their computer systems, and nothing about paid sick leave laws makes it impossible for

Alaska's computer systems to work. The only thing Alaska shows here is that it is not nimble,

which is not the fault of Washington's law. AS Ex. 10 at 7, 9; AS Ex. 15 at 19; AS Ex. 16 at 7-

10.[8] Relatedly, A4A argues the requirement to take leave in one-hour increments is

burdensome. Lee Rep. 54. Again, difficulty in compliance is not a commerce clause burden.

*CTS*, 481 U.S. at 93-94. And an airline can apply for a variance for this requirement, rendering

---

[7] Alaska notes that it would take 15 months to change one key system but it has not even tried to update it. O'Brien Decl. 10. I-1433 was adopted in November 2016 and the paid sick leave provision went into effect January 1, 2018, giving Alaska time to change its systems.

[8] O'Brien believes that the sick leave law would require Alaska's systems to:
(1) track the hours its flight crew performed work as defined under the Law for sick leave accrual purposes; (2) track the location(s) where that work was performed; (3) establish a separate sick leave bank under the Law; (4) track sick leave usage under the Law; (5) pay flight crew for sick leave used based on a "normal hourly compensation" rate; and (6) regularly report accrual and usage to each employee.

O'Brien Decl. 6. He argues that modifying Alaska's flight crew systems to comply with those requirements may not be possible. O'Brien Decl. 6. This opinion is speculative and lacks foundation. (1) Alaska already tracks hours. AS Ex. 14 at 7-9; AS Ex. 26 at 31-32; AS Ex. 30 at 20-25; AS Ex. 37 at 29-31, 33, 35; AS Ex. 38 at 3-7, 33-35, 40-41, 51, 56-57. Alaska also tracks flight attendant work by trip in its trip for pay (TFP) model. L&I works with employers that pay by piecework, allowing conversion formulas. Alaska uses a 1.13 conversion rate in its collective bargaining agreement (CBA) and L&I's employment standards manager Johnson said that could be used to calculate hours worked. AS Ex. 35 at 6-20; AS Ex. 13 at 49; AS Ex. 37 at 36. (2) Alaska need not track locations where the work was performed for Washington-based employees, as all hours count. AS Ex. 35 at 5. (3) Although a separate leave bank may be established, it is not required. Johnson Decl. 9. But Virgin was able to use a separate leave bank. AS Ex. 12 at 30. (4) Airlines must track sick leave usage, but this is already done by airlines. AS Ex. 37 at 36-37. (5) It is true that flight attendants need to be paid their normal compensation, but this is already done under the TFP system. AS Ex. 35 at 6-20. Employers may pay by piecework. WAC 296-128-670(2)(b). (6) Reporting sick leave use and accrual presents no particular challenge for airlines such as Alaska that already keeps track of this information. AS Ex. 13 at 23; Mann Ex. 3 at 4-5. Alaska is able to manage complying with sick leave for ground crew. Johnson Ex. 3 at 4-5.

it speculative that this would be a burden. WAC 296-128-640(1); *see also Hill v. Garda CL Nw., Inc.*, 394 P.3d 390, 401-02 (Wash. Ct. App. 2017), *rev'd on different grounds*, 424 P.3d 207 (Wash. 2018); Johnson Decl. 6. Alaska has not approached L&I about seeking a variance. Johnson Decl. 6; AS Ex. 3 at 3.

Third, Alaska also complains that it will have to update its CBAs to comply with the law. 2d Decl. Ryan 4. There is no authority that the dormant Commerce Clause shields airlines from complying with state laws if their CBAs are inconsistent with state law. State law controls over CBAs, and such agreements must give way to nonnegotiable state rights. RCW 49.46.090 (cannot have private agreement to waive requirements of RCW 49.46); *see also Alaska Airlines*, 898 F.3d at 919-20; AS Ex. 30 at 9-20, 26-27; AS Ex. 35 at 10-11. And importantly, operational problems with one firm shows no substantial burden on interstate commerce. *Exxon Corp.*, 437 U.S. at 127-28.

Finally, A4A argues airlines will incur costs to cover more absences, to account for delays, and to change Alaska's computer systems to apply the law. Lee Rep. 8-9; O'Brien Decl. 10; 2d Ryan Decl. 15. But the court has rejected arguments that cost increases alone— which is what A4A's arguments boil down to—violate the dormant Commerce Clause. *See Burlington Northern R. Co. v. Dep't of Public Serv. Reg.*, 763 F.2d 1106, 1114 (9th Cir. 1985); *Pac. Merch.*, 639 F.3d at 1159, 1177-82. In *Burlington Northern*, state law compelled the railroad to maintain freight agency operations at stations it considered economically wasteful. 763 F.2d at 1108. But the court upheld the law, and explained that "a loss to the company does not, without more, suggest that the Montana statute impede[s] substantially the free flow of commerce from state to state." *Id.* at 1114 (quotation omitted). In *Pacific Merchant Shipping*, the Ninth Circuit rejected a commerce clause challenge to California's vessel fuel rules even though compliance with those rules would cost the industry hundreds of millions of dollars annually. 639 F.3d at 1159.

Courts have adopted the same analysis for the airline industry. In *Bernstein v. Virgin*

ATTORNEY GENERAL OF WASHINGTON
LABOR & INDUSTRIES DIVISION
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7740

*America, Inc.*, the district court cited *Pacific Merchant* and rejected a commerce clause claim related to the airline's obligation to follow state minimum wage laws, including staffing levels for rest breaks. 227 F. Supp. 3d 1049, 1069 (N.D. Cal. 2017). The airline's cost of compliance was estimated at $100 per flight, and this was acceptable given it was "relatively small" compared to the overall cost of a flight. *Id.*

These cases are indistinguishable from the situation here. To support its dormant Commerce Clause claim, A4A mainly offers no more than general assertions that increased use of sick leave increases costs. AS Ex. 36 at 3-4.[9] But even if Alaska would face increased costs, under *Burlington Northern*, *Pacific Merchant Shipping*, and *Bernstein*, these costs constitute no impermissible burden on interstate commerce.

A4A claims that because of increased costs and the need to cover absences, Alaska will have to reduce flights and lose market share. Harrison Decl. 7. Alaska speculates about the extent of these effects but, in any event, neither reduction in services to consumers nor a reduced market share to a business is a basis to find a dormant Commerce Clause violation. As detailed above, in *Exxon* the challenger was permissibly required to close 36 retail shops— which affected both its market share and consumers—yet the Court found no commerce clause violation. *Exxon*, 437 U.S. at 119, 127-28; *see also Nat'l Ass'n of Optometrists & Opticians*, 682 F.3d at 1151-53. It may well be true that Alaska will face reduced profits—but the dormant Commerce Clause does not protect profits. *Nat'l Ass'n of Optometrists & Opticians*, 682 F.3d at 1154 ("not a significant burden on interstate commerce merely because a non-discriminatory regulation precludes a preferred, more profitable method of operating in a retail market."); *Pharmaceutical Care Mgm't Ass'n v. Rowe*, 429 F.3d 294, 313 (1st Cir. 2005)

---

[9] Alaska does claim it would cost "many millions of dollars" to change its computer system. O'Brien Decl. 10. But Alaska now routinely spends millions of dollars to fix its over 615 computer systems. Jain Decl. 3; AS Ex. 37 at 47. It spent $60 million to adapt its software after the Virgin merger, and it spends over a million to adapt its software after changes to collective bargaining agreements. AS Ex. 37 at 47. Plainly, this is part of its business model to incur these costs and it still functions as a successful business, flying 438,000 flights yearly. Mann Ex. 3 at 10-11; AS Ex. 39 at 4.

DEPARTMENT'S MOTION FOR
SUMMARY JUDGMENT --
NO. 3:18-cv-05092-RBL

20

ATTORNEY GENERAL OF WASHINGTON
LABOR & INDUSTRIES DIVISION
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7740

(reiterating that burdening a company's profits "is not violative of the Commerce Clause").

> **b.** **A4A's claim of increased delays demonstrates no commerce clause claim because consumer inconvenience is not a significant burden on interstate commerce**

A4A's primary witness, Dr. Lee, posits that increased use of sick leave will contribute to additional flight delays leading to increased costs and customer dissatisfaction. Lee Rep. 9-10.[10] But cost increases alone are mainly irrelevant and the Court in *Exxon* rejected consumer inconvenience as a ground that violates the dormant Commerce Clause: "It may be true that the consuming public will be injured by the loss of the high-volume, low-priced stations operated by the independent refineries, but again that argument relates to the wisdom of the statute, not to its burden on commerce." 437 U.S. at 128.

In any event, imperceptible delay does not violate the dormant Commerce Clause. First, the proposition that more sick leave usage will cause increased delay is dubious, especially given Dr. Lee's concession that JetBlue—who did not follow New York's sick leave law—had more delays than Virgin—who followed the law. Tregillis Ex. 1 at 73; AS Ex. 22 at 3; AS Ex. 29 at 3-4. And, looking at Virgin and its compliance with New York's sick leave law starting in March 2015, Dr. Lee found no statistically significant increase in flight delays in Virgin's years ending March 2016 or March 2017. Tregillis Ex. 1 at 37; AS Ex. 28 at 7-8. Later in 2017, in the final seven months before the closure of the JFK flight attendant base in November 2017, Dr. Lee found only a 1.20 percentage-point increase in delays of at least 15 minutes, from April to October. Tregillis Ex. 1 at 24. Lee provides no reason beyond speculation why delay that occurred two years later is attributable to New York's law.[11]

---

[10] A4A also claimed that there would be greatly increased cancellations of flights. Dkt. 1, p. 3. But this is speculation, as it has not documented this result in its expert report, relying only on anecdotal claims. Lee Rep. 60; Tregillis Ex. 1 at 21. In fact, air flight records show only four cabin-crew shortage cancellations in the three years after New York's sick leave law took effect. Tregillis Ex. 1 at 64-65.

[11] Another plausible reason for increased sick leave usage during the seven months was stress caused by uncertainty over Virgin's merger with Alaska and the threatened flight attendant base closure. Tregillis Ex. 1 at 48-62; Mann Ex. 1 at 48-50; AS Ex. 8 at 67-68; AS Ex. 9 at 16; AS Ex. 12 at 31-32, 40-42; AS Ex. 28 at 4-5, 9; AS Ex. 31 at 18.

DEPARTMENT'S MOTION FOR
SUMMARY JUDGMENT --
NO. 3:18-cv-05092-RBL

21

ATTORNEY GENERAL OF WASHINGTON
LABOR & INDUSTRIES DIVISION
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7740

But second, even accepting A4A's speculative premise—that there were some delays of at least 15 minutes that New York's sick leave law contributed to in part, A4A shows no burden implicating the dormant Commerce Clause. As A4A must concede, delay is part and parcel of the airline industry. Mann Ex. 1 at 6, 16-19. The sick leave law does not substantially affect the interstate market where delay and cancellations are already pervasive. Airlines average only 79% on-time performance, and plan for only 80% to 85% on-time performance. Mann Ex. 1 at 6, 16-31; Mann Ex. 2 at 4; AS Ex. 7 at 10-11; AS Ex. 8 at 59; AS Ex. 33 at 3. Airline expert Mann said that slight delay claimed by A4A would be imperceptible to the flying public and, in his rebuttal report, Dr. Lee could not deny this with any evidence. Mann Ex. 1 at 6, 11, 31; Mann Ex. 2 at 3-4. This is because the wide variability in on-time performance has conditioned the American-flying public to delays. Mann Ex. 2 at 3-4. Indeed, despite persistent delays, the number of airline passengers keeps increasing, with high customer satisfaction. AS Ex. 24 at 6, 11, 44-45.

### c. Airlines, including Alaska, routinely and effectively operate under many jurisdictions' laws

A4A also contends that it should not have to comply with multiple state laws. Dkt. 1, p. 2. But not only are its member airlines already complying with multiple state laws relating to sick leave, the Supreme Court has recently rejected this precise argument in *Wayfair* by approving of statutes that tax internet-based out-of-state sellers even though these sellers face "tax-collection obligations in thousands of different taxing jurisdictions." 138 S. Ct. at 2093. As the Supreme Court has emphasized before, "this Court has only rarely held that the Commerce Clause itself pre-empts an entire field from state regulation, and then only when a lack of national uniformity would impede the flow of interstate goods." *Exxon Corp.*, 437 U.S. at 128.

A4A has not shown an impediment to the flow of interstate goods: airlines keep flying despite leave laws. Mann Ex. 1 at 53-55. A4A contends that local regulations should not apply

DEPARTMENT'S MOTION FOR
SUMMARY JUDGMENT --
NO. 3:18-cv-05092-RBL

22

ATTORNEY GENERAL OF WASHINGTON
LABOR & INDUSTRIES DIVISION
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7740

to airlines because airlines operate nationwide. Dkt. 1, p. 13. But A4A's members choose to operate in many states so they must follow many state laws; and there is no evidence that the airline industry has ground to a halt because of this—instead, it thrives. Mann Ex. 1 at 8, 53-55, 58; AS Ex. 24 at 6, 11, 44-45. And airlines routinely comply with other local laws such as unemployment compensation, workers' compensation, and local tax laws. AS Ex. 3 at 3; AS Ex. 14 at 18. Courts have upheld various local laws affecting airlines or transportation companies under the dormant Commerce Clause. *E.g.*, *Nw. Airlines, Inc. v. Cty. of Kent, Mich.*, 510 U.S. 355, 373-74 (1994) (upholding local user fees as applied to airline industry under dormant Commerce Clause).[12]

Courts look to congressional intent to determine if there is a reason to have a nationwide policy. In *Exxon*, the Court looked to congressional intent to see if there was a nationwide policy, and not finding one did not impose such a requirement on the oil industry even though it operated nationally. 437 U.S. at 128-29. In *Pacific Merchant Shipping*, California had a law about vessel fuel rules of ships designed to reduce pollution, and the company argued that national uniformity about maritime transportation meant the law violated the dormant Commerce Clause. 639 F.3d at 1158, 1178-80. But the court rejected this argument, pointing out federal legislation with a savings clause that allowed state regulation. *Id.* at 1180. Likewise, the savings clause to the FMLA shows it was not Congress's intent to curtail state and local sick leave laws. 29 U.S.C. § 2651(b) ("Nothing in this Act or any amendment made by this Act shall be construed to supersede any provision of any State or local law that provides greater family or medical leave rights than the rights established under

---

[12] Other airline and transportation laws satisfy the dormant Commerce Clause. *See Huron Portland Cement Co. v. Detroit*, 362 U.S. 440, 448 (1960) (upholding Detroit's pollution ordinance, with which federally licensed ships would have to comply); *Lloyd A. Fry Roofing Co. v. Wood*, 344 U.S. 157 (1952) (upholding Arkansas law requiring certain interstate truck drivers to obtain a permit); *Hirst*, 910 F.3d at 967 (upholding state minimum wage laws as applied to flight attendants did not violate dormant Commerce Clause); *Bernstein*, 227 F. Supp. 3d at 1069 (upholding state minimum wage and rest break law applied to flight attendants); *Booher v. JetBlue Airways Corp.*, No. 15-CV-01203-JSW, 2017 WL 6343470, at *5 (N.D. Cal. Dec. 12, 2017) (upholding overtime laws as applied to flight attendants).

DEPARTMENT'S MOTION FOR
SUMMARY JUDGMENT --
NO. 3:18-cv-05092-RBL

23

ATTORNEY GENERAL OF WASHINGTON
LABOR & INDUSTRIES DIVISION
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7740

1  this Act or any amendment made by this Act."). The FMLA regulates airlines, showing

2  Congress considered the airline industry under the savings clause. 29 U.S.C. § 2611(2)(D).

3  Consistent with this federal policy, the airlines, including Alaska, have conceded that

4  they follow local paid sick leave laws without disruption to routes or fares. AS Ex. 13 at 14;

5  AS Ex. 15 at 13, 18; *see* AS Ex. 9 at 26. Alaska has complied with the sick leave provisions of

6  the Washington's Family Care Act since at least 1998, admitting that following this sick leave

7  law has caused no operational difficulties. AS Ex. 13 at 14; *see also* AS Ex. 1 at 14. In fact,

8  Alaska does not assess points against flight attendants for using their family care leave. AS Ex.

9  14 at 10-11. Alaska has adapted to this sick leave legislation by applying the most favorable

10  law of the jurisdictions in which it operates. *See* AS Ex. 1 at 17; AS Ex. 2 at 3. For instance, to

11  determine the definition of which family members are subject to coverage for family care leave

12  requirements, Alaska follows the law of the jurisdiction with the more favorable provision to

13  its workers. AS Ex. 1 at 14-17; AS Ex. 2 at 3. This shows it is possible to comply with multiple

14  jurisdictions' laws. Watkins Ex. 1 at 18. Alaska can offer sick leave without assessing points

15  and still have a flourishing airline. Alternatively, it can follow the law of the employee's

16  domicile as it does for workers' compensation and as other airlines do for sick leave. AS Ex.

17  10 at 18; AS Ex. 15 at 18-19; AS Ex. 16 at 32; AS Ex. 19 at 8-9; AS Ex. 25 at 5-6; *see* AS Ex.

18  31 at 2, 4. After reviewing the industry data, airline expert Mann concluded airlines "are

19  successfully managing crew resources under the auspices of differing state and local leave

20  laws." Mann Ex. 1 at 62; *see also* Mann Ex. 1 at 57-62.

21  Dr. Lee concedes that airlines report having been able to comply with sick leave laws,

22  but argues, "the disruptive effect on operations *will compound* as carriers become subject to

23  more and more sick leave laws . . . ." Lee Rebuttal Rep. 43 (emphasis original). A4A can offer

24  no more than speculation about future impacts; however, in assessing burdens on interstate

25  commerce, the courts refuse to indulge litigants' speculations about how state and local

26  regulations *might* cause harms. *E.g.*, *Black Star Farms LLC v. Oliver*, 600 F.3d 1225, 1232

(9th Cir. 2010) (refusing to take the "leap of faith" required to infer effects not supported by evidence). It can't be that laws might exist someday; they must exist now. *Black Star Farms*, 600 F.3d at 1232.

>  **d.    A4A shows no conflict with another state's law, or that Alaska could not manage any difference in laws**

A4A provides no proof that its members cannot comply with the laws of Washington and of other states. To show an unconstitutional burden, a plaintiff must show that complying with two states' laws is virtually impossible. For example, in *Bibb v. Navajo Freight Lines, Inc.*, the Court struck down an Illinois statute requiring the use of a certain size and shape of mud flap on Illinois highways. 359 U.S. 520, 522 (1959). The statute outlawed mud flaps permissible in forty-five other states, and Arkansas required the precise type of mud flap that Illinois prohibited. *Id.* at 522, 527. As a result, trucking companies could not comply with the Illinois statute and other states' laws. *Id.* at 527. The Court held Illinois's law therefore placed a "heavy burden" on the interstate flow of goods where the trucks had to change mud flaps at the Illinois border. *Id.* at 530. The Court observed that *Bibb* was "one of those cases—few in number—where local safety measures that are nondiscriminatory place an unconstitutional burden on interstate commerce." *Id.* at 529.

Unlike the Illinois law in *Bibb*, Washington's sick leave law requires no change to any of A4A's members' aircrafts. This is dispositive because in the transportation arena, courts have found dormant Commerce Clause violations only where (1) the state laws substantially impaired an interstate industry's ability to function physically in transporting goods, and (2) no adequate state policy justified applying the law. *See Bibb*, 359 U.S. at 528.[13] And in evaluating burdens on interstate commerce, the court considers whether the state statute creates

---

[13] *See also Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429, 446 (1978) ("substantial burden" imposed by requiring truck drivers to either re-route around the state to use double trailers or incur delays by using single trailers through the state); *Pacific Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761, 773 (1945) ("serious burden" to interstate commerce, and "substantial obstruction" to Congress's national railroad policy, to comply with state limitations on number of railroad train cars).

"irreconcilable obligations" that cannot be resolved without system-wide impacts. *Bostain*, 153

P.3d at 855-56 (rejecting a burden on interstate commerce argument when enforcement of the

state minimum wage act on hours worked outside Washington by a Washington-based

interstate truck driver did not "create irreconcilable obligations."). "To show the threat of

inconsistent regulation, [the challenging party] must either present evidence that conflicting,

legitimate legislation is already in place or that the threat of such legislation is both actual and

imminent." *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1104-05 (9th Cir. 2013)

(quotations omitted). In the airline and trucking contexts, courts have rejected claims of

irreconcilable conflicts when such claims are merely speculative. *Bostain*, 153 P.3d at 856;

*Bernstein*, 227 F. Supp. 3d at 1070.

To avoid such rejection, A4A must show a ripe controversy. *Clark v. City of Seattle*,

899 F.3d 802, 809 (9th Cir. 2018). But A4A has shown no ripe controversy over an actual

conflict with a law that results in impeding interstate commerce. To show a ripe controversy,

A4A would need to show that Washington State and another state would each apply its sick

leave law to the flight crew; that airlines could not comply with the most favorable state's law

and satisfy the other state's law; that (assuming a conflict) one state would not give way to the

other; and that any resulting irreconcilable conflict would affect the flow of goods in interstate

commerce. *E.g. Bibb*, 359 U.S. at 527; *see also CTS*, 481 U.S. at 88-89; *Bostain*, 153 P.3d at

856. The Supreme Court has approved of using the conflicts of law approach in the

Restatement, and under it, there is no constitutional issue. *CTS Corp.*, 481 U.S. at 89.

A4A attempts to show irreconcilable conflicts by pointing out that different states have

different accrual rates, citing California, Massachusetts, and New York City's laws that give

one hour of leave for every 30 worked. AS Ex. 36 at 5-6. Even if these laws applied to

Washington-based flight crew, A4A shows no reason why compliance with these laws would

not satisfy Washington's 40-hour requirement. If an airline complied with those locales'

accrual rates, it would comply with Washington's law. RCW 49.46.210 (entitling employees

DEPARTMENT'S MOTION FOR
SUMMARY JUDGMENT --
NO. 3:18-cv-05092-RBL

26

ATTORNEY GENERAL OF WASHINGTON
LABOR & INDUSTRIES DIVISION
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7740

"at least" one hour of paid sick leave for every forty hours worked). In any event, if the Court

considered it a ripe controversy with an "irreconcilable conflict," the remedy would be not to

apply it to those jurisdictions, not strike down the whole law.

### 4. The benefits of paid and protected sick leave outweigh any putative burdens

Even if A4A showed a cognizable burden on interstate commerce (it does not), the paid

and protected sick leave law must be upheld because the putative burden is not "clearly

excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142. In *Bibb*, the Court

emphasized that courts will uphold local laws affecting transportation for safety reasons but in

that case—unlike here—the state did not present evidence that the benefits of the laws

outweighed any burden. 359 U.S. at 523, 528. The Court recognized that, upon proper proof,

states may regulate industries that operate nationwide, even if there is an interstate burden. *Id.*

at 523 ("We have . . . upheld state statutes applicable alike to interstate and intrastate

commerce, despite the fact that they may have an impact on interstate commerce."). Even in

evaluating a state's interest, "the Supreme Court has frequently admonished that courts should

not second-guess the empirical judgments of lawmakers concerning the utility of legislation."

*Nw. Venison Producers v. Smitch*, 20 F.3d 1008, 1017 (9th Cir. 1994) (internal quotation

omitted).

The sick leave law can be struck down only if "the burdens of the statute" on interstate

commerce "so outweigh the putative benefits as to make the statute unreasonable or irrational."

*Alaska Airlines, Inc. v. City of Long Beach*, 951 F.2d 977, 983 (9th Cir. 1991) (sustaining local

noise ordinance against airlines' commerce clause challenge). This test does not invite courts

to engage in an unconstrained weighing of competing national and local interests. *Id*. Instead, it

directs courts to examine whether the law operates so irrationally as to make its stated purpose

illusory. *Id.* at 983. Here the law is neither irrational nor unreasonable. Flying sick spreads

disease as flight attendants move about the plane. Watkins Ex. 1 at 11. Many serious epidemics

DEPARTMENT'S MOTION FOR
SUMMARY JUDGMENT --
NO. 3:18-cv-05092-RBL

ATTORNEY GENERAL OF WASHINGTON
LABOR & INDUSTRIES DIVISION
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7740

1  have been spread by airline travel. Watkins Ex. 1 at 10-11. Sick flight crewmembers fly

2  because they fear disciplinary points, thus prolonging their own illness and spreading it to

3  others. Watkins Decl. Ex. 1 at 4. Andrew Decl. 2; Levin Decl. 2; Rafferty Decl. 2-3; Ruiz

4  Decl. 2. Washington's law rationally and reasonably works to reduce these effects.

5        Compliance with Washington's law may subject employers to inconvenience, but this

6  putative burden is not "clearly excessive in relation to the putative local benefits." *See Pike*,

7  397 U.S. at 142; Part II.B, II.C *supra*. Washington has a powerful interest in preventing

8  economic loss, disability, and death that comes from the spread of disease. It also has a

9  powerful interest in ensuring that its citizens are paid fairly, and that families have minimal

10  disruption from illness. Washington laws allow workers to take time off if they are sick

11  without fear of reprisal. This advances compelling state interests that far outweigh A4A's

12  claims of burden.

## B.    Washington's Sick Leave Law Does Not Violate the Airline Deregulation Act Because It Does Not Bind Airlines to Any Rate, Route, or Service

        A4A cannot show that Washington's sick leave law violates the Airline Deregulation

Act (ADA) because the law binds no carrier to a rate, route, or service. 45 U.S.C. § 41713(b)

preempts the States from "enact[ing] or enforc[ing] a law, regulation, or other provision having

the force and effect of law relating to a price, route, or service of an air carrier . . . ." A law is

preempted only if it "directly or indirectly mandate[s], prohibit[s], or otherwise regulate[s]"

prices, routes, or services. *Dilts v. Penske Logistics, LLC*, 769 F.3d 637, 647 (9th Cir. 2014).[14]

Congress did not intend to preempt "generally applicable state transportation, safety, welfare,

or business rules that do not otherwise regulate prices, routes, or services." *Id.*[15]

        Only laws that "bind[]" the firm to a specific rate, route, or service are preempted. *Id.* at

_____

[14] The courts use cases under the Federal Aviation Administration Authorization Act (FAAAA), *see* 49 U.S.C. § 14501(c)(1) to interpret the ADA. *DiFiore v. Am. Airlines, Inc.*, 646 F.3d 81, 86 n.4 (1st Cir. 2011).
[15] After *Dilts*, the 9th Circuit rejected claims that workers' compensation and minimum wage laws violate the FAAAA. *Delivery Express Inc. v. Sacks*, 728 F.3d Appx. 730 (9th Cir. 2018); *Ortega v. J.B. Hunt Transport, Inc.*, 694 F.3d Appx. 589 (9th Cir. 2017).

647. In *Dilts*, the court held that state rest break laws are not preempted because they "plainly are not the sorts of laws 'related to' prices, routes, or services that Congress intended to preempt. They do not set prices, mandate or prohibit certain routes, or tell motor carriers what services they may or may not provide, either directly or indirectly." *Dilts*, 769 F.3d at 647. Similarly, the sick leave law does not bind Alaska to any price, route, or service. *See Air Transp. Ass'n of Am., Inc. v. Port of Seattle*, No. C14-1733-JCC, 2014 WL 12539373, at *1 (W.D. Wash. Dec. 19, 2014) ("time off" employment policy does not implicate rate, route, or service).

## C. Washington's Sick Leave Law Satisfies Due Process Because Washington Regulates Only Those Airlines With a Significant Connection to Washington

Washington only regulates an employer if it has Washington-based employees, and so the sick leave law satisfies due process. Washington's sick leave law does not violate the Due Process Clause even though it may have an extraterritorial effect. In *Phillips Petroleum Co. v. Shutts*, the Court held that "for a State's substantive law to be selected in a constitutionally permissible manner, that State must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." 472 U.S. 797, 818 (1985) (quotation omitted); *AT & T Mobility LLC v. AU Optronics Corp.*, 707 F.3d 1106, 1110-12 (9th Cir. 2013).

The conflicts of law test used in Washington provides contacts that satisfy *Shutts. See Bostain*, 153 P.3d at 855; *Burnside*, 864 P.2d at 940-41. In *Bostain*, the Washington Supreme Court considered whether Washington's minimum wage laws covered all hours—both in- and out-of-state—worked by Washington-based truck drivers. 153 P.3d at 856. The Court held that Washington laws applied to Washington-based employees and so there was no extraterritorial violation. *Id.* at 854-57. The *Bostain* Court directed the use of the conflicts of law analysis where an employee is a Washington-based employee if the employee has significant contacts with Washington. *Bostain*, 153 P.3d at 855-56; Restatement (2nd) of Conflicts of Law § 9; *see*

DEPARTMENT'S MOTION FOR
SUMMARY JUDGMENT --
NO. 3:18-cv-05092-RBL

29

ATTORNEY GENERAL OF WASHINGTON
LABOR & INDUSTRIES DIVISION
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7740

*Burnside*, 864 P.2d at 940; *see also Dow*, 989 N.E.2d at 913-14.

To satisfy this test, it is not enough for someone to fly over Washington airspace, as A4A wrongly claims L&I's position is. Johnson Decl. 5, 10-11; Lee Rep. 28, 30. Washington regulates employees with significant relationships to Washington. AS Ex. 27 at 3. The only airline employer with flight crew covered by the Washington leave laws is Alaska, which is headquartered in Washington and with the majority of its flight crew domiciled in Washington. AS Ex. 3 at 3. These sorts of contacts include the employer having a business presence, such as a headquarters, in Washington. Johnson Decl. 4. This test satisfies due process because only employers connected to Washington are subject to Washington's paid sick leave law.

If a flight crew consists of Washington-based employees, then Washington's law would cover all their hours. *Bostain*, 153 P.3d at 855-56 (all of interstate truck driver's hours covered by Minimum Wage Act because driver is Washington-based employee); *see Alaska Packers Ass'n v. Indus. Acc. Comm'n*, 294 U.S. 532, 541 (1935) (state may grant compensation to local employees for injuries received outside its borders); *AT & T Mobility LLC.*, 707 F.3d at 1110-12 (state may regulate out-of-state contact if significant connection to state has aggregation of contacts); AS Ex. 35 at 5.

## V. CONCLUSION

Washington's paid sick leave law provides important benefits and this Court should reject the airlines' attempts to evade the law. Summary judgment should be granted for L&I.

DATED this 25th day of July 2019.

By: */s/ Anastasia Sandstrom*
　　Anastasia Sandstrom, WSBA No. 24163
　　Katy Dixon, WSBA No. 43469
　　James Mills, WSBA No. 36978
　　800 Fifth Ave., Suite 2000
　　Seattle, WA 98104
　　anas@atg.wa.gov
　　(206) 464-7740
　　Attorneys for Defendants

DEPARTMENT'S MOTION FOR
SUMMARY JUDGMENT --
NO. 3:18-cv-05092-RBL

30

ATTORNEY GENERAL OF WASHINGTON
LABOR & INDUSTRIES DIVISION
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7740

CERTIFICATE OF SERVICE

I hereby certify that on 25th day of July, 2019, I electronically filed the foregoing along with the Declaration of David Johnson with three exhibits, the Declaration of Robert Mann with four exhibits, the Declaration of Anastasia Sandstrom with 39 exhibits, the Declaration of Christian Tregillis with one exhibit and a Proposed Order Granting Defendants' Motion for Summary Judgment and Denying Plaintiff's Motion for Summary Judgment with the Clerk of the Court using the CM/ECF System, which in turn automatically generated a Notice of Electronic Filing (NEF) to all parties in the case who are registered users of the CM/ECF system. The NEF for the foregoing specifically identifies recipients of electronic notice as follows:

*Representatives for Plaintiffs*:
Harry Korrell: harrykorrell@dwt.com
John Hodges-Howell: jhodgeshowell@dwt.com
Jeff Bosley: jeffbosley@dwt.com
Rebecca Francis: rebeccafrancis@dwt.com
Heather Persun: heatherpersun@dwt.com
Robert Siegel: rsiegel@omm.com
Chris Hollinger: chollinger@omm.com
Adam Koh Sweeney: akohsweeney@omm.com
K. MacDonnell: kmacdonnell@omm.com
M. Vuong: mvuong@omm.com

*Representatives for Intervenor*:
Kathleen Barnard: barnard@workerlaw.com
Darin Dalmat: dalmat@workerlaw.com
Benjamin Berger: berger@workerlaw.com
Esmeralda Valenzuela: valenzuela@workerlaw.com

Note: Exhibits filed under seal, Mann Ex. 1, AS Ex. 8, AS Ex. 9, AS Ex. 16, AS Ex. 17, served via separate e-mail per e-service agreement to the parties as addressed above.

DATED this 25th day of July 2019, at Seattle, Washington.

*/s/ Shana Pacarro-Muller*
Shana Pacarro-Muller
Legal Assistant at Anastasia Sandstrom

DEPARTMENT'S MOTION FOR
SUMMARY JUDGMENT --
NO. 3:18-cv-05092-RBL

31

ATTORNEY GENERAL OF WASHINGTON
LABOR & INDUSTRIES DIVISION
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7740