1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

The Honorable Ronald B. Leighton

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

AIR TRANSPORT ASSOCIATION OF
AMERICA, d/b/a AIRLINES FOR AMERICA,

               Plaintiff,

      v.

THE WASHINGTON DEPARTMENT OF
LABOR & INDUSTRIES and JOEL SACKS, in
his official capacity as Director of the
Department of Labor & Industries,

              Defendants.

&

ASSOCIATION OF FLIGHT ATTENDANTS-
COMMUNICATION WORKERS OF
AMERICA, AFL-CIO, a labor organization,

              Intervenor.

No. C18-05092 RBL

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT

***Noted for Consideration:***
Friday, August 23, 2019

ORAL ARGUMENT REQUESTED

"Aviation is unique among transportation industries in its relation to the Federal Government—
it is the only one whose operations are conducted almost wholly within the Federal jurisdiction,
and are subject to little or no regulation by States or local authorities."  U.S. Senate, 85th
Congress 2d Session, Report No. 1811 at 5 (July 9, 1958).

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................ 1

II.  STATEMENT OF UNDISPUTED MATERIAL FACTS ................................ 3

   A.   A4A Member Carriers Are Instrumentalities of Interstate Commerce. ............... 3

   B.   A4A Member Carrier CBAs Provide Generous Paid Sick Leave Benefits.......... 4

   C.   Flight Crew Sick Leave Causes Delays and Cancellations. ................................ 5

   D.   A4A Member Carrier CBAs Balance the Need for Paid Sick Leave with the Need for Reliable Staffing. ............................................................................. 7

   E.   Local Jurisdictions Are Passing Protected Sick Leave Laws, Which Increase Sick Leave Use and, Therefore, Flight Delays and Cancellations. ................................................................................................... 8

   F.   Washington's Paid Sick Leave Law Adds to the Multiplicity of State and Local Paid Sick Leave Laws. ............................................................................. 10

     1.   Washington's Paid Sick Leave Law Increases Sick Leave for Flight Crew and Prohibits Carriers from Applying Reliability Policies. ................................................................................................... 10

     2.   L&I's Final Administrative Policy for "Washington-based" Employees Establishes a Complex, Fact-Specific Test......................... 11

   G.   Applying Local Paid Sick Leave Laws to Flight Crew Will Increase Sick Leave Use and Cause Adverse Operational Effects. .......................................... 12

III. ARGUMENT ..................................................................................................... 16

   A.   The ADA Preempts Applying the Washington PSL to Flight Crew. ................. 16

   B.   The Washington Paid Sick Leave Law as Applied to Flight Crew Violates the Dormant Commerce Clause of the United States Constitution. ............................................................................................... 19

     1.   Applying the PSL to Flight Crew Will Burden Flights and Routes. ............................................................................................... 21

     2.   Applying the PSL to Flight Crew Will Result in Substantial Expenditures. ........................................................................................ 22

3.      Applying the PSL to Flight Crew Will Cause Significant
                Operational Burdens. ............................................................. 23

        4.      Applying the PSL to Flight Crew Will Cause Personnel Trouble.......... 27

C.      The Burdens Resulting from Applying the PSL to Flight Crew Clearly
        Exceed the Putative Local Benefit. ................................................... 29

IV.     CONCLUSION ............................................................................. 30

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Federal Cases**

4
*Am. Airlines, Inc. v. Wolens*,
5     513 U.S. 219 (1995) ........................................................................................................16, 28

*Am. Booksellers Found. For Free Expression v. Dean*,
6     202 F. Supp. 2d 300 (D. Vt. 2002) ..............................................................................26

7
*Am. Fuel & Petrochem. Mfrs. v. O'Keeffe*,
8     903 F.3d 903 (9th Cir. 2018) ......................................................................................21

9
*Angeles v. U.S. Airways, Inc.*,
10     2013 WL 622032 (N.D. Cal. 2013) ............................................................................17

*Bibb v. Navajo Freight Lines*
11     359 U.S. 520, 526, 529-30 (1959) ..........................................................................20, 22

12
*Blackwell v. Sky-West Airlines, Inc.*,
13     2008 WL 5103195 (S.D. Cal. 2008)............................................................................16

14
*BMW of North America, Inc. v. Gore*
15     517 U.S. 559, 571 (1996) ............................................................................................26

*Brindle v. R.I. Dep't of Labor & Training*,
16     2019 WL 2505009 (D.R.I. 2019) ................................................................................19

17
*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*,
18     476 U.S. 573 (1986) ....................................................................................................26

19
*California v. Taylor*,
    353 U.S. 553 (1957) ....................................................................................................19
20

*Dilts v. Penske Logistics, LLC*,
21     769 F.3d 637 (9th Cir. 2014) ..................................................................................17, 19

22
*Edgar v. MITE Corp.*,
23     457 U.S. 624 (1982) ....................................................................................................26

24
*Healy v. Beer Inst.*,
    491 U.S. 324 (1989) ..............................................................................................2, 20, 27
25

*Henson Aviation*,
26     18 NMB 441 (1991) ..................................................................................................4, 27

27

*Hirst v. Skywest, Inc.*,
    910 F.3d 961 (7th Cir. 2018) ......................................................................21

*Int'l Franchise Ass'n, Inc. v. City of Seattle*,
    97 F. Supp. 3d 1256 (W.D. Wash. 2015) ...................................................21

*Legato Vapors, LLC v. Cook*,
    847 F.3d 825 (7th Cir. 2017) ......................................................................27

*Mass. Delivery Ass'n v. Coakley*,
    769 F.3d 11 (1st Cir. 2014) .........................................................................17

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992) ....................................................................................16

*Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*,
    567 F.3d 521 (9th Cir. 2009) ......................................................................21

*Nw. Airlines, Inc. v. State of Minn.*,
    322 U.S. 292 (1944) ................................................................................3, 19

*Nw., Inc. v. Ginsberg*,
    572 U.S. 273 (2014) ..............................................................................16, 17

*Oman v. Delta Air Lines*,
    153 F. Supp. 3d 1094 (N.D. Cal. 2015) .....................................................25

*Overka v. Am. Airlines, Inc.*,
    790 F.3d 36 (1st Cir. 2015) .........................................................................17

*Pike v. Bruce Church, Inc.*,
    397 U.S. 137 (1970) ........................................................................20, 21, 23

*Raymond Motor Transp., Inc. v. Rice*,
    434 U.S. 429 (1978) ....................................................................................29

*Rocky Mt. Farmers Union v. Corey*,
    730 F.3d 1070 (9th Cir. 2013) ....................................................................21

*S. Pac. Co. v. Arizona*,
    325 U.S. 761 (1945) ....................................................................................19

*Shaffer v. Heitner*,
    433 U.S. 186 (1977) ....................................................................................26

*Stone ex rel. Estate of Stone v. Frontier Airlines, Inc.*,
    256 F. Supp. 2d 28 (D. Mass. 2002) ..........................................................20

*Transp. Ass'n of Am. v. City & Cnty. of San Francisco*,
   992 F. Supp. 1149 (N.D. Cal. 1998) .................................................................19

*United States v. Lopez*,
   514 U.S. 549 (1995) .........................................................................................21

*Venegas v. Global Aircraft Serv., Inc.*,
   2016 WL 5349723 (D. Me. 2016) .....................................................................18

*Ward v. United Airlines, Inc.*
   2016 WL 3906077 (N.D. Cal. 2016) .................................................................20

*Watson v. Emp'rs Liab. Assurance Corp.*,
   348 U.S. 66 (1954) ...........................................................................................26

**State Cases**

*United Air Lines, Inc. v. Industrial Welfare Commission*,
   211 Cal. App. 2d 729 (1963) ................................................................20, 21, 29

**Federal Statutes**

45 U.S.C.
   §§ 151 *et seq.* (Railway Labor Act).......................................................... *passim*
   § 152, Fourth & Ninth .........................................................................................4
   § 181 *et seq.*....................................................................................................27

49 U.S.C.
   § 1371 *et seq.* (Airline Deregulation Act) ................................................ *passim*
   § 40101(a)............................................................................................................3
   § 41713..............................................................................................................16
   § 41713(b)(1).....................................................................................................25

Pub. L. No. 95-504, 102, 92 Stat. 1705 (1978) .........................................................16

**State Statutes**

Cal. Labor Code § 245.5(3) .........................................................................................8

Mich. Comp. Laws § 408.962(e)(iv)-(v) ....................................................................8

ORS
   § 653.606 ...........................................................................................................26
   § 653.626 .......................................................................................................9, 25

RCW
    49.46.010(3) ...............................................................................................2, 11, 29
    49.46.200 *et seq.* ...............................................................................................1
    49.46.210(1) ...............................................................................................5, 10
    49.46.210(2) ...............................................................................................4

**Municipal Ordinances**

Los Angeles Admin. Code § 10.37.2(b) ...............................................................27

Los Angeles Ord. No. 184320 ...............................................................................9

Los Angeles Ord. No. 185321 ...............................................................................27

San Diego Mun. Code §§ 39.0104, 39.0105 ..........................................................24

N.Y.C. Admin. Code § 20-913 ...............................................................................9

**Regulations**

WAC
    296-128-600 ...............................................................................................10
    296-128-620 ...............................................................................................26
    296-128-630 ...............................................................................................10
    296-128-640 ...............................................................................................10, 26
    296-128-650 ...............................................................................................27
    296-128-650 ...............................................................................................17, 25
    296-128-660 ...............................................................................................10
    296-128-670 ...............................................................................................10
    296-128-750 ...............................................................................................11, 21, 25

**Constitutional Provisions**

U.S. Const. Article I, § 8, cl. 3 ...............................................................................19

**Other Authorities**

MA Attorney General's Office, "Earned Sick Time in Massachusetts Frequently
    Asked Questions," *available at*:
    http://www.mass.gov/ago/docs/workplace/earned-sick-time/est-faqs.pdf ............9

NYC Consumer Affairs, FAQ #10, *available at*:
    https://www1.nyc.gov/site/dca/about/paid-sick-leave-FAQs.page#cba................9

# I.   INTRODUCTION

This case is not about whether pilots and flight attendants ("flight crew") should receive paid sick leave—they already do.  Flight crew have long received generous paid sick leave benefits through nationwide, industry-specific collective bargaining agreements.  The sick leave policies negotiated by the flight crew unions and the members of Plaintiff Air Transport Association of America d/b/a Airlines for America ("A4A Member Carriers") balance (a) the need for flight crew to stay home when sick and (b) the carriers' need to maintain reliable flight operations and to comply with complex federal regulations governing the industry.[1]  Indeed, if the federally-required number of flight attendants or pilots does not show up for work, flights cannot depart, and delays or cancellations result.  Flight crew and A4A Member Carriers have therefore agreed upon CBA policies that encourage flight crew to use unplanned sick leave only when they or family members are sick, as well as upon provisions granting flight crew significant flexibility and control over their work schedules.

With its new paid sick leave law, RCW 49.46.200 *et seq.*, however, Washington would prohibit carriers from applying the negotiated policies necessary for on-time and reliable operations, and would do so without regard for the generous paid sick leave flight crew already receive under their CBAs.  Increasing flight crew sick leave entitlement, while stripping carriers of their ability to manage sick leave use, will cause sick leave use to increase, driving increased flight delays and cancellations.  This is not speculative:  it has already happened in another jurisdiction due to a similar law.  When Virgin America attempted to comply with New York City's paid sick leave law, sick leave use by its JFK-based flight attendants nearly doubled that of its other two bases and was a primary factor in Virgin's decision to close the base in 2018.

Despite Virgin's experience, Defendant Department of Labor & Industries ("L&I") and

---

[1] A4A is a trade association that advocates on behalf of its nine (9) member airlines: (1) Alaska Airlines, Inc.; (2) American Airlines, Inc.; (3) Atlas Air, Inc.; (4) Federal Express Corp.; (5) Hawaiian Airlines, Inc.; (6) JetBlue Airways Corp.; (7) Southwest Airlines Co.; (8) United Airlines, Inc.; and (9) United Parcel Service Co.  Compl. ¶ 13 [Dkt. 1].

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (C18-05092 RBL) - 1

Intervenor Association of Flight Attendants-Communication Workers of America, AFL-CIO ("AFA") insist Washington's Paid Sick Leave Law ("PSL") should apply to flight crew.  But under federal law and the U.S. Constitution, Washington cannot impose a nationwide sick leave policy for flight crew—many of whom live and largely work outside of Washington—when doing so would cause flight delays and cancellations and other disruptions to flight operations, thereby burdening interstate commerce and affecting airline prices, routes, and services.  Thus, the Court should grant A4A's motion for summary judgment for the following reasons:

*First*, applying the PSL to flight crew would violate the Airline Deregulation Act ("ADA"), 49 U.S.C. § 1371 *et seq.*, which preempts state laws "related to" airline prices, routes, or services.  The PSL will increase flight crew sick leave use, which will increase flight delays and cancellations, result in some carriers increasing prices or reducing route and flight options and require carriers to comply with a patchwork of state and local laws.

*Second*, applying the PSL to flight crew would violate the Dormant Commerce Clause of the U.S. Constitution because it would burden interstate commerce by causing flight delays and cancellations and other flight disruptions.  Further, if Washington can regulate flight crew paid sick leave then so can other jurisdictions.  Thus, flight crew performing the same work, on the same flight, could be subject to different paid sick leave laws, while different jurisdictions could lay claim to the same crewmember at the same time.  Requiring carriers to navigate such a complex patchwork of state and local laws would disrupt their ability to comply with nationwide CBAs and federal laws and would create a constant threat of litigation.  The DCC prohibits these types of burdens, which "would arise if … many … State[s] adopted similar legislation."  *Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989).

*Third*, the burdens on interstate commerce clearly exceed the local benefit of the PSL. Washington already exempts from the PSL employees who work directly in interstate commerce, cross state lines, have paid sick leave benefits under CBAs, and come into contact with the public, such as railroad employees, ferry workers, and others.  RCW 49.46.010(3). Washington thus recognizes the PSL's application to all workers is not necessary to achieve its

local benefit.  This is particularly so here, where the work group is highly mobile, engaged in federally-regulated, extraterritorial work, and governed by complex, nationwide CBAs with generous paid sick leave benefits.

## II.    STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.    A4A Member Carriers Are Instrumentalities of Interstate Commerce.

A4A Member Carriers operate flights out of Washington airports and provide interstate transportation to the public.  Compl. ¶ 14; Lee Rep. ¶¶ 9-16.[2]  Alaska Airlines, for instance, which is headquartered in Washington, operates almost entirely interstate routes, with only 2.5% of its routes (7 of 280) occurring entirely within Washington State.  Lee Rep. ¶ 10.  Other A4A Member Carriers are similar.  *Id.* ¶ 10 n.35.

Flight crew, in turn, comprise a highly mobile workforce that works across state lines and in federally-regulated airspace—not within the boundaries of any given state and not within the boundaries of the state where they are "based" or "domiciled."  *Id.* ¶¶ 17-24.[3]  For instance, between January 2013 and March 2018, not a single Alaska flight attendant or pilot worked on flights exclusively within Washington State.  *Id.* ¶¶ 18-19.  Rather, Alaska flight attendants based at Sea-Tac spent "only about 17% of their duty time … on the ground in Washington"—less than the time they spent on the ground in other states (26%-30%) or in federally-regulated airspace (54%-58%).  Lee Rep. ¶ 20 & Ex. 8.[4]

A complex and comprehensive federal regulatory regime governs A4A Member Carriers, including flight crew activities, duties, and staffing levels.  *See Nw. Airlines, Inc. v. State of Minn.*, 322 U.S. 292, 302 (1944) ("[f]ederal control" over the industry "is intensive and exclusive") (Jackson, J., concurring); 49 U.S.C. § 40101(a) ("public interest" requires "a complete and convenient system" of "interstate air transportation"); Lee Rep. ¶ 26 n.63.

---

[2] In the interest of efficiency, A4A cites the expert reports by its expert, Dr. Darin N. Lee, attached as exhibits to the Lee Declaration, directly, as "Lee Rep." and "Lee Rebuttal."  A4A also cites the deposition transcripts attached as exhibits 1-12 to the Marsh Declaration directly, as "Johnson 30(b)(6) Dep.," "Mann Dep.," etc.

[3] "A pilot or flight attendant base (also known as a 'domicile') is an airport from where an airline starts and ends flight crew work assignments (typically multi-day assignments, referred to as 'pairings')."  Lee Rep. ¶ 17 n.46; *see also* Johnson 30(b)(6) Dep. 30:6-11; Peterson 30(b)(6) Dep. 63:10-14.

[4] *See also* Kilayko Decl. ¶ 22; Carlson Decl. ¶ 23; Shaw Decl. ¶ 20; Simone Decl. ¶ 22 (similar for other carriers).

**B.      A4A Member Carrier CBAs Provide Generous Paid Sick Leave Benefits.**

System-wide CBAs negotiated under the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151 *et seq.*, generally govern the terms and conditions of employment for A4A Member Carrier flight crew.  *See* Ryan Decl. (6/28/19) ¶¶ 3-11; Kilayko Decl. ¶ 2; Simone Decl. ¶ 2; Schubert Decl. ¶ 2.[5]  These CBAs cover nearly every aspect of flight crew employment, including scheduling, compensation, paid sick leave, and attendance—and they do so on a nationwide basis.  Schubert Decl. ¶ 2; Ryan Decl. (7/27/18) ¶¶ 3-38; Kilayko Decl. ¶¶ 2, 14-35; Carlson Decl. ¶¶ 2, 15-31; Simone Decl. ¶¶ 2, 16-31; Shaw Decl. ¶¶ 2, 13-28.  System-wide CBAs allow for uniformity and predictability in the terms and conditions of employment for flight crew, who live, work in, and are based in numerous states across the country.  Ryan Decl. (6/28/19) ¶¶ 3-11; Kilayko Decl. ¶ 2; Simone Decl. ¶ 2; Schubert Decl. ¶ 2; Peterson 30(b)(6) Dep. 154:14-156:12.  This uniformity and predictability also allows carriers to both maintain on-time and reliable operations and ensure system-wide compliance with federal regulations. Ryan Decl. (6/28/19) ¶ 3; Lee Rep. ¶¶ 43-46.

Flight crew and A4A Member Carriers have bargained for paid sick leave.  *See* Ryan Decl. (7/27/18) ¶¶ 21-26, 31-38; Schubert Decl. ¶ 3; Simone Decl. ¶¶ 28-31; Carlson Decl. ¶¶ 28-31; Kilayko Decl. ¶¶ 29-35; Shaw Decl. ¶¶ 23-28.  L&I's expert, Mr. Mann, admits the carriers provide "significant access to [paid] sick leave" through these CBA provisions.  Mann. Dep. 38:19-39:10.  Alaska's pilots earn 5.5 hours of paid sick leave for every month the pilot works six or more hours; American and United pilots earn five hours of paid sick leave for every month of service.  Ryan Decl. (7/27/18) ¶¶ 21-26; Schubert Decl. ¶ 3; Carlson Decl. ¶ 28. American's flight attendants accrue 4.5 hours of paid sick leave per month for every month they are available to work 15 or more days.  Simone Decl. ¶ 28.  *See also* Kilayko Decl. ¶ 29 (United flight attendants accrue four hours per month); Ryan Decl. (7/27/18) ¶ 32 & Shaw Decl. ¶ 23 (Alaska and Southwest flight attendants accrue 1 "trip for pay" ("TFP") of paid sick

---

[5] System-wide representation means the craft or class, e.g., flight attendants or pilots, and must include all eligible employees, regardless location.  *See Henson Aviation*, 18 NMB 441, 443 (1991); 45 U.S.C. § 152, Fourth & Ninth.

leave for every 10 worked or credited[6]).  Pilots and flight attendants also accumulate paid sick leave in large banks that carry over from year to year.  *See, e.g.*, Ryan (7/27/18) ¶¶ 24, 25 (Alaska pilots can carry over 1,000 hours); Kilayko Decl. ¶ 29 (United flight attendants can carry over 1,250 hours).[7]  These CBA provisions are more generous than state and local laws. *See, e.g.*, RCW 49.46.210(1)(j) (carryover capped at 40 hours).

Flight crew fly "pairings," which consist of multiple flights, often over multiple days. Ryan Decl. (7/28/18) ¶ 13; Lee Rep. ¶¶ 17-18 & nn. 47, 49; Butler Decl. ¶ 8.  When a flight crewmember calls out sick on one of the flights in a pairing, it is often impossible for that crewmember to re-join later flights in the pairing.  Ryan Decl. (7/27/18) ¶ 33; Kilayko Decl. ¶ 6; Lee Rep. ¶ 43.  As a result, the airline removes the crewmember from all remaining flights in that pairing.  Kilayko Decl. ¶ 6; Ryan Decl. (7/27/18) ¶ 33.  The airline then, per its CBA, pays sick leave from the crewmember's sick leave bank.  *See* Carlson Decl. ¶¶ 28-29; Shaw Decl. ¶ 23; Ryan Decl. (7/27/18) ¶ 33.

### C.   Flight Crew Sick Leave Causes Delays and Cancellations.

While A4A Member Carriers recognize the need for paid sick leave—as evidenced by their CBAs—flight crew sick leave use, especially on short notice and at high volumes, causes flight delays and cancellations.  *See* Schubert 30(b)(6) Dep. 72:8-10 ("We did cancel flying and take a number of delays the holiday period the year prior due to flight attendants sick [leave].");  *see also* Lee Rep. ¶¶ 55-56 & Exs. 15-16.[8]  L&I's expert, Mr. Mann, acknowledges flight crew sick leave use can cause delays, admitting "an individual flight might be delayed on the basis of a very late [sick call] notice."  Mann Dep. 35:17-36:14; *see also id.* 26:7-16.

Delays and cancellations occur because, among other things, federal law requires carriers to have a minimum number of pilots and flight attendants on board before any flight can depart.  *See, e.g.*, Lee Rep. ¶ 43; Schubert Decl. ¶ 5; Butler Decl. ¶ 20.  The remaining

---

[6] TFP is the unit of pay for flight attendants under the Alaska and Southwest CBAs, and is based on mileage flown, not days or hours worked.  Ryan Decl. (7/27/18) ¶¶ 28-29; Shaw Decl. ¶¶ 20-22.
[7] *See also* Carlson Decl. ¶ 28; Schubert Decl. ¶ 3; Simone Decl. ¶ 28; Shaw Decl. ¶ 23; Lee Rep. ¶ 49.
[8] Carlson 30(b)(6) Dep. 35:2-3; Butler Dep. 58:13-17; Schubert Decl. ¶ 8; Simone Decl. ¶ 5; Kilyako Decl. ¶ 5.

crewmembers on a flight cannot simply cover for the absent crewmember; rather, the carrier must find a replacement, or the plane cannot take off.  Lee Rep. ¶¶ 43, 45.  Carriers hire "reserve" flight crew, who are on-call on certain days each month to serve as replacement crew if needed, but reserve crew are often allowed at least two hours to report for duty under the CBAs.  Schubert Decl. ¶ 7; Shaw Decl. ¶ 5; Carlson Decl. ¶ 6; Simone Decl. ¶¶ 3, 6.  So, if a pilot or flight attendant calls out sick with insufficient notice, the flight will be delayed as the airline attempts to locate and assign a reserve crewmember to the flight, which can take hours. *Id.*, *see also* Ryan Decl. (7/27/18) ¶¶ 40-42; Lee Rep. ¶¶ 44-46.

In addition, carriers do not maintain reserve flight crew at every airport they serve.  *See*, *e.g.*, Schubert Decl. ¶ 7; Ryan Decl. (7/27/18) ¶ 40.  If a flight crewmember calls out sick from a non-base airport, the airline will have to "deadhead" a reserve to the airport, i.e., move a reserve flight crewmember from one airport to another.  Ryan Decl. (7/27/18) ¶¶ 17, 40; Simone Decl. ¶ 6; Carlson Decl. ¶ 6; Kilayko Decl. ¶ 5; Shaw Decl. ¶ 5; Lee Rebuttal ¶ 32. Deadheading often takes hours and sometimes requires displacing a paying customer from his or her seat to accommodate the crewmember.  Butler Dep. 64:1-3 ("I still displace guests, paying customers, when I'm deadheading crew members between two places.").[9]  Sick call outs at non-base airports cause even longer delays: in 2017, American delays due to flight attendant absences averaged 92 minutes at non-base airports versus 26 minutes at base airports.  Lee Rebuttal ¶ 32.[10]

A delay in one flight can have a ripple effect, causing delays or cancellations in subsequent flights and even to other carriers providing connecting flights.  Lee Rebuttal ¶¶ 20-23; Ryan Decl. (7/27/18) ¶ 41.  This effect is not hypothetical:  as Dr. Lee showed, on July 22, 2008, Alaska aircraft N839VA was early arriving into Sea-Tac, its second stop of the day, but a 45-minute delay out of Sea-Tac caused delays in each of its next three stops, in Los Angeles,

---

[9] *See also* Ryan Decl. (7/27/18) ¶ 40; Ryan Decl. (6/28/19) ¶ 46.
[10] *See also* Mann Dep. 66:15-20 (L&I expert admitting "you either wait for someone to report or you cancel the flight and ferry it and probably put the passengers on another airline or on a later flight").

San Francisco, and Las Vegas.  Lee Rebuttal ¶ 20 & Ex. 4.[11]

Delays and cancellations harm the flying public.  *Id.* ¶ 19 & n. 62 (1% increase in delays at American would affect nearly 4,000 "daily passengers").  Delays and cancellations slow travel, cause missed connections, and cost passengers money.  *Id.* ¶¶ 19, 26 n.86.

### D.    A4A Member Carrier CBAs Balance the Need for Paid Sick Leave with the Need for Reliable Staffing.

L&I and AFA agree that on-time and reliable operations are critical.  Johnson 30(b)(6) Dep. 63:17-64:2; Peterson 30(b)(6) Dep. 88:12-17.  L&I and AFA also agree carriers' ability to reliably staff flight crew is critical to maintaining on-time and reliable operations.  Johnson 30(b)(6) Dep. 64:3-9, 231:5-14; Peterson 30(b)(6) Dep. 88:18-89:6.  Thus, to balance the need for flight crew to not work when sick with the airline's need for predictable flight crew attendance, flight crew and A4A Member Carriers have bargained for no-fault attendance or reliability policies in their CBAs.  Simone Decl. ¶¶ 2, 31; Kilayko Decl. ¶¶ 2, 33; Shaw Decl. ¶¶ 2, 26; Ryan Decl. (7/27/18) ¶¶ 35-36, 42-45.  Under these policies, airlines assess "points" for sick calls, missed trips, late reports, and no shows.  *Id*.  The negotiated point values reflect the level of operational disruption resulting from the event:  no shows or short notice calls receive more points than sick calls made with the maximum amount of notice.  *See* Ryan Decl. (7/27/18) ¶¶ 35-36; Kilayko Decl. ¶ 33; Shaw Decl. ¶ 26.

Carriers also factor the points assessed under these policies into their progressive discipline policies.  *See, e.g.*, Simone Decl. ¶ 31; Kilayko Decl. ¶ 34; Shaw Decl. ¶ 27; Ryan Decl. (7/27/18) ¶¶ 35-38; Butler Decl. ¶ 16.  As points accumulate, the level of discipline increases, from warnings to, in rare cases, termination.  *Id*.  Carrier CBAs often also contain point-reduction programs, which allow flight attendants to erase points and avoid any discipline.  *See* Ryan Decl. (7/27/18) ¶ 38; Butler Decl. ¶¶ 16-17; Shaw Decl. ¶ 27; Peterson 30(b)(6) Dep. 82:13-83:20 (admitting an Alaska flight attendant can use paid sick leave under

---

[11] *See also* Carlson Dep. 28:3-24.

the CBA and end with no points).[12]

Some pilots and flight attendants use paid sick leave for illegitimate reasons.  Lee Rebuttal ¶ 63.[13]  L&I's expert, Mr. Mann, admitted in deposition, "I'm aware in my experience that that has happened."  Mann Dep. 27:21-28:13.  Sick leave also spikes around holidays, school vacation periods, and major sporting events.  *See* Carlson Dep. 34:14-35:1; Simone Decl. ¶ 11; Schubert Decl. ¶ 3; Lee Rebuttal ¶ 63.  Some flight crewmembers also use sick leave to manage their schedules, i.e., when a request to drop a trip was denied.  *See* Carlson Dep. 34:3-11.  Because of the consequences to flight operations of flight crew absences, A4A Member Carriers reserve the right to request verification of illness, regardless the number of days missed, when they see indicators of sick leave abuse.  *See* Shaw Decl. ¶ 25, 9; Ryan Decl. (7/27/18) ¶ 26; Carlson Decl. ¶ 9; Butler Decl. ¶ 14.  Simone 30(b)(6) Dep. 67:19-68:12.  For instance, in March and April 2017—which corresponds with school spring breaks—Southwest flight attendants called out sick at such a high rate that the airline depleted its reserves, declared a "sick leave emergency," and required flight attendants who called out sick to see a company doctor.  Taitte 30(b)(6) Dep. 78:22-79:6, 81:2-14, 84:25-85:6.  This reduced the sick leave rates "by about half."  *Id*. 78:22-79:6

### E.    Local Jurisdictions Are Passing Protected Sick Leave Laws, Which Increase Sick Leave Use and, Therefore, Flight Delays and Cancellations.

Many states and cities have enacted their own paid sick leave laws, each with its own and sometimes conflicting provisions regarding accrual, carryover, use, verification, and notification.  *See* Marsh Decl., Exs. 13 & 14 (summarizing over 30 paid sick leave laws across the country); Lee Rep. ¶¶ 70-71; Lee Rebuttal ¶¶ 40-46.  Some of these laws exempt carriers covered by the RLA, recognizing the exclusivity of federal jurisdiction over the industry.  *See, e.g.*, Mich. Comp. Laws § 408.962(e)(iv)-(v); Cal. Labor Code § 245.5(3).  But most do not.

For example, New York City's ESTA mandates that employers, even those

---

[12] An American flight attendant can take 48 paid sick days, with advance notice, without progressing to the second level of discipline.  Lee Rebuttal ¶ 63.
[13] *See also* Ryan Decl. (7/27/18) ¶ 44; Simone Decl. ¶¶ 8, 11.

headquartered outside the City, provide one hour of paid sick leave for every 30 hours worked, up to 40 hours per year, with a carryover of up to 40 hours.  N.Y.C. Admin. Code §§ 20-913, -914.[14]  Employers may not ask for medical verification unless the employee is absent for four or more consecutive workdays and, per the law's anti-retaliation provisions, may not apply points under a no-fault reliability policy.  *Id.* §§ 20-914, -918.  The Massachusetts law applies to employees whose "primary place of work is in Massachusetts regardless of the location of the employer," 940 CMR 33.03(1), and regardless if the employee also works outside Massachusetts.[15]  The law has similar accrual, carryover rates, and anti-retaliation provisions, but different rules for medical verification.  *See* Mass. Gen. L. ch. 149 § 148C(d)(4), (h); 940 CMR 33.03(1), 33.06(1)(a)-(e).[16]

When a state or local paid sick leave law applies to flight crew, sick leave use increases, increasing flight delays and cancellations.  In April 2015, Virgin America tried to comply with New York City's ESTA by suspending its points policy for sick leave use.  Butler Decl. ¶ 18; Butler Dep. 70:18-71:5, 79:9-16.  Sick leave use surged for the JFK-based flight attendants, almost doubling the average rate at Virgin's other two bases.  Butler Decl. ¶¶ 18-28; Lee Rep. ¶¶ 58-66; Lee Rebuttal ¶¶ 10-11, 39; Butler Dep. 62:12-63:1.[17]  This required Virgin to temporarily reassign flight attendants based in California to JFK, deadhead flight attendants across the country, and pay for their hotels—all to cover increased sick leave use by JFK-based flight attendants.  Butler Decl. ¶¶ 23-26; Lee Rep. ¶¶ 58-62; Lee Rebuttal ¶¶ 10-11, 38-39 &

[14] "Paid Safe and Sick Leave Law FAQs," NYC Consumer Affairs, FAQ #10, https://www1.nyc.gov/site/dca/about/paid-sick-leave-FAQs.page#cba.
[15] MA Attorney General's Office, "Earned Sick Time in Massachusetts Frequently Asked Questions," at 3, http://www.mass.gov/ago/docs/workplace/earned-sick-time/est-faqs.pdf.
[16] *See also* ORS § 653.606, 653.626 (Oregon's paid sick leave law has different accrual rates of one hour for every 30 hours worked or 1.75 hours for every 40 hours worked and allows employers to seek medical verification where the employee has a "pattern of abuse," such as "repeated use of unscheduled sick time on or adjacent to weekends, holidays, vacation days or paydays"); Los Angeles Paid Sick Leave Ord. No. 184,320, Art. 7 §§ 187.01, 187.04, 187.08 (applies to employees who work "in the City for the same Employer for 30 days or more within a year from the commencement of employment" since July 1, 2016; employees can earn up to 48 hours of paid sick time per year, with a carryover cap of 72 hours; and it prohibits waivers of paid sick leave entitlements).
[17] American has had similar experiences, witnessing increased sick leave use by ground employees when it tried to comply with the Los Angeles law, Lee Rep. ¶¶ 67-69; Moses Decl. ¶¶ 1-9; and experiencing increased flight attendant absences, especially around weekends and holidays, since trying to comply with the Massachusetts law, leading to increased delays and cancellations. Simone Decl. ¶¶ 8-10.

Ex. 2.  These efforts increased overhead, while delays and cancellations still increased.  Butler Decl. ¶¶ 23-26; Butler Dep. 71:20-72:1, 95:22-25, 96:13-15.  Before trying to comply with ESTA, Virgin had no cabin crew shortage cancellations and only four delays.  Lee Rep. ¶¶ 61-62.  But after compliance, it had three cancellations and 103 delays.  *Id.*

"The adverse operational effects, high administrative burdens, and significant increase in overhead resulting from ESTA compliance contributed significantly to Virgin America's decision to close its base."  Butler Decl. ¶ 26.  AFA admits Virgin closed the base in part because "management … seemed to believe that there was a disproportionately large amount of sick leave use in the JFK base compared to other pre-merger Virgin bases."  Peterson 30(b)(6) Dep. 183:15-19; 184:10-14.

**F.      Washington's Paid Sick Leave Law Adds to the Multiplicity of State and Local Paid Sick Leave Laws.**

**1.      Washington's Paid Sick Leave Law Increases Sick Leave for Flight Crew and Prohibits Carriers from Applying Reliability Policies.**

The Washington PSL requires one hour of paid sick leave for every 40 hours worked, with no limit on accrual in a given year and a carryover cap of 40 hours.  RCW 49.46.210(1)(a), (j).  Employers may not require employees to take leave in increments exceeding one hour absent a waiver.  WAC 296-128-630(4).  To obtain a waiver, which unions can oppose, employers must show "good cause."  WAC 296-128-640.  Waivers cannot exceed three years, and L&I can revoke them "at any time."  WAC 296-128-640(1), (5)(d)(8).[18]

For each hour of leave used, the employer must pay the employee the greater of the state minimum hourly wage or the employee's "normal hourly compensation," which is the "hourly rate that an employee would have earned for the time during which the employee used paid sick leave."  RCW 49.46.210(1)(i); WAC 296-128-600(10); WAC 296-128-670(2).

Employers may not request medical verification unless the employee misses more than three days *and* the employer has a written policy or CBA provision satisfying the regulations' requirements for verification requests.  WAC 296-128-660.  Employers may not request

---

[18] *See also* Johnson 30(b)(6) Dep. 147:23-25, 150:17-151:20.

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (C18-05092 RBL) - 10

medical verification even when they reasonably suspect sick leave abuse.  WAC 296-128-750; Johnson 30(b)(6) Dep. 153:10-24.  The PSL also prohibits employers from assigning points for use of sick leave under a no-fault reliability policy.  *Id.*; Johnson Dep. 227:2-16, 245:2-12; Marsh Decl., Ex. 15 at 26; RCW 49.46.210(3)-(4); WAC 296-128-770.

### 2. L&I's Final Administrative Policy for "Washington-based" Employees Establishes a Complex, Fact-Specific Test.

The PSL does not cover all employees who work in Washington.  Rather, Washington exempts 16 categories of employees from the PSL, including railroad workers who cross state lines and construction workers covered by CBAs.  *See* RCW 49.46.010(3)(a)-(p); Sess. Laws 2019, c 236.  But according to L&I, the PSL may apply to other employees who work outside Washington if the employee is "Washington-based."  *See* Marsh Decl., Ex. 16 at 3-4; Johnson 30(b)(6) Dep. 204:2-15.

On May 22, 2019, L&I published a final administrative policy (the "Policy") to explain how it will decide whether an employee is "Washington-based" and therefore covered by the PSL.  Marsh Decl., Ex. 16; Johnson 30(b)(6) Dep. 191:15-23.  The Policy establishes a multi-factor test, consisting of several non-exclusive factors, including (1) where the employment agreement was made; (2) whether the employee lives in Washington; (3) whether the employer has its base of operations in Washington; (4) whether the employee has his or her base of operations in Washington; (5) whether the employer maintains a work site in Washington; (6) if an employee leaves Washington for work, whether the trips begin and end in Washington; (7) whether the employee is supervised by individuals operating from the employer's location in Washington; (8) the amount of work performed in Washington; and (9) the length of a contract to do work in Washington.  Marsh Decl., Ex. 16 at 2.[19]  The Policy states L&I "will give careful consideration to *where* the work is performed."  *Id.* at 3 (emphasis added).  *See also* Johnson 30(b)(6) Dep. 284:12-18.  L&I admits this test is "complex," fact-specific, and individual, and that its application to any particular employee cannot be predicted in advance.

---

[19] *See also* Johnson 30(b)(6) Dep. 79:24-80:21.  No statute or regulation defines the term "Washington-based"; nor does the PSL define "employer's base of operations," "employee's base of operations," or "work site."

Johnson 30(b)(6) Dep. 79:24-80:21.

L&I claims "it does not assume that an employee domiciled in Washington is automatically Washington-based. Instead, it [will] appl[y] the full analysis of factors [on an employee-by-employee basis] to determine if there is [a] significant relationship with … Washington." *Id.* 126:19-24; 182:11-19. Yet L&I also asserts the PSL applies to flight crew who are based in Washington, i.e., Alaska flight attendants and pilots based at Sea-Tac. *Id.* 137:22-138:5; 204:2-15; 215:11-216:3; 279:4-16; 283:9-18. Once L&I determines an employee is "Washington-based," the PSL's "sick leave requirements apply regardless of where the employee works those hours." *Id.* 100:11-19, 199:1-201:19, 284:19-286:15. L&I claims for "Washington-based" flight crew all hours worked, even those worked in federally-regulated airspace and in other states, accrue toward and are protected under the PSL. *Id.*[20]

## G.    Applying Local Paid Sick Leave Laws to Flight Crew Will Increase Sick Leave Use and Cause Adverse Operational Effects.

Applying the Washington PSL to flight crew will increase sick leave use, causing adverse operational effects, as occurred when Virgin tried to comply with New York City's ESTA. *See* Lee Rep. ¶¶ 58-64; Lee Rebuttal ¶¶ 9-11, 38-39 & n.27; Butler Decl. ¶¶ 22-28; Mann Dep. 37:13-38:6; Johnson 30(b)(6) Dep. 230:23-231:14; Schubert Decl. ¶ 11.

*Increased Delays and Cancellations*. Increased flight crew sick leave will increase delays and cancellations (as it did for Virgin), and missed passenger connections. *See* Lee Rep. ¶¶ 55-56, 58-64 & Exs. 15-16; Lee Rebuttal Rep. ¶¶ 10-11, 19, 38-39 & n. 62; Butler Decl. ¶ 24; Butler Dep. 49:3-15, 58:13-17.[21] Increased delays and cancellations will affect hundreds if not thousands of passengers per day. Lee Rebuttal ¶ 19 & n.62.

*Increased Ground Times and Longer Connections*. To protect against flight delays and cancellations resulting from increased flight crew sick leave use, A4A Member Carriers will need to schedule more ground time and longer minimum connection times between flights.

---

[20] At the same time, L&I admits "it's possible for an employee to be working in two different states and only the time worked in Washington accrues in the Washington law." Johnson 30(b)(6) Dep. 200:21-24. L&I's Policy gives no guidance on when this contrary result might occur. *Id.* 285:21-286:15.
[21] *See also id.* Johnson 30(b)(6) Dep. 230:23-231:9; Mann Dep. 35:17-22, 36:8-11.

*See* Harrison Decl. ¶¶ 17-20; Carlson Dep. 29:15-21. This will reduce the number of flights offered and extend layovers and itineraries. Harrison Decl. ¶ 20.

**Route Cancellations.** To accommodate increased overhead without an increase in productivity (because carriers will need to hire more reserve flight crew for the same number of flights), some carriers will need to cancel marginally profitable routes. Butler Decl. ¶23; Butler Dep. 95:22-25; 96:13-15; Ryan Decl. (6/28/19) ¶¶ 44-46; Schubert Decl. ¶10; Carlson Decl. ¶ 8; Kilayko Decl. ¶ 8; Simone Decl. ¶ 7; Lee Rep. ¶¶ 51, 53; Lee Rebuttal ¶¶ 31-35, 48-52; Harrison Decl. ¶¶ 13-15.

**Significant Capital Expenditures.** To comply with the PSL, A4A Member Carriers will also need to expend significant capital to create new IT systems, or modify existing ones, to enable them to track how many hours flight crew perform work in Washington versus elsewhere. None of the carriers has such systems. O'Brien Decl. ¶¶ 16-22; Carlson Decl. ¶ 11; Schubert Decl. ¶ 12; Simone Decl. ¶ 13; Kilayko Decl. ¶ 10; Shaw Decl. ¶ 9; Lee Rebuttal ¶ 46 & n.148. Alaska's IT systems, some of which it licenses from vendors, process flight departure and arrival times, but not flight path data. Jain Decl. ¶ 10; O'Brien Decl. ¶¶ 8, 13, 18.a. Alaska does not have an IT system that allows it to track all hours its flight crew performed work for purposes of sick leave accrual under state or local paid sick leave laws, however those laws may define "work." O'Brien Decl. ¶ 17. Nor do its IT systems allow for accrual and use of sick leave on an hourly basis, as Alaska's flight attendants accrue and use sick leave by TFP, not the hour. *Id.* ¶ 19. Changing or developing IT systems to allow Alaska to track how many hours of "work" flight crew performed and where may not be technically possible, would cost millions of dollars, take years to implement, and risk failures in other IT systems, which could cause flight disruptions. *Id.* ¶¶ 11, 12, 14, 15, 17, 18.a., b., 22; Jain Decl. ¶¶ 5-16.

Further complicating such an endeavor, flight crew have successfully bargained for flexible scheduling provisions in their CBAs that allow them to select a base airport in a different state from that in which they live and to manage where and when they fly. Peterson 30(b)(6) Dep. 15:10-12, 67:6-13, 52:12-15, 98:15-99:2; Simone Decl. ¶¶ 17, 19; Kilayko Decl.

¶ 15; Shaw Decl. ¶¶ 14, 17; Jones Dep.19:22-21:11; Ryan Decl. (7/17/18) ¶ 9, 15.[22]  Flight crew bid for and are assigned monthly flight schedules and then can modify those schedules by adding, dropping, and trading pairings or trips, often without advance notice or prior approval from the airline.  Lee Rep. ¶ 18 n. 49.[23]  In fact, flight attendants can trade trips right up to the point at which passengers begin boarding a flight.  Ryan Decl. (6/28/19) ¶ 28.[24]

As a result, flight crew do not work the same trips between the same airports at the same start and end times each calendar week or month.  Peterson 30(b)(6) Dep. 126:19-127:2, 129:3-8; Kilayko Decl. ¶ 19; Shaw Decl. ¶ 18; Carlson Decl. ¶ 19; Ryan Decl. (7/27/18) ¶15; Ryan Decl. (6/28/19) ¶36.

Because of these flexible CBA provisions, A4A Member Carriers cannot know in advance where any given flight attendant or pilot will fly and when, requiring new IT systems or modifications to existing ones to enable real-time tracking of where each flight crewmember performed each hour of work.  *See* Ryan Decl. (6/28/19) ¶ 36; O'Brien Decl. ¶ 18a-b.

***Collective Bargaining.***  A4A Member Carriers will also need to bargain with their unions to take steps necessary to comply with the Law, such as implementing a new crew tracking system or rate of pay.  *See, e.g.*, Peterson 30(b)(6) Dep. 97:9-13, 87:14-25 (admitting AFA would grieve a unilateral implementation of a clock-in/clock-out program or pay rate change).  And some carrier CBAs, such as Alaska's pilot CBA, prohibit carriers from using any devices capable of performing such tracking.  *See* Ryan Decl. (6/28/19) ¶¶ 10-12.

A4A Member Carriers will also need to negotiate an hourly rate of pay, as the Law requires employers to pay sick leave at a "normal hourly rate," but carriers do not compensate flight crew in this way.  *See* Peterson 30(b)(6) Dep. 87:14-25.  Instead, flight crew pay turns on

---

[22] *See also* Johnson 30(b)(6) Dep. 31:3-18.

[23] *See also* Ryan Decl. (7/27/18) ¶¶ 13-16; Ryan Decl. (6/28/19) ¶¶ 34-35; Carlson Decl. ¶ 20; Shaw Decl. ¶ 16-17; Simone Decl. ¶¶ 16-19; Kilayko Decl. ¶ 18 (discussing flexible scheduling and trading provisions in Alaska, United, Southwest, and American flight attendant and pilot CBAs); Peterson 30(b)(6) Dep. 15:6-9 (admitting "[flight attendants] are able to flex up and flex down our schedules quite a bit").

[24] Trip trading is common:  on a month-to-month basis, from March 2017 to March 2019, less than 10% of Alaska's Sea-Tac-based lineholding flight attendants (i.e., flight attendants with monthly schedules, as opposed to reserve flight attendants) worked the schedule Alaska awarded them in the monthly bid process, and 62% invoked their rights under their CBA to fly fewer flights than originally awarded.  Ryan Decl. (6/28/19) ¶¶ 34, 35.

complex, negotiated-for formulae involving minimum pay rules, per diems, incentives, and other payment types, including pay rules and premiums that depend on events occurring in-flight (such as mechanical delays). *See, e.g.*, Simone Decl. ¶¶ 23-27; Shaw Decl. ¶¶ 21-22; Ryan Decl. (6/28/19) ¶¶ 13-24 (Alaska has 98 pay codes for flight attendants, 61 of which derive from the CBA). These complex compensation provisions are not based on hourly rates or hours of work. *See, e.g.*, Carlson Decl. ¶¶ 24-27; Ryan Decl. (6/28/19) ¶¶ 13-24; Simone Decl. ¶¶ 23-27; Shaw Decl. ¶¶ 21-22.[25]

***Compliance with Multiple State and Local Laws for a Highly Mobile Work Force.***
A4A Member Carriers will also face the administrative burden of tracking multiple and evolving state and local paid sick leave laws and then having to determine which law applies to which flight attendant and pilot, and when. Lee Rep. ¶ 70; Lee Rebuttal ¶¶ 40-46.[26] In addition to the flexible scheduling provisions in the CBAs, which mean carriers cannot predict flight crew flying schedules in advance, the CBAs allow flight crew to select a base airport in a different state from the one in which they live and to change their base airports, even multiple times a year. Ryan Decl. (6/28/19) ¶¶ 25, 27; Simone Decl. ¶¶ 9, 17; Kilayko Decl. ¶ 15; Shaw Decl. ¶¶ 10, 14; Butler Decl. ¶ 25; Butler Dep. 68:10-69:15; Lee Rep. ¶ 41.[27] As of June 2019, 178 of the 1,247 Alaska pilots and 326 of the 2,348 Alaska flight attendants based at Sea-Tac lived outside Washington and commuted to and from work by air travel. Ryan Decl. (6/28/19) ¶ 26. It is thus not uncommon for flight crew to live and perform most of their work in a state other than the one in which they are based. *See id.* ¶¶ 25-32 & Exs. 1, 2 (examples of Alaska flight attendants who live in Utah and Arizona, commute to and from Sea-Tac, and work primarily in other states outside Washington and in federally-regulated airspace); *see also* Lee Rep. ¶¶ 17-24 & Exs. 6, 7.[28] And flight crew who live or are based in different states from each other often work the same flights. *See* Ryan Decl. (7/27/18) ¶ 33.

---

[25] Alaska and Southwest flight attendant CBAs pay by TFP (i.e., mileage), not hours worked. *See supra* n.6.
[26] *See also* Schubert Decl. ¶ 12; Simone Decl. ¶ 13; Carlson Decl. ¶ 11; Kilayko Decl. ¶ 10; Shaw Decl. ¶ 9.
[27] *See also* Peterson 30(b)(6) Dep. 52:12-15.
[28] Simone Decl. ¶¶ 9, 22; Shaw Decl. ¶ 20; Kilayko Decl. ¶ 22 (same for American, Southwest, and United).

Thus, multiple state and local laws may apply to the same flight crewmember at the same time, and different laws may apply to flight crew flying the same flight—all of which carriers would need to monitor and determine in real-time to attempt to comply with these laws. *See* Lee Rep. ¶¶ 70-71; Lee Rebuttal ¶¶ 40-46 & n.18; *see also* Schubert Decl. ¶¶ 12-13; Simone Decl. ¶¶ 13-14; Carlson Decl. ¶¶ 11-12; Kilayko Decl. ¶¶ 10-12; Shaw Decl. ¶¶ 9-10.

## III.  ARGUMENT

### A.    The ADA Preempts Applying the Washington PSL to Flight Crew.

Congress enacted the ADA, 49 U.S.C. § 41713, "to promote 'efficiency, innovation, and low prices' in the airline industry through 'maximum reliance on competitive market forces and on actual and potential competition.'" *Nw., Inc. v. Ginsberg*, 572 U.S. 273, 280 (2014) (quoting 49 U.S.C. §§ 40101(a)(6), (12)(A)).  *See also* Pub. L. No. 95-504, 102, 92 Stat. 1705 (1978) (same); *Blackwell v. Sky-West Airlines, Inc.*, 2008 WL 5103195, at *16 (S.D. Cal. 2008) (same) (quoting *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 371 (2008)).  To prevent states from "undo[ing] federal deregulation with regulation of their own," *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 378 (1992), the ADA includes an express preemption provision: "[A] state … may not enact or enforce a law, regulation, or other provision having the force and effect of a law related to a price, route, or service of an air carrier[.]"  49 U.S.C. § 41713(b)(1); *see also Am. Airlines, Inc. v. Wolens*, 513 U.S. 219 (1995).

The U.S. Supreme Court consistently interprets this provision as having a "broad pre-emptive purpose," reaching state laws "having a connection with or reference to airline 'rates, routes, or services.'"  *Morales*, 504 U.S. at 383-84.  The ADA preempts state laws of general application that indirectly affect airline prices, routes, or services, so long as the connection is not "too tenuous, remote or peripheral."  *Id*. at 390 ("state laws preventing obscene depictions" too tenuous).  As the Court put it: "there is little reason why state impairment of the federal scheme should be deemed acceptable so long as it is effected by the particularized application of a general statute"—indeed, a contrary conclusion would "ignore[] the sweep of the 'relating to' language" in the provision.  *Id.* at 390.  *See also Wolens*, 513 U.S. at 226, 228 (state

consumer protection act claim preempted); *Ginsberg*, 572 U.S. at 284 (breach of implied

covenant of good faith and fair dealing claim preempted).

Numerous courts have thus held the ADA preempted state labor laws that directly or

indirectly related to prices, routes, or services.  *See, e.g.*, *Overka v. Am. Airlines, Inc*., 790 F.3d

36 (1st Cir. 2015) (ADA preempted claims under Massachusetts Tips Law); *Mass. Delivery

Ass'n v. Coakley*, 769 F.3d 11, 21-22 (1st Cir. 2014) (ADA preempts Massachusetts

independent contractor statute if the law's effect on prices, routes, or services is "significant,"

even if indirect); *Angeles v. U.S. Airways, Inc.,* 2013 WL 622032, at *9 (N.D. Cal. 2013) (ADA

preempted state law meal and rest break claims).  And the Ninth Circuit has recognized the

ADA preempts generally applicable statutes that "contribute to 'a patchwork of state service-

specific laws," because such laws "defeat[] Congress' deregulatory objectives."  *Dilts v. Penske

Logistics, LLC*, 769 F.3d 637, 647 (9th Cir. 2014) (discussing Federal Aviation Administration

Authorization Act's preemption provision, modeled after the ADA's) (citations omitted).[29]

The ADA preempts Washington's PSL as applied to flight crew because the PSL's

application will cause flight delays and cancellations, increased passenger displacement, fewer

route choices, and, for some A4A Member Carriers, increased fares, and the PSL will

contribute to a patchwork of state-specific laws.  The PSL gives flight crew more paid sick

leave for the same work, allows for sick calls with little or no notice (if notice is not

"practicable"), and prohibits employers from enforcing no-fault reliability policies.  WAC 296-

128-650 & -770.  These provisions will increase sick leave use, including short notice sick calls

and sick calls away from base airports (i.e., sick leave use with the greatest operational

impact)—as evidenced by Virgin's experience when it attempted to comply with New York

City's ESTA.  *See* Butler Decl. ¶¶ 18-28; Lee Rep. ¶¶ 58-67; Lee Rebuttal ¶¶ 10-11, 39.

---

[29] *Dilts* held the FAAA's preemption provision did not preempt drivers' state meal and rest break claims.  769 F.3d at 647-50.  This case differs.  The plaintiffs in *Dilts* worked exclusively *within* California; thus, the Court left open whether the ADA preempts state labor laws when applied to transportation workers who routinely cross state lines, such as flight crew.  *See id.* at 640, 648, n. 2.  Also, the defendants in *Dilts* produced no evidence showing the law's application would meaningfully affect prices, routes, or services.  *Id*. at 649.  While A4A does not concede such proof is necessary under the ADA, it has produced sufficient proof here.

1  Increased sick leave use will increase flight delays and cancellations and, therefore, missed

2  passenger connections—as Virgin experienced.  *See* Lee Rep. ¶¶ 61-62; Butler Decl. ¶ 24.

3         An increase in sick calls at non-base airports will also require more deadheading of

4  flight crew, which will mean removing passenger seats from inventory, including denying a

5  seat to a passenger who already booked a ticket.  Lee Rebuttal ¶ 32; Butler Decl. ¶ 23; Butler

6  Dep. 64:1-3; Ryan Decl. (6/28/19) ¶ 46 (Alaska CBAs prohibit it from requiring flight crew to

7  sit in non-revenue jump seats when deadheading for work).  Increased flight crew sick leave

8  absences will also result in carriers scheduling more ground time between flights and longer

9  minimum connection times to reduce the likelihood of delays.  Harrison Decl. ¶¶ 17-20;

10  Carlson Dep. 29:15-21.  The flying public will therefore have fewer flight options and longer

11  itineraries.  *See* Harrison Decl. ¶¶ 17-20; *see also* Lee Rebuttal ¶ 50.  The ADA preempts these

12  types of adverse effect on routes and services.  *See, e.g.*, *Venegas v. Global Aircraft Serv., Inc.*,

13  2016 WL 5349723 (D. Me. 2016) (preempting independent contractor claims because

14  classifying plaintiffs as employees would entitle them to reduced airfare travel benefits, taking

15  seats on flights and reducing the seats available to the public).

16         Applying the PSL to flight crew will also cause labor costs to increase (through

17  increased reserve headcount), which will result in carriers either increasing passenger fares,

18  reducing the number of flights offered, or cancelling marginally profitable routes.  Lee Rebuttal

19  ¶¶ 33, 48-52; Schubert Decl. ¶ 4; Shaw ¶ 7; Kilayko Decl. ¶ 8; Harrison Decl. ¶¶ 17-20.  Plus,

20  because reserves will be entitled to the same statutory paid sick leave as lineholders, sick leave

21  usage among reserves will also increase, while crew productivity overall will decrease.  Butler

22  Decl. ¶ 23; Lee Rebuttal ¶ 32.  As the former Vice President of Airports, Inflight and Customer

23  Service at Virgin testified: "I just kept adding reserves in New York, and I added reserves and

24  sick leave went up.  I added more reserves and sick leave went up.  Then the reserves called in

25  sick."  Butler Dep. 95:22-25, 96:10-12.  To satisfy federal regulations regarding flight staffing

26  levels, Virgin had to deadhead flight crew from its California bases to JFK and pay for hotels,

27  per diems, and deadhead rates for cross-country travel.  *See supra* Part II.E.  These increased

costs contributed to Virgin's decision to close the base.  *Id.*  This evidence confirms that applying the PSL to flight crew will increase labor costs, which will affect carrier prices, routes, or services, rendering the PSL preempted under the ADA.  *See, e.g.*, *Brindle v. R.I. Dep't of Labor & Training*, 2019 WL 2505009, at *6 (D.R.I. 2019) (ADA preempted applying state overtime laws to airline customer service agents because increased labor costs would cause airline to reduce staff on holidays and weekends, affecting services and competition).

Further, if Washington can regulate flight crew paid sick leave, so can other jurisdictions, and A4A Member Carriers will be forced to continuously track and apply a patchwork of state and local paid sick leave laws to a highly mobile work force.  Lee Rebuttal ¶¶ 40-46.  This outcome defeats the ADA's "deregulatory objectives," warranting declaring the law preempted under the ADA.  *Dilts*, 769 F.3d at 647.

> **B.**      **The Washington Paid Sick Leave Law as Applied to Flight Crew Violates the Dormant Commerce Clause of the United States Constitution.**

The Commerce Clause of the U.S. Constitution empowers Congress to "regulate Commerce with foreign Nations, and among the several States."  U.S. Const. art. I, § 8, cl. 3. This clause "not only . . . grant[s] legislative power to Congress, but also impliedly . . . limit[s] the power of State and local governments to enact laws affecting foreign and interstate commerce."  *Transp. Ass'n of Am. v. City & Cnty. of San Francisco*, 992 F. Supp. 1149, 1161 (N.D. Cal. 1998) (citing *Healy*, 491 U.S. at 326 n.1).  This implied limitation, known as the Dormant Commerce Clause ("DCC"), prevents a state from regulating "those phases of the national commerce which, because of the need of national uniformity, demand that their regulation, if any, be prescribed by a single authority."  *S. Pac. Co. v. Arizona*, 325 U.S. 761, 767 (1945).

Congress has recognized that "airlines are direct instrumentalities of interstate commerce," *California v. Taylor*, 353 U.S. 553, 567 n.15 (1957), and that it has "national responsibility for regulating air commerce," *Nw. Airlines*, 322 U.S. at 302 (1944) (Jackson, J., concurring).  "Aviation is unique among transportation industries in its relation to the Federal

Government—it is the only one whose operations are conducted almost wholly within the Federal jurisdiction, and are subject to little or no regulation by States or local authorities."  S. Rep. No. 1811, at 5 (1958).

Facially neutral local laws that have an incidental burden on interstate commerce violate the DCC when the "burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits."  *Pike v. Bruce Church, Inc*., 397 U.S. 137, 142 (1970).  This limitation "reflect[s] the Constitution's special concern both with the maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce and with the autonomy of the individual States within their respective spheres."  *Healy*, 491 U.S. at 335-36 (citations omitted).  Under *Pike*, "[c]ourts use a 'burden versus benefit' balancing test to determine the constitutionality of state laws that incidentally affect interstate commerce." *Stone ex rel. Estate of Stone v. Frontier Airlines, Inc*., 256 F. Supp. 2d 28, 45 (D. Mass. 2002).

Courts have recognized various "burdens" under *Pike*.  In *Bibb v. Navajo Freight Lines*, the U.S. Supreme Court declared a state law unconstitutional because it required interstate motor carriers to stop and change rear mudguards, delaying and inconveniencing interstate motor carriers crossing the state's lines.  359 U.S. 520, 526, 529-30 (1959).  In *Pike*, the Court held a state regulation that would have required a capital expenditure of $200,000 to build a new cantaloupe packing facility imposed an unconstitutional financial burden.  397 U.S. at 145. In *Ward v. United Airlines, Inc.*, a federal district court held applying California's labor code to pilots "would impose too great an administrative burden on United's interstate and international airline" because it would require the airline to "monitor the … precise hours spent working in each state and determine which state's laws applied in that bid period."  2016 WL 3906077, at *5-6 (N.D. Cal. 2016).  And in *United Air Lines, Inc. v. Industrial Welfare Commission*, 211 Cal. App. 2d 729 (1963), the court held a law regarding uniform expense reimbursements was unconstitutional as applied to flight attendants because it would create "personnel troubles," as only some flight attendants would be reimbursed while others working the same flight would

not. *Id.* at 748-49, *disapproved of on other grounds*, 27 Cal. 3d 690, 728 n.15 (1980). The PSL imposes each of these types of burdens when applied to flight crew.[30]

### 1.      Applying the PSL to Flight Crew Will Burden Flights and Routes.

Applying the PSL to flight crew will increase sick leave use because flight crew will be entitled to take more paid sick leave, on short or no notice, with no consequences—i.e., without incurring points under CBA policies and without medical verification requirements. As Virgin's experience establishes, granting flight crew more paid sick leave while eliminating the airline's ability to manage use of that leave through reliability policies increases sick leave usage. *See supra* Part II.E & Part III.A. Southwest's sick leave emergencies in the spring 2017 also bear this out: by declaring a "sick leave emergency" and requiring flight attendants who called out sick to see a company doctor, sick leave rates reduced by half. Taitte 30(b)(6) Dep. 78:22-79:6, 81:2-:14, 84:25-85:6. Because the PSL prohibits employers from requesting medical verification even on suspicion of abuse this outcome is magnified here. WAC 296-128-750; Johnson 30(b)(6) Dep. 153:10-24. And as discussed, increased flight crew sick leave use will increase flight delays and cancellations—as occurred at Virgin. *See supra* Part II. E. Increased flight crew sick leave use will also result in passenger displacement, fewer flight options, and longer itineraries. *See supra* Part II.G. L&I and AFA admit airlines must maintain on-time and reliable operations and that reliable flight crew staffing is necessary to accomplish those goals. Johnson 30(b)(6) Dep. 63:17-64:9, 231:5-14; Peterson 30(b)(6) Dep. 88:12-89:6. And the undisputed evidence confirms that applying the PSL to flight crew will burden interstate flights and passengers traveling on interstate itineraries through delays,

---

[30] The Seventh Circuit's decision in *Hirst v. Skywest, Inc.*, 910 F.3d 961 (7th Cir. 2018), which held "*Pike* balancing is triggered only when the challenged law discriminates against interstate commerce in practical application," is not binding in this circuit and contradicts long-standing U.S. Supreme Court and Ninth Circuit precedent. *See, e.g.*, *United States v. Lopez*, 514 U.S. 549, 579-80 (1995) ("States may not impose regulations that place an undue burden on interstate commerce, even where those regulations do not discriminate between in-state and out-of-state business."); *Am. Fuel & Petrochem. Mfrs. v. O'Keeffe*, 903 F.3d 903, 910 (9th Cir. 2018) (*Pike* applies to "nondiscriminatory" laws); *Rocky Mt. Farmers Union v. Corey*, 730 F.3d 1070, 1087 (9th Cir. 2013) (same); *Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521, 528 (9th Cir. 2009) (same); *Int'l Franchise Ass'n, Inc. v. City of Seattle*, 97 F. Supp. 3d 1256, 1267 (W.D. Wash. 2015) (same), *aff'd*, 803 F.3d 389, 399 (9th Cir. 2015) ("Absent discrimination, we will uphold the law unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefit.") (quotations omitted).

cancellations, reduced flight options, displacement, and longer itineraries, bringing this case squarely within *Bibb*. *See* 359 U.S. at 526, 529-30 (invalidating state law because it would delay motor carrier operations and prompt movement of cargo is of the essence).

### 2.    Applying the PSL to Flight Crew Will Result in Substantial Expenditures.

To comply with the PSL, A4A Member Carriers will need to develop or modify IT systems capable tracking hours of work under the PSL and where those hours were performed—an endeavor, if possible, that would take years and cost millions.  O'Brien Decl. ¶¶ 11, 12, 14, 15, 17, 18.a., b., 22; Jain Decl. ¶¶ 5-16.  This is so because L&I testified the PSL does not apply to flight crew simply because they are based in Washington, but rather L&I will give "careful consideration" to where the work was performed and will conduct an employee-by-employee analysis.  Marsh Decl., Ex. 16 at 3; Johnson 30(b)(6) Dep. 284:12-18.  Carriers will have no choice but to track the amount of time flight crew work in Washington versus elsewhere to determine whether each crewmember is "Washington-based" under L&I's test or subject to some other law (or both).  This will require an overhaul to complex and highly interconnected IT systems for a highly mobile workforce with a highly variable work schedule over which they have significant control.  *See supra* Part II.G.  Further, some carriers, such as Alaska, rely on IT systems licensed from vendors and cannot unilaterally change those systems to comply with the PSL.  O'Brien Decl. ¶ 13; Jain Decl. ¶ 10.

Even if carriers such as Alaska could accomplish such technological changes (an unknown), doing so could disrupt other IT systems necessary for flight operations, causing delays and cancellations.  O'Brien Decl. ¶¶ 11, 12, 14, 15, 17, 18.a., b., 22; Jain Decl. ¶¶ 5-16.  Carrier IT systems are interconnected, so an "outage" in one system can have a rippling effect across other systems.  Jain Decl. ¶¶ 5-7; O'Brien Decl. ¶ 22.[31]  The opportunity costs of

---

[31] The threat of IT outages on airline operations is not speculative.  *See* https://www.washingtonpost.com/transportation/2019/05/14/software-outage-causes-delays-jetblue-airline-travelers/?utm_term=.cc7b7a130af7; https://www.npr.org/2019/04/01/708738804/u-s-flight-delays-hit-several-airlines-computer-problems-blamed); https://www.usatoday.com/story/travel/flights/2019/04/29/sabre-airline-computer-outage-american-alaska-jetblue-affected/3618486002/); https://www.gao.gov/products/GAO-19-514) (identifying 34 IT system outages in three years; concluding 85% of them led to flight delays and cancellations).

developing and modifying IT systems to comply with the PSL would also be substantial.  *See, e.g.*, Schubert Decl. ¶ 12; Simone Decl. ¶ 13.  Because complying with the PSL for flight crew would require significant capital expenditures, the PSL's application to flight crew unduly burdens interstate commerce under *Pike*.  *See* 397 U.S. at 142.

### 3.   Applying the PSL to Flight Crew Will Cause Significant Operational Burdens.

*Burden of Tracking and Ensuring Compliance.*  L&I admits even it cannot determine in advance when the PSL will apply to any given employee, as that question turns on a case-by-case, fact-specific determination.  *See supra* Part II.F.2.  A4A Member Carriers will have to devote considerable resources to scrutinizing the highly variable and unpredictable work schedules of many thousands of employees who may have some connection to Washington.  *See id.*; *see also* Lee Rep. ¶¶ 70-71; Lee Rebuttal ¶¶ 40-46 & n. 18; Schubert Decl. ¶¶ 12-13; Carlson Decl. ¶¶ 11-12; Simone Decl. ¶¶ 13- 14; Kilayko Decl. ¶¶ 10-12; Shaw Decl. ¶¶ 9-10.  The DCC prohibits such a burden on interstate commerce.  *See Ward*, 2016 WL 396077, at *5.

Applying the PSL to flight crew would also expose carriers to a patchwork of state and local paid sick leave laws.  Presently, more than 35 state and local paid sick leave laws exist, each with its own requirements regarding applicability and substantive compliance.  Marsh Decl., Exs. 13 & 14.  This is no small task, given each jurisdiction has its own test for determining when its law applies to a given employee.  *See* Johnson 30(b)(6) Dep. 102:9-17.  While L&I applies a multi-factor test that gives "careful consideration" to where the work was performed, (a) New York City's ESTA applies to employers based outside the City if an employee works 80 hours in the City in a calendar year, and (b) Massachusetts' law applies to employees whose "primary place of work" is in Massachusetts, which can be satisfied even if the employee performs less than 50% of her work in the state.  *See supra* Part II.E & F.2.  Although each of these jurisdictions applies a different test, each also deems all hours worked by a covered employee as counting for sick leave accrual purposes, regardless of where those hours were worked.  *See* Johnson 30(b)(6) Dep. 100:11-19, 199:1-201:19, 284:19-286:15; DCA

Enforcement Policy: Airline Flight Crew under the New York City Earned Safe and Sick Time Act (May 2018) at 2;[32] 940 CMR 33.30 (Massachusetts).  San Diego's law applies to employees who work two hours in a calendar week inside the City's boundaries, and only hours worked in San Diego count towards accrual.  San Diego Mun. Code §§ 39.0104, 39.0105.

Thus, a pilot or flight attendant who lives in Washington and routinely flies pairings that include flights between Sea-Tac, San Diego, New York City, and Massachusetts could be subject to each of these different laws, simultaneously.  A4A Member Carriers will have to determine *after* flights have flown (because flight crew can change their own schedules without prior company approval, *see* Jones Dep. 19:22-21:11) whether, when, and to whom these different state and local laws apply, and then track and monitor the use of different paid sick leave benefits under each regime, for thousands of flight crew.

Carriers will also have to comply with a different patchwork of paid sick leave laws for the same employee virtually every day, as each flight crewmember routinely works in multiple states and in different combinations of states in any given pairing.  For example, "Washington-based" employees can take paid sick leave to care for an ill sibling or grandparent.  RCW 49.46.210(2)(e), (g).  But employees covered by the Massachusetts law cannot.  940 CMR 33.02.  If carriers have to comply with some combination of these laws—a real possibility, given the highly mobile nature of flight crew, who can live, be based in, and work in numerous states—the permissible reasons for and amount of paid sick leave a flight crewmember could take could change from month to month.  The costs of sorting through which laws apply to whom and when would divert essential resources away from growing airline routes and services.  *See* Lee Rebuttal ¶¶ 40-46, 50-51.

If faced with such patchwork regulation, carriers will face litigation over competing obligations.  *See* Johnson 30(b)(6) Dep. 103:4-106:23.  Oregon allows employers to request medical verification when they reasonably suspect sick leave abuse without regard to the

---

[32] https://www1.nyc.gov/assets/dca/downloads/pdf/businesses/DCAEnforcementPolicyMemo-PaidSickLeave-FlightCrew.pdf.

number of missed days, ORS 653.626(3)(b), while Washington does not, WAC 296-128-750.

A flight attendant might start the year under Oregon's law but change her base assignment to

Sea-Tac, qualifying her for paid sick leave under Washington's law.[33]  If that flight attendant

then takes paid sick leave and the airline suspects it is for an improper purpose, the airline

would face certain litigation over a request for a medical verification.  Surely the flight

attendant would claim the Washington law was more employee-friendly on this point and

therefore trumped the Oregon law.[34]

   And as discussed above, compliance with even just the Washington PSL as to flight

crew will require overhauling carrier IT systems, a process that will take years and cost

millions of dollars to develop and then test to reduce the risk of system outages.  If carriers

have to comply with other state and local paid sick leave laws with other accrual rates and

tracking requirements, these costs will only multiply.

   ***Burden of Renegotiating CBAs.***  To comply with the PSL, A4A Member Carriers will

have to renegotiate their CBAs, which could take years and would further divert essential

resources from growing interstate commerce.  Alaska's pilots and flight attendants unions have

taken the position that Alaska cannot unilaterally impose a tracking system without collective

bargaining.  Peterson 30(b)(6) Dep. 97:9-13; Ryan Dep. 56:8-15, 58:14-59:8; Ryan Decl.

(6/28/19) ¶¶ 10-12.  Even if Alaska could develop or modify IT systems to track where every

flight crewmember performed every hour of work, it would have to negotiate changes to their

CBAs with the unions.  Carriers would have to negotiate other CBA provisions, too, such as

what the "normal hourly rate" for any statutory sick leave taken will be, Peterson 30(b)(6) Dep.

87:14-22, and reasonable notice and medical verification policies that satisfy WAC 296-128-

650, -660.  The RLA prohibits carriers from unilaterally imposing a normal hourly rate or

---

[33] Flight crew have exhibited such behavior: after American began trying to comply with the Massachusetts paid sick leave law, flight attendants started requesting base transfers to Boston for the month of December only to take advantage of that law over the holidays.  Simone Decl. ¶¶ 8-10.  Virgin flight attendants also requested temporary base transfers to take advantage of New York City's ESTA.  Butler Decl. ¶ 25.

[34] The threat of litigation is real.  In one recent lawsuit, a Delta flight attendant who was based at JFK but flew flight segments to and from California sued under California's state minimum wage requirements.  *See Oman v. Delta Air Lines*, 153 F. Supp. 3d 1094 (N.D. Cal. 2015).

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (C18-05092 RBL) - 25

modifying their CBAs to comply with the PSL, and any attempt by a carrier to do these things

would result in labor disputes, which could disrupt flights.  Ryan Decl. (6/28/19) ¶¶ 3-11.[35]

Directing A4A Member Carriers to comply with the most restrictive paid sick leave law

would not cure the constitutional defects.  Such a result would allow the jurisdiction with the

most restrictive provision to set national policy, which states cannot do.  *See Brown-Forman*

*Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 582-83 (1986); *Edgar v. MITE Corp.*,

457 U.S. 624, 642-43 (1982) ("Commerce Clause … precludes the application of a state statute

to commerce that takes place wholly outside of the State's borders"); *Am. Booksellers Found.*

*For Free Expression v. Dean*, 202 F. Supp. 2d 300, 320 (D. Vt. 2002), *aff'd in part, modified in*

*part*, 342 F.3d 96 (2d Cir. 2003) (statute violated DCC where web publishers outside Vermont

had to conform communication to Vermont's law or risk penalty); *see also Shaffer v. Heitner*,

433 U.S. 186, 197 (1977) ("[A]ny attempt 'directly' to assert extraterritorial jurisdiction over

persons … would offend sister States and exceed the inherent limits of the State's power.").[36]

Further, just as there is no uniform standard for determining whether any one state's law

applies to highly mobile employees like flight crew, no uniform standard for determining

whether one state law is more restrictive than another exists either.  *See* Johnson 30(b)(6) Dep.

103:4-106:23.  Oregon's paid sick leave law allows for more rapid accrual than Washington's,

but also allows employers to request medical verification on suspicion of sick leave abuse,

while Washington does not.  *Compare* ORS § 653.606, .626; *with* WAC 296-128-620, -750.

Other jurisdictions can enact still different paid sick leave regimes tomorrow and beyond,

---

[35] The PSL also give unions leverage in bargaining by allowing them to oppose an airline's request for a variance from the one hour increment of use requirement.  WAC 296-128-640.

[36] Thus, applying the PSL to flight crew nationwide would also violate the Due Process Clause of Fourteenth Amendment to the U.S. Constitution.  *See* Dkt 1 ¶¶ 73-76.  State laws violate the Fourteenth Amendment when, despite having only insignificant contacts with the parties, events, or transactions at issue, the laws attempt to regulate and control activities beyond the states' boundaries.  *See, e.g.*, *Watson v. Emp'rs Liab. Assurance Corp.*, 348 U.S. 66, 70-71 (1954).  As the Court explained in *BMW of North America, Inc. v. Gore*, "while we do not doubt that Congress has ample authority to enact … a policy for the entire Nation, it is clear that no single State could do so, or even impose its own policy choice on neighboring States."  517 U.S. 559, 571 (1996).  L&I asserts when the PSL applies to flight crew, it follows them wherever they work.  Johnson 30(b)(6) Dep. 100:11-19.  To the extent the PSL regulates conduct outside Washington and in states in which A4A Member Carriers' conduct would otherwise be lawful, such as in Alaska (which has no paid sick leave law), applying the PSL to flight crew would violate the Fourteenth Amendment.  *See Gore*, 517 U.S. at 572 ("a State may not impose economic sanctions on violators of its laws with the intent of changing the tortfeasors' lawful conduct in other States").

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (C18-05092 RBL) - 26

which may also conflict with an existing state or local paid sick leave law.[37]  Because state and local laws comprise an ever-changing patchwork of regulation, and because changing IT systems and negotiating CBAs to comply with just one paid sick leave law takes significant time and resources, carriers will always be out of compliance somewhere.  Carriers will thus face a constant stream of agency actions and litigation under state and local paid sick laws.

The U.S. Supreme Court has made clear that in analyzing whether a state law violates the DCC, courts must "consider[ ] how the challenged statute may interact with the legitimate regulatory regimes of other States and the effect that would arise if not one, but many or every, State adopted similar legislation."  *Healy*, 491 U.S. at 336.  Although the "threat of inconsistent regulation, not inconsistent regulation in fact, is enough" to implicate the DCC, *Legato Vapors, LLC v. Cook*, 847 F.3d 825, 834 (7th Cir. 2017), the evidence in this case confirms A4A Member Carriers will in fact face irreconcilable problems from having to comply with inconsistent regulation.

### 4.    Applying the PSL to Flight Crew Will Cause Personnel Trouble.

Recognizing the highly mobile nature of flight crew work, Congress authorized flight crew to collectively bargain for rates of pay and working conditions under the RLA.  *See* 45 U.S.C. § 181 *et seq*.  The RLA mandates system-wide collective representation, fostering nation-wide CBAs to ensure that highly mobile flight crew are treated uniformly regardless where they live, are based, or work on any given day.  *See In re Henson Aviation, Inc.*, 18 NMB at 443 ("The Board has consistently held that such representation in the airline industry must be on a system-wide basis."); Ryan Decl. (6/28/19) ¶¶ 3-11.  Flight crew CBAs thus ensure that highly mobile flight crew are treated similarly regardless where they live, are based, or operate flights on any given day, while ensuring system-wide compliance with the myriad federal regulations governing the industry.  *See supra* Part II.B; Peterson 30(b)(6) Dep. 154:15-155:19 (AFA acknowledging Alaska's flight attendant CBA requires uniform treatment).

---

[37] *See, e.g.*, Los Angeles Ord. No. 185321, Los Angeles Admin. Code § 10.37.2(b) (living wage ordinance for airport ground employees caps paid time off at 96 hours and requires cash payments every 30 days for additional accrued, unused time off, rather than allowing for the paid sick leave banks required under other laws and CBAs).

Subjecting flight crew to a patchwork of state and local regulations means treating flight crew disparately, undermining the purpose of a system-wide CBA.  For instance, carriers cannot discipline flight crew without just cause.  *See Am. Airlines, Inc., PHX & TWU, Local 502*, 107 AAR 14 (Horowitz, Arb., 2006).[38]  To determine whether just cause exists, arbitrators must, among other things, analyze whether the airline applied its policy evenhandedly and without discrimination across the system, or singled out an employee for harsher punishment.[39] If an employer treats employees differently, the arbitrator will not find just cause.  The state of Alaska does not have a paid sick leave law.  An A4A Member Carrier may therefore assign points for sick calls and impose discipline under the applicable CBA to a flight attendant who is based and lives in Alaska.  The same carrier cannot assign points to a flight attendant covered by Washington's PSL.  As a result, the carrier's conduct would be permitted in one jurisdiction but forbidden in another, even though it would otherwise allowed under the CBA.  Similarly, if a flight from San Diego to Washington D.C. has one flight attendant covered by Washington's PSL (because he is based in Washington, lives in Washington, and spends time working in Washington) and another covered by Oregon's law (because she is based in Oregon, lives in Oregon, and spends time working in Oregon), and both call out sick, the carrier could not ask for medical verification from the Washington flight attendant but could from the Oregon one.

As these examples show, if state and local paid sick leave laws apply to flight crew, uniform application of discipline and of the terms and conditions of pay and work would be impossible.  *See, e.g.*, Peterson 30(b)(6) Dep. 155:17-19 (AFA admitting "[s]o if there was disparate treatment of flight attendants for the same type of occurrence, that would be problematic under the CBA.").  This outcome will confuse flight crew working side-by-side and cause labor discord.  *See id.* 156:5-7 (AFA admitting "if there was disparate treatment, then we would file a contractual grievance on that [under the RLA]").  The PSL would result in different rules governing flight crew working side-by-side, under the same CBA, rendering it

---

[38] *See also* Elkouri & Elkouri, How Arbitration Works 930-33 (6th Ed. 2003).
[39] *See* Discipline & Discharge in Arbitration, 2-6 (Norman Brand & Melissa H. Biren eds. 3rd Ed. 2015) ("Discriminatory enforcement is the antithesis of just cause.").

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (C18-05092 RBL) - 28

an unconstitutional burden on interstate commerce.  *See United Air Lines*, *Inc.*, 211 Cal. App. 2d at 748-49.

### C.    The Burdens Resulting from Applying the PSL to Flight Crew Clearly Exceed the Putative Local Benefit.

When analyzing the putative local benefits under the DCC, courts must test the "assertion[s]" in the record to determine whether state regulation in fact meaningfully advances the State's goals.  *Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429, 444-45 (1978). Washington already exempts 16 categories of workers, including railroad workers who, like flight crew, are highly mobile and routinely cross state lines are exempt.  RCW 49.46.010(3). Washington also exempts construction workers who, like flight crew, are covered by collective bargaining agreements that offer paid sick leave benefits.  Laws of 2019, ch. 236 § 4.  And Washington exempts other employees who, like flight crew, come into frequent contact with the public, such as ferry workers and after school child care program employees.  RCW 49.46.010(3).  L&I admits the PSL achieves its local benefit despite these exemptions.  Johnson 30(b)(6) Dep. 27:17-28:4.  Thus, the PSL's application to all workers is not necessary for the Law to achieve its local benefit.  *See Rice*, 434 U.S. at 445 ("[T]he State's assertion that the challenged regulations contribute to highway safety is … undercut by the maze of exemptions from the general truck-length limit that the State itself allows.").

This is particularly so here, given flight crew have "significant" paid sick leave benefits under their CBAs.  Mann Dep. 38:24-39:1; *see also* Lee Rep. ¶ 49.  Flight crew accrue more paid sick leave, and can carryover more sick leave, from year to year than the PSL requires. *See supra* Part II.B.  L&I's expert, Mr. Mann, admitted any benefit of applying the PSL to flight crew is "incremental" at best.  Mann Dep. 38:12-39:10.  L&I's other expert, Mr. Tregillis, similarly admitted he has no basis for concluding A4A Member Carrier sick leave policies are insufficient for pilots and flight attendants to avoid flying when ill.  Tregillis Dep. 7:16-19, 8:4-11 ("Q: Do you have any opinion as to whether or not those policies and CBA provisions are sufficient for pilots and flight attendants to avoid having to fly sick? A: No.").

# IV.    CONCLUSION

For the foregoing reasons, A4A respectfully requests that this Court grant its Motion for Summary Judgment and conclude the ADA preempts and the DCC prevents the PSL's application to flight crew.

DATED this 25th day of, 2019.

By */s/ Harry J. F. Korrell*
Harry J. F. Korrell WSBA #23173
Rebecca J. Francis, WSBA #41196
John Hodges-Howell, WSBA #42151
DAVIS WRIGHT TREMAINE LLP
1201 Third Avenue, Suite 2200
Seattle, WA 98101-3045
Telephone: (206) 622-3150
Email: harrykorrell@dwt.com
          rebeccafrancis@dwt.com
          jhodgeshowell@dwt.com

Robert A. Siegel (*pro hac vice*)
O'MELVENY & MYERS LLP
400 South Hope Street, 18th Floor
Los Angeles, CA 90071
Telephone: (213) 430-6005
Email: rsiegel@omm.com

Chris A. Hollinger (*pro hac vice*)
Adam P. KohSweeney (*pro hac vice*)
O'MELVENY & MYERS LLP
2 Embarcadero Center, 28th Floor
San Francisco, CA 94111
Telephone: (415) 984-8700
Email: chollinger@omm.com
          akohsweeney@omm.com

*Attorneys for Plaintiff, Air Transport Association of America, d/b/a Airlines for America*

## CERTIFICATE OF SERVICE

I hereby certify that on July 25, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

Katy Dixon
Anastasia Sandstrom
Callie A. Castillo
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-389-2770
katyd@atg.wa.gov
anas@atg.wa.gov

Callie A Castillo
Washington State Attorney General's Office
1125 Washington St. SE
Olympia, WA 98504-0110
360-586-1520
calliec@atg.wa.gov

James P Mills
Attorney General's Office (Tac)
1250 Pacific Avenue, Suite 105
PO Box 2317
Tacoma, WA 98401-2317
253-597-3896
JamesM7@atg.wa.gov

Kathleen Phair Barnard
Darin M. Dalmat
Schwerin Campbell Barnard Iglitzin & Lavitt LLP
18 W Mercer St., Suite 400
Seattle, WA 98119-3971
206-285-2828
barnard@workerlaw.com
dalmat@workrlaw.com

DATED this 25th day of July, 2018.

/s/ Heather Persun
Heather Persun