HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

AIR TRANSPORT ASSOCIATION OF
AMERICA, dba AIRLINES FOR
AMERICA,

              Plaintiff,

    v.

WASHINGTON DEPARTMENT OF
LABOR & INDUSTRIES and JOEL
SACKS, in his official capacity as
Director of the Department of Labor &
Industries,

              Defendant,

    &

ASSOCIATION OF FLIGHT
ATTENDANTS-COMMUNICATION
WORKERS OF AMERICA, AFL-CIO,
a labor organization,

              Intervenor.

CASE NO. 18-cv-05092-RBL

ORDER ON CROSS-MOTIONS FOR
SUMMARY JUDGMENT

DKT. ## 83, 93, & 102

## INTRODUCTION

THIS MATTER is before the Court on Plaintiff Airlines for America, Defendant

Washington Department of Labor & Industries, and Intervenor Association of Flight Attendants-

1  Communication Workers of America's (AFA) Cross-Motions for Summary Judgment.

2  Dkt. ## 83, 93, & 102. This lawsuit challenges Washington's Paid Sick Leave Law (WPSLL) as

3  applied to flight crew employees. In addition to guaranteeing accrual of paid sick leave hours,

4  WPSLL prohibits employers from requesting medical verification of illness, disciplining

5  employees for using their leave, and preventing employees from using leave in one-hour

6  increments. The Law applies to all employees who are "Washington-based," a status that L&I

7  determines by considering several factors on a case-by-case basis.

8      Pilots and flight attendants already enjoy paid sick leave under their company-specific

9  collective bargaining agreements, but those CBAs do not contain all the additional protections

10  afforded by WPSLL. According to the Airlines,[1] these protections will increase the rate of flight

11  crew absences, which will ultimately increase flight delays, cancellations, and costs. The Airlines

12  also argue that WPSLL will conflict with other jurisdictions' sick leave laws, contributing to a

13  patchwork of regulations that will burden the Airlines and raise consumer prices. Consequently,

14  the Airlines' argue that WPSLL violates the U.S. Constitution's Dormant Commerce Clause.

15  They also contend that WPSLL is preempted by the Airline Deregulation Act (ADA) and

16  violates the Fourteenth Amendment's Due Process Clause.

17      L&I and AFA argue that WPSLL does not violate the Dormant Commerce Clause

18  because the Law's health benefits outweigh any speculative burdens on interstate commerce.

19  Furthermore, they argue that WPSLL is not preempted by the ADA because the Law does not

20  sufficiently impact the rate, routes, or services offered by the Airlines. Finally, L&I and AFA

21

22

23  [1] Airlines for America is an association of prominent U.S. air carriers that includes Alaska
Airlines, Inc.; United Airlines, Inc.; American Airlines, Inc.; and Southwest Airlines Co.; among

24  others.

1  contend that WPSLL does not violate the Due Process Clause because it only regulates the

2  activities of parties with significant ties to Washington.

3      For the following reasons, the Court GRANTS L&I and AFA's Motions for Summary

4  Judgment and DENIES the Airlines' Motion for Summary Judgment.

5                    **BACKGROUND**

6  **1.**    **The Airlines' Flight Crew Sick Leave Policies**

7      For years, the Airlines have regulated flight crew employment terms pursuant to

8  nationwide CBAs negotiated under the Railway Labor Act (RLA). Although they differ, the

9  Airlines' CBAs for pilots and flight attendants provide for sick leave accrual, banking, and roll-

10 over that generally meet or exceed WPSLL's requirements. For example, pilots at Alaska,

11 American, and United Airlines accrue 5 or 5.5 hours of leave for roughly every month of work.

12 For flight attendants, Alaska and Southwest Airlines employees receive sick leave based on how

13 many "trips for pay," or "TFP," they have flown. A TFP basically amounts to a flight of 243

14 miles or less. Flight attendants begin accruing one TFP of sick leave for every ten TFP flown

15 after being hired, but they cannot use their paid sick leave until the end of a 180-day

16 probationary period. American and United flight attendants accrue 4.5 and 4 hours of leave for

17 roughly each month worked, respectively. The Airlines' CBAs also have provisions that allow

18 flight crew to bank sick leave hours that carry over from year to year.

19     Because of the mobile nature of their work, flight crew have unusual schedule structures

20 that complicate the use of sick leave. Schedules are broken down into "trip pairings" comprised

21 of a series of flights that begin and end in a flight crew member's domicile airport, which is

22 sometimes in a different state from where the employee resides. Consequently, when an

23 employee calls in sick for the day a trip pairing begins, they are removed from that pairing and

24

replaced by a different crew member. This replacement is necessary to comply with federal regulations regarding the minimum number of crew members on each flight. If the sick employee later "calls in well," they may trade trips with another employee or pick up a trip to start working again. However, if they are unable to change their schedule, the necessary number of sick leave hours to cover the pairing are deducted from their bank.

The Airlines retain several bargained-for methods of controlling flight crew attendance, which are the main focus of this case. One is the assignment of "points" to employees for sick calls, missed trips, late reports, and no-shows. Building up points can lead to disciplinary actions such as counseling, warnings, and dismissal. Different types of employee actions result in different point assignments. For example, Alaska can assess 3 points for a no-show, 2.5 points or less for calling in sick on short notice, and .5 points per day for calling in sick with adequate notice. Employees can reduce their amount of accumulated points through several means, such as working for an entire quarter without taking any leave.

The Airlines also retain the right to demand that an employee provide medical verification when they take a sick day. The Airlines can exercise this right regardless of the number of days an employee has been on leave or their reason for taking leave. Some Airlines, such as Alaska, have a standing policy of not requiring verification when flight crew take an absence. However, in periods of concentrated sick leave use Airlines have the ability to reinstate verification requirements to stem increased absences.

**2.      Washington's Paid Sick Leave Law**

In 2016, Washington voters passed Initiative 1433 adding paid sick leave benefits to Washington's Minimum Wage Act. This resulted in Washington's Paid Sick Leave Law and its accompanying L&I regulations. Under WPSLL, employees begin accruing one hour of paid sick

1   leave for every 40 hours worked after a 90-day post-hire period. RCW 49.46.210(1)(a) & (d). If

2   an employee does not use their accrued sick leave by the end of the year, employers are

3   authorized to cap the amount of state-mandated leave that rolls over to the next year at 40 hours.

4   RCW 49.46.210(1)(j).

5        Most relevant to this case, WPSLL restricts some policies that employers use to control

6   sick leave use. First, under WPSLL, an employer cannot adopt any policy that "counts the use of

7   paid sick leave time as an absence that may lead to or result in discipline." RCW 49.46.210(3).

8   Second, an employer may not require medical verification from employees for sick leave

9   absences of three days or less. RCW 49.46.210(1)(g). Third, an employer may not restrict

10  employees' ability to take sick leave in small increments, such as one hour. WAC 296-128-

11  630(4).

12       These restrictions have exceptions. An employer may require that an employee provide

13  "reasonable notice of an absence from work," RCW 49.46.210(1)(f), which means at least ten

14  days' notice if the absence was foreseeable and notice "as soon as possible before the required

15  start of [the employee's] shift" if it was not. WAC 296-128-650(1). An employer also may

16  require medical verification for absences over three days in length or withhold pay from an

17  employee if they believe sick leave was used for an unauthorized purpose. WAC 296-128-750;

18  RCW 49.46.210(1)(g). There must be a "written policy or a collective bargaining agreement"

19  outlining these procedures before they can be implemented. *Id.*; WAC 296-128-650(3). Finally,

20  L&I grants variances from WPSLL's leave increment restriction if an employer can establish

21  that "compliance with the requirements for increments of use are infeasible, and that granting a

22  variance does not have a significant harmful effect on the health, safety, and welfare of the

23  involved employees." WAC 296-128-640(1). To date, L&I has approved 26 of the 38 waiver

24

1    applications it has received from employers but has not received an application from any of the

2    Airlines. Johnson Dec., Dkt. # 84 at 6.

3         WPSLL applies to all "Washington-based" employees. *Id*. at 5. To determine if an

4    employee is "Washington-based," L&I considers the following factors on a case-by-case basis:

5    "(1) Where was the employment agreement made? (2) Does the employee live in Washington?

6    (3) Does the employer have its base of operations in Washington? (4) Does the employee have

7    his or her base of operations in Washington? (5) Does the employer maintain a work site in

8    Washington? (6) If the employee leaves Washington as part of the employee's work, where does

9    the trip begin and end? (7) Does the employee receive work assignments from a location in

10    Washington? (8) Is the employee's work supervised by individuals operating from the

11    employer's location in Washington? (9) How much of the work is performed in Washington?

12    [and] (10) How long is the contract to do work in Washington?" L&I Explanatory Statement,

13    Dkt. # 103, Ex. 16, at 2-3.

14         Although L&I considers all these factors, it also states that "some factors may be more

15    relevant than others" in specific situations. *Id*. at 3. For flight crew, who do not spend very much

16    time working in any one place, L&I has indicated that location of work is given less weight.

17    Johnson Dep., Dkt. # 103, Ex. 4, at 283-86. Being domiciled at a Washington airport may be

18    enough to make an employee Washington-based if other factors are also satisfied, as is likely the

19    case for Alaska flight crew because of that company's ties to the state. Johnson Dec. at 5.

20    However, merely being domiciled at a Washington airport without more would not be enough to

21    make WPSLL applicable. *Id*.

22

23

24

# DISCUSSION

## 1.   Summary Judgment Standard

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether an issue of fact exists, the Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson Liberty Lobby, Inc*., 477 U.S. 242, 248-50 (1986); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). A genuine issue of material fact exists where there is sufficient evidence for a reasonable factfinder to find for the nonmoving party. *Anderson*, 477 U.S. at 248. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251-52.

The moving party bears the initial burden of showing that there is no evidence which supports an element essential to the nonmovant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Once the movant has met this burden, the nonmoving party then must show that there is a genuine issue for trial. *Anderson*, 477 U.S. at 250. If the nonmoving party fails to establish the existence of a genuine issue of material fact, "the moving party is entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323-24. There is no requirement that the moving party negate elements of the non-movant's case. *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990). Once the moving party has met its burden, the non-movant must then produce concrete evidence, without merely relying on allegations in the pleadings, that there remain genuine factual issues. *Anderson*, 477 U.S. at 248.

**2.      Dormant Commerce Clause**

The Airlines first and most forcefully challenge WPSLL under the Dormant Commerce

Clause. The Commerce Clause, which empowers Congress "[t]o regulate Commerce . . . among

the several States," also entails a "dormant" or "negative" implication that the states may not

interfere with interstate commerce. *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337 (2008)

(quoting Art. I, § 8, cl. 3). The modern jurisprudence surrounding this Dormant Commerce

Clause "is driven by concern about economic protectionism—that is, regulatory measures

designed to benefit in-state economic interests by burdening out-of-state competitors." *Nat'l*

*Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1148 (9th Cir. 2012) (quoting

*Davis*, 553 U.S. at 337-38).

Although the Dormant Commerce Clause analysis normally starts with whether the

challenged law discriminates against out-of-state interests, the Airlines do not argue that WPSLL

is discriminatory.[2] This means the Law is invalid only if the burden it places on interstate

commerce is "clearly excessive in relation to the putative local benefits." *Sullivan v. Oracle*

---

[2] As a threshold issue, L&I and AFA argue that WPSLL is "invulnerable to Commerce Clause challenge" because Congress expressly authorized the states to pass laws burdening interstate commerce in this area. *See W. & S. Life Ins. Co. v. State Bd. of Equalization of California*, 451 U.S. 648, 652 (1981). They point to the savings clause of the FMLA. *See* 29 U.S.C. § 2651(b) ("Nothing in this Act or any amendment made by this Act shall be construed to supersede any provision of any State or local law that provides greater family or medical leave rights than the rights established under this Act or any amendment made by this Act."). However, for a court to find such an authorization, it must be "unmistakably clear" that Congress "affirmatively contemplate[d] [immunizing] otherwise invalid state legislation." *S.-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 91 (1984). The FMLA's savings clause does not clearly indicate such an intent. Instead, Congress's most obvious purpose in passing §§ 2651(b) was to ensure that federal regulation did not impede parallel state laws that provide even more leave time. Because such laws can coexist with federal ones without burdening interstate commerce, there is little reason to conclude that Congress intended to give states free reign to violate the Commerce Clause in the areas governed by the FMLA. *See Bernstein v. Virgin Am., Inc.*, 227 F. Supp. 3d 1049, 1068 n. 8 (N.D. Cal. 2017).

*Corp.*, 662 F.3d 1265, 1271 (9th Cir. 2011) (internal quotation marks omitted) (quoting *Pike*, 397

U.S. 137, 142 (1970)). This balancing test requires "sensitive consideration of the weight and

nature of the state regulatory concern in light of the extent of the burden imposed on the course

of interstate commerce." *Kassel v. Consol. Freightways Corp. of Delaware*, 450 U.S. 662, 670-

71 (1981) (quoting *Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429, 440 (1978)). If the

challenged law has extraterritorial reach, "the court must consider the practical effects of the

regulatory scheme, taking into account the possibility that other states may adopt similar

extraterritorial schemes and thereby impose inconsistent obligations." *Pac. Merch. Shipping

Ass'n v. Goldstene*, 639 F.3d 1154, 1178 (9th Cir. 2011). However, there "must be a *substantial

burden* on interstate commerce" for a regulation to be struck down. *Harris*, 682 F.3d at 1148

(citing *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 298 n. 12 (1997); *CTS Corp. v. Dynamics

Corp. of Am.*, 481 U.S. 69, 88 (1987)).

Truly neutral laws that have been struck down under the Dormant Commerce Clause

generally entail "inconsistent regulation of activities that are inherently national or require a

uniform system of regulation." *Harris*, 682 F.3d at 1148. In *Southern Pacific Co. v. State of

Arizona ex rel. Sullivan*, for example, the Court invalidated an Arizona law limiting the length of

trains because it would force railroads to suffer large inefficiencies and profit losses by

shortening their trains upon entering the state. 325 U.S. 761, 771-74 (1945). Similarly, *Bibb v.

Navajo Freight Lines, Inc.* held that an Illinois regulation of trucking mudguards that conflicted

with the laws in neighboring states would impermissibly require companies to re-equip all their

trucks and change to a different type of mudguard at the border. 359 U.S. 520, 527-28 (1959).

The challenged laws in both cases provided meager safety benefits and may even have *decreased*

safety. 325 U.S. at 779; 359 U.S. at 525; *see also Kassel*, 450 U.S. at 671 (holding state truck

length requirements unconstitutional); *Rice*, 434 U.S. at 445 (same). These cases teach that when a local law offers dubious benefits, is "out of step" with other jurisdictions, and causes unavoidable, excessive compliance inefficiencies, it likely violates the Dormant Commerce Clause. *See Kassel*, 450 U.S. at 671.

On the other hand, congressional control of interstate commerce was "never intended to cut the States off from legislating on all subjects relating to the health, life, and safety of their citizens, though the legislation might indirectly affect the commerce of the country." *Huron Portland Cement Co. v. City of Detroit, Mich.*, 362 U.S. 440, 443–44 (1960). Consequently, in *Huron* the Court sustained a law regulating pollution from ships despite the appellant's arguments that other local governments may pass conflicting laws. *Id.* at 448; *see also Pac. Merch. Shipping*, 639 F.3d at 1180-81 (upholding California regulation raising fuel quality requirements for vessels in the state's coastal waters). Even if multiple state laws do create overlapping obligations on companies, the Commerce Clause does not itself require courts to impose uniform legal standards. *See Moorman Mfg. Co. v. Bair*, 437 U.S. 267, 269-80 (1978) (declining to invalidate Iowa's anomalous method of computing income tax in the absence of congressional action). Finally, the mere fact that a law impacts a "particular structure or methods of operation in a retail market" is not enough to make it unconstitutional. *See Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 127-28 (1978) (upholding Maryland statute that restricted the ability of oil refiners to sell gas within the state).

In this case, the Airlines identify two broad types burdens on interstate commerce. First, the Airlines contend that WPSLL creates administrative and financial burdens by regulating in an area that requires uniform national standards. More specifically, they assert that complying with Washington's new Law will require the Airlines to reconfigure IT systems to track

protected sick leave, renegotiate flight crew CBAs, and navigate an increasingly complex and overlapping patchwork of local sick leave regulations. Second, the Airlines argue that WPSLL will lead to more abuse of paid sick leave, which will burden the interstate movement of goods and people by increasing flight delays and cancellations.[3] In contrast to these negative effects, the Airlines contend that WPSLL provides few benefits over the paid sick leave that flight crew already receive under their CBAs and that exempting flight crew from WPSLL would not interfere with the Law's main purpose.

*a.* ***Financial and Administrative Burdens from Inconsistent Regulatory Regimes***

As both a legal and factual matter, the Court rejects the Airlines' argument that WPSLL creates an unmanageable administrative burden by regulating in an area where national uniformity is necessary. The Airlines emphasize that they are instrumentalities of interstate commerce and therefore should not be subject to local regulation. *See Ickes v. F.A.A.*, 299 F.3d 260, 263 (3d Cir. 2002). But such instrumentalities are not automatically beyond the reach of all state regulation. In fact, *Bibb* was quick to recognize that "[t]he power of the State to regulate the use of its highways is broad and pervasive," 359 U.S. at 523, and highways are undoubtedly instrumentalities of interstate commerce. *See United States v. Guest*, 383 U.S. 745, 757 (1966). The question is whether Congress has expressed a need for uniformity in this particular area of regulation. *See Pac. Merch. Shipping Ass'n v. Goldstene*, 639 F.3d 1154, 1180 (9th Cir. 2011).

---

[3] The Airlines also try to convince the Court that allowing inconsistent sick leave laws will cause personnel troubles between flight crew members who enjoy different types of benefits. *See United Air Lines, Inc. v. Indus. Welfare Comm'n*, 211 Cal. App. 2d 729, 747 (Ct. App. 1963) (holding that California law requiring defendant airline to pay for flight attendants' uniforms would burden commerce by creating personnel issues). However, this purely speculative argument does not amount to the type of substantial burden that is necessary for a law to violate the Dormant Commerce Clause. *See Bernstein*, 227 F. Supp. 3d at 1069 (rejecting the "personnel troubles" argument in a similar context involving airline workers).

1    The answer is no. The Airlines rely on the Railway Labor Act (RLA), which was passed

2    to "promote stability in labor-management relations by providing a comprehensive framework

3    for resolving labor disputes" involving railway and airline workers. *Hawaiian Airlines, Inc. v.*

4    *Norris*, 512 U.S. 246, 252 (1994); *see also* 45 U.S.C. § 151a. But the RLA's dispute resolution

5    system "does not provide for, nor does it manifest any interest in, national or systemwide

6    uniformity in substantive labor rights." *Alaska Airlines Inc. v. Schurke*, 898 F.3d 904, 919 (9th

7    Cir. 2018) (en banc). Consequently, while the RLA dictates that certain disputes arising from a

8    CBA must be resolved in a non-judicial forum, it does not preempt underlying state law rights.

9    *Id*. at 922-23. And, for reasons explained later in this Order, the ADA does not impliedly

10   preempt all state labor rights.

11   On the other hand, Congress has explicitly permitted local laws ensuring employment

12   benefits beyond those contemplated in federal statutes. Specifically, the savings clause of the

13   FMLA provides, "Nothing in this Act or any amendment made by this Act shall be construed to

14   supersede any provision of any State or local law that provides greater family or medical leave

15   rights than the rights established under this Act or any amendment made by this Act." 29 U.S.C.

16   § 2651(b). While the FMLA does not regulate the airline industry specifically, it also does not

17   exempt it, suggesting that Congress generally approves of local laws boosting labor protections

18   for airline employees. *See Pac. Merch.*, 639 F.3d at 1180 (declining to strike down law where

19   Congress had expressed approval of local regulation through a savings clause). The Airlines

20   argue that the FMLA is inapplicable here because it only provides for unpaid leave, but the term

21   "greater family or medical leave rights" logically encompasses leave laws that are more generous

22   in *quality* as well as quantity.

23

24

1    The Airlines also identify several court cases holding that aviation requires uniform

2    regulation. *See City of Burbank v. Lockheed Air Terminal Inc.*, 411 U.S. 624, 625-26 (1973);

3    *Chicago & S. Air Lines v. Waterman S. S. Corp.*, 333 U.S. 103, 107, 114 (1948). But none of the

4    Airlines' examples address labor rights for airline workers. On that issue, several courts have

5    recently held that local regulation is permissible. *See, e.g., Hirst v. Skywest, Inc.*, 910 F.3d 961,

6    967 (7th Cir. 2018) (upholding minimum wage requirement); *Bernstein v. Virgin Am., Inc.*, 227

7    F. Supp. 3d 1049, 1069 (N.D. Cal. 2017) (same); *Mendis v. Schneider Nat'l Carriers Inc*, No.

8    C15-0144-JCC, 2016 WL 6650992, at *6 (W.D. Wash. Nov. 10, 2016) (upholding rest break

9    requirement). Even courts reaching contrary conclusions did not hold that absolute national

10   uniformity was necessary. *See, e.g., Ward v. United Airlines, Inc.*, No. C 15-02309 WHA, 2016

11   WL 3906077, at *5 (N.D. Cal. July 19, 2016).

12   In addition to lacking a legal requirement for uniformity, WPSLL's practical application

13   and relation to other jurisdictions' sick leave laws do not create an unmanageable tangle of

14   conflicting regulations. The multi-factor analysis that L&I uses to determine if an employee is

15   Washington-based lends itself to broad patterns that allow the Airlines to accurately identify

16   which employees are covered by WPSLL, especially with L&I's assistance. *See* Grice Dec., Dkt.

17   # 121, at 5. The Airlines make much of L&I's statement that it gives "careful consideration" to

18   where work is performed, but this is only to decide whether WPSLL applies to an employee *at*

19   *all*, not to divide protected from non-protected hours. *See* Johnson Dep., Dkt. # 103, Ex. 4, at

20   137-38. WPSLL applies in a binary fashion contingent on whether an employee is Washington-

21   based.[4]

22

23   [4] The one example where different laws could apply to hours worked in different states involves
     a "tie" among L&I's factors, such as when a contractor from Oregon performs a particular job

24   entirely in Washington. *See* Johnson Dep., Dkt. # 103, Ex. 4, at 199-201. However, it is difficult

1      Because of this, it is hard to imagine how L&I's work location factor could be outcome-

2  determinative. Flight crew domiciled at a particular airport begin and end their flight pairings at

3  that location, besides which they are mainly on duty in the air and for a few hours at a smattering

4  of other airports. [5] *See* Grice Dec. at 2-4; Ryan Dec., Dkt. # 110, at 5, 7-8; Ryan Dep., Dkt. # 88,

5  Ex. 38, at 107. The Airlines provide no examples of employees that spend an inordinate amount

6  of time at a particular non-domicile airport. If flight crew generally perform a plurality of their

7  work in their domicile state, the main factors for applying WPSLL will be relatively steady

8  criteria, such as a flight attendant's domicile, residence, and their employer's contacts with

9  Washington. *See Bostain v. Food Exp., Inc.*, 159 Wash. 2d 700, 719 (2007) (holding that it is not

10  an excessive burden for employers with multi-state operations to identify Washington-based

11  employees); Simone Dep., Dkt. # 88, Ex. 10, at 81 (stating that American applies sick leave laws

12  according to the airport where flight attendants are domiciled).[6] Identifying WPSLL's scope of

13  application will thus not pose an unmanageable administrative burden for the Airlines.

14

---

15  to see how this situation could arise in the airline industry, where flight crew rarely spend very much time in any one place.

16  [5] The Airlines do provide two examples of Alaska flight attendants that are based at Sea-Tac but reside in other states. Second Ryan Dec., Dkt. # 111, at 11. They explain that these flight

17  attendants commute from their home state to Sea-Tac, then fly pairings that take them back and forth between Sea-Tac and two other states, after which they commute back to their home state.

18  Dkt. # 111, Ex. 2. But even if these unconventional employees do not spend a significant amount of time working in Washington, they still appear to spend more time working there than in any

19  other particular state. Most of their working time, of course, is spent in the air.

20  Alaska also claims that some flight crew may be based at one airport but fly exclusively out of another airport, which seems theoretically possible if an employee traded *all* of their flights.

21  Second Ryan Dec. at 11-12; Ryan Dep., Dkt. # 129, Ex. 2, at 72-73. However, Alaska provides no examples or statistics of this actually happening; indeed, the concept of a domicile airport

22  would be almost meaningless if an airline allowed this to occur frequently. The Court therefore does not put much stock in this theory.

23  [6] These facts distinguish this case from *Ward v. United Airlines, Inc.*, No. C 15-02309 WHA,

24  2016 WL 3906077 (N.D. Cal. July 19, 2016), upon which the Airlines rely. In *Ward*, the court determined that a California law requiring employers to furnish a semi-monthly pay statement

1    Even if this were not the case, the Court rejects the Airlines' argument that WPSLL is per

2    se unconstitutional if it pushes companies to reform their system-wide sick leave policies as the

3    most efficient means of compliance. In *Pacific Merchant*, the Ninth Circuit upheld California's

4    shipping fuel standards despite the obvious impact the regulation would have on the quality of

5    fuel companies could use away from California's waters. *See* 639 F.3d at 1181; *Mendis*, No.

6    2016 WL 6650992, at *4 (holding that the rest break provision in Washington's Minimum Wage

7    Act was not unconstitutionally extraterritorial as applied to airline workers); *see also Bibb*, 359

8    U.S. at 526 ("If we had here only a question whether the cost of adjusting an interstate operation

9    to these new local safety regulations prescribed by Illinois unduly burdened interstate commerce,

10   we would have to sustain the law . . . ."). Rather, a regulation is only per se unconstitutional if it

11   directly and necessarily regulates interstate commerce. *See Nat'l Collegiate Athletic Ass'n v.*

12   *Miller*, 10 F.3d 633, 639 (9th Cir. 1993) (striking down Nevada law imposing special procedural

13   requirements on NCAA enforcement actions). WPSLL clearly does not fall into this category.

14        To the extent that WPSLL could potentially overlap with other jurisdictions' sick leave

15   laws, it still does not excessively burden commerce. The risk of incompatible standards is not as

16   severe here as in cases where the Supreme Court has struck down a conflicting law for its

17   obvious and unavoidable inefficiencies. *See Kassel*, 450 U.S. at 671; *Raymond Motor*, 434 U.S.

18   at 445; *Bibb*, 359 U.S. at 527-28; *S. Pac.*, 325 U.S. at 773-75. The Airlines present no evidence

19

---

20   explaining hourly rates applied only to employees who spent the given period working
     principally in California. *Id.* at 3-4. The court held that this would impose an overwhelming

21   burden on airlines, which would have to track what percentage of each employee's time was
     spent in California. *Id.* at 5. Here, in contrast, the application of WPSLL does not turn on flight

22   crew working a slightly higher percentage of time in Washington than any other state. Rather, an
     employee slipping in or out of coverage would likely result from an infrequent and identifiable

23   event, such as changing their domicile airport. Simone Dec., Dkt. # 114 at 3; Second Ryan Dec.
     at 10. This does away with the prospect of having to dissect each employee's work-location

24   percentages to determine whether WPSLL applies.

1   of likely widespread overlap between WPSLL and other laws. The most probable source of

2   conflict comes from laws that apply to an employee based solely on the number of hours worked

3   in the jurisdiction, since it is conceivable that a Washington-based flight attendant that frequently

4   flies to such a jurisdiction could meet its quota and be subject to both sick leave laws.[7] But even

5   if such fringe cases exist, sick leave laws' requirements for accrual, carryover, and discipline

6   tend to integrate rather than conflict.[8] *See Instructional Sys., Inc. v. Computer Curriculum Corp.*,

7   35 F.3d 813, 826 (3d Cir. 1994) (explaining that "state laws which merely create additional, but

8   not irreconcilable, obligations" are not unconstitutionally inconsistent).

9       Furthermore, Washington's law is not the one "out of step" with other jurisdictions when

10  it comes to extraterritorial application. *Kassel*, 450 U.S. at 671. In *Kassel*, *Raymond*, *Bibb*, and

11  *Southern Pacific*, the Supreme Court struck down outlier laws that imposed new rules in conflict

12  with other jurisdictions. But here, WPSLL is not an outlier; indeed, the crux of the Airlines'

---

13

14  [7] The Airlines cite examples of sick leave laws in New York City, Massachusetts, and San Diego. Airlines' Motion, Dkt. # 102, at 23. Under the New York law, an employee is covered if they work more than 80 hours in the city within a year. R.C.N.Y., Title 6, Chapter 7, § 7-203.

15  But there is a provision that excludes employees subject to CBAs that offer "comparable benefit" in the form of "paid days off." N.Y.C. Admin. Code, § 20-916. The Massachusetts law applies if

16  the employee's "primary place of work" is Massachusetts, which requires spending a plurality of work time within the state. MA Attorney General's Office, "Earned Sick Time in Massachusetts

17  Frequently Asked Questions," *available at*: http://www.mass.gov/ago/docs/workplace/earned-sick-time/est-faqs.pdf. It is hard to see how an airline employee domiciled in Washington could

18  meet this requirement. The San Diego law, which applies to any employee who qualifies for California's Minimum Wage Law and works at least two hours in the city in a week, may have

19  the greatest potential for conflict. S.D. Mun. Code § 39.0104. However, that law also states that an employer that provides "greater paid time off" through a CBA is deemed in compliance "even

20  if the employer utilizes an alternative methodology for calculation of, payment of, and use of" paid sick leave. § 39.0105. The Airlines' sick leave policies under their CBAs likely qualify

21  them for this exception. In any case, the notice, verification, and discipline provisions of San Diego's law are largely in sync with WPSLL. §§ 39.0106, 39.0111.

22

23  [8] There are obviously differences between sick leave laws—for example, the Airlines point out that WPSLL protects sick leave to care for an ill sibling or grandparent while Massachusetts' law

24  does not. Airlines' Motion, Dkt. # 102, at 24. However, these obligations do not conflict in a way that would make it impossible for an employer to comply with both.

1    complaint is that too many localities are passing sick leave laws with similar requirements to

2    Washington's. If anything, laws like San Diego's that could apply to workers who spend a

3    minimal amount of time in the jurisdiction are the most "out of step" because they could apply to

4    workers with little connection to the place. *See* S.D. Mun. Code § 39.0104. Striking down

5    Washington's law would thus amount to holding that *no* jurisdiction can constitutionally regulate

6    sick leave for airline workers. The Dormant Commerce Clause does not mandate such an

7    extreme outcome merely to avoid possible overlap. *See Moorman*, 437 U.S. at 278-79 (holding

8    that the benefits of avoiding duplicative taxation did not justify a court-mandated uniform

9    income tax calculation standard); *Exxon*, 437 U.S. at 128 (declining to hold that the interstate gas

10   market required uniform regulation).

11        In light of this lack of conflict, the financial burdens imposed by WPSLL alone are not

12   enough to make it unconstitutional simply because aviation is an interstate industry. *See Pac.*

13   *Merch.*, 639 F.3d at 1181 (9th Cir. 2011); *Burlington N. R. Co. v. Dep't of Pub. Serv. Regulation*,

14   763 F.2d 1106, 1114 (9th Cir. 1985) (upholding Montana law requiring railroad to staff stations

15   in towns of over 1,000 people). The Airlines exaggerate the size of these burdens, which they

16   have not actually calculated. Airlines' Interrogatory Response, Dkt. # 88, Ex. 36, at 4. Upgrading

17   IT systems will likely not pose a herculean challenge since tracking where flight crew perform

18   each hour of work is not necessary to determine if WPSLL applies. Evidence also suggests that

19   Alaska has already updated its systems to track WPSLL-protected leave and unprotected leave

20   separately for employees. *See* Alaska/L&I Correspondence, Dkt. # 84, Ex. 3. In addition,

21   Alaska's flight attendant CBA contains a savings clause that allows for compliance with new

22   regulatory mandates without renegotiation. *See* Alaska Flight Attendant CBA, Dkt. # 110, Ex. B,

23

24

1    at 31-1; *see also* Johnson Dep., Dkt. # 88, Ex. 35, at 116; Taitte Dep., Dkt. # 88, Ex. 16, at 33.

2    WPSLL's administrative compliance costs therefore do not create an unconstitutional burden.

3    *b.*       *Burden on Transportation of Goods and Passengers from Sick Leave Abuse*

4          Unlike cases such as *Bibb* and *Southern Pacific*, the Airlines' argument that WPSLL will

5    directly impede the flow of goods and people does not stem from inefficient clashes between

6    different states' laws. Instead, the Airlines argue that significant delays will result from any law

7    restricting their ability to threaten discipline and request verification when employees call in

8    sick.[9] But the evidence does not show that WPSLL will substantially increase flight delays and

9    cancelations or that the Airlines lack the ability to mitigate any limited impact on operations.

10          There is some support to back up the Airlines' claim that laws similar to WPSLL

11    influence sick leave abuse, although it is difficult to ascertain how much increased sick leave use

12    is fraudulent vs. legitimate. *See, e.g.*, Butler Dec., Dkt. # 104, at 7 (After New York City's sick

13    leave law was passed, Virgin flight attendants "on occasion" transferred to JFK, maximized their

14    leave, then transferred back); Simone Dec. at 3 (American flight attendants started using more

15    sick leave around the holidays after Massachusetts' sick leave law passed). However, a limited

16    increase in sick leave abuse does not necessarily translate into delays, cancellations, and base

17    closures. To prove that it does, the Airlines' primarily rely on Virgin's experience at its JFK base

18    after New York City passed the Earned Sick Time Act (ESTA), which has similar provisions to

19

20    [9] The Airlines also contend that WPSLL's provision ensuring that employees can take sick leave in increments as small as one hour will allow flight attendants to game the system by missing an

21    entire flight pairing by taking just one hour of sick leave at the time of departure. *See* WAC 296-128-630. But this argument ignores the fact that Washington's law allows companies to apply for

22    a variance if complying with WPSLL's minimum increment requirement would not be feasible. WAC 296-128-640. Evidence suggests that the process for obtaining a variance is

23    straightforward and that L&I has approved most of the applications it has received. Dkt. # 84 at 6. If the loophole that the Airlines describe truly exists, it seems highly likely that the Airlines

24    would receive a variance.

WPSLL. During the years after Virgin began complying with ESTA, the company saw increased delay and cancellation rates associated with cabin crew shortages. Lee Report, Dkt. # 107, Ex. 2, at 61-65. The Airlines claim that this "contributed significantly" to Alaska's decision to close the JFK base in November 2017 after it acquired Virgin in 2016. Butler Dec. at 7.

However, for the first two years after Virgin began complying with ESTA, cabin crew delays only increased by .16 percentage points, an amount that is almost irrelevant compared to the Airlines' overall delay rates of 15 to 20 percent. Tregillis Report, Dkt. # 87, Ex. 1, at 28-29; Mann Report, Dkt. # 86 at 15-16; Lee Depo., Dkt. # 88, Ex. 28, at 8. During the final seven months before the JFK base's closure, cabin crew delays suddenly increased by 1.2 percentage points, which the Airlines' expert speculatively attributes to flight crew finally becoming "fully aware" of ESTA's terms. Lee Report at 64-65. But other major changes at Virgin around that time, including Alaska's decision to cut reserve pools after the Virgin acquisition and announcements related to closing the JFK base, cast serious doubt on the Airlines' causation theory. Tregillis Report at 36-50; *see also* Am. Airlines Dep., Dkt. # 89, at 130-131 (American has also experienced increased use of sick leave after base closure announcements).

It also seems likely that the JFK base was closed because it was too small to be profitable, not because of ESTA. Tregillis Report at 41-42; Mann Report at 32-34. Notably, there are no indications of other airlines experiencing closures or other operational impacts because of sick leave laws. Moses Dep., Dkt. # 88, Ex. 7, at 72-73 (American's LAX base has expanded despite LA's sick leave law); Am. Airlines Dep. at 24, 41-42 (sick leave laws do not affect American's plans for network expansion); Shaw Dep., Dkt. # 88, Ex. 15, at 38, 74-75 (Southwest's operations have been unaffected by Oakland, LA, and Baltimore's sick leave laws); Southwest Dep., Dkt. # 91 at 28-31 (Southwest's Baltimore, Atlanta, LA, and Oakland bases

1    have grown despite sick leave laws); United Dep., Dkt. # 88, Ex. 20, at 44-45 (United attributes

2    no base closures, route changes, or fair changes to local sick leave laws); Alaska Dep., Dkt. # 88,

3    Ex. 13, at 79-80 (Alaska's operations have not been impacted by complying with Washington's

4    Family Care Act).

5        To the extent that WPSLL may have some impact on sick leave abuse, the Airlines have

6    tools to feasibly mitigate these effects. The Airlines currently tolerate a 15-20% rate of 15+

7    minute delays. Mann Report at 17. To ensure flight crew absences do not push delays beyond

8    that range, the Airlines analyze sick leave trends and allocate resources accordingly. For

9    example, the Airlines may increase the number of reserve flight crew, prohibit flight attendants

10   from trading trips, or, in extreme situations, offer pay incentives for employees to cover for

11   absent coworkers. *See* Am. Airlines Dep. at 60-89, 97; Alaska Dep. at 229-30; United Dep. at

12   50-51; Jones Dep., Dkt. # 88, Ex. 26, at 65-66. If WPSLL causes flight crew absences to increase

13   somewhat, the Airlines could maintain their level of on-time performance by spending more on

14   these mitigation tools. Admittedly, short-notice absences and sick calls away from a base airport

15   are harder to address by increasing reserves, since most reserves must take the time to drive to a

16   base airport from home and must be flown to a non-base airport. However, the Airlines do not

17   persuasively show why short-notice calls will increase significantly under WPSLL or why flight

18   crew would often abuse their sick leave in the middle of a flight pairing far from home.

19       WPSLL's protections also have limitations. For example, employers may require notice

20   "as soon as possible" before the start of the employee's shift "unless it is not practicable to do

21   so." WAC 296-128-650(1)(b). This assuages some of the Airlines' fears about short-notice

22   absences. Second, WPSLL only protects employees for authorized uses of sick leave. WAC 296-

23   128-750. If an employee abuses sick leave, their employer can withhold payment. And while

24

1   WPSLL does not explicitly say so, the Airlines could likely discipline an employee if they were

2   proven to have used sick leave for an unauthorized purpose. A contrary interpretation would not

3   harmonize with WPSLL's goal of only protecting employees who have exercised their right to

4   care for themselves and family members. *See* RCW 49.46.200; RCW 49.46.210(4).

5          In short, WPSLL does not unavoidably obstruct interstate commerce in the same way as

6   other regulations that have been invalidated under the Dormant Commerce Clause. *See*

7   *Raymond*, 434 U.S. at 445 (truck length regulations "slow the movement of goods"); *Bibb*, 359

8   U.S. at 527 (mud guards requirements "caus[e] a significant delay"). Instead, the extent to which

9   the Airlines allow delays from slightly increasing because of WPSLL boils down to a calculation

10  of compliance costs. This does not amount to a substantial burden on commerce.

11  *c.*      ***Local Benefits of Washington's Paid Sick Leave Law***

12         In light of WPSLL's insubstantial impact on commerce, the burdens created by the Law

13  are not "clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142. Unlike

14  *Kassel*, *Raymond*, *Bibb*, and *Southern Pacific*, WPSLL's health benefits are not illusory. In fact,

15  WPSLL is well-within Washington's "broad authority under [its] police powers to regulate the

16  employment relationship to protect workers" and ensure "occupational health and safety."

17  *DeCanas v. Bica*, 424 U.S. 351, 356 (1976). Although it is true that flight crew already accrue

18  paid sick leave under their CBAs, the Airlines' policy of assigning points and requiring

19  verification discourages employees from *using* their leave, especially for early-stage or

20  non-debilitating illnesses. Watkins Report, Dkt. # 95, Ex. 1, at 6. Indeed, several flight attendants

21  have attested to working while sick to avoid acquiring points. Rafferty Dec., Dkt. # 98, at 3;

22  Levin Dec., Dkt. # 99, at 2. But research shows that flight attendants' interactions with

23  passengers make them both the most likely source and recipient of disease on flights. *See*

24

1   Watkins Report at 10. This translates into a higher need for unencumbered sick leave for flight

2   attendants and greater risks from disincentivizing its use. The Washington Legislature's interest

3   in diminishing this risk and protecting workers is therefore far from "unreasonable or irrational."

4   *See Alaska Airlines, Inc. v. City of Long Beach*, 951 F.2d 977, 983 (9th Cir. 1991).

5        The Airlines' challenge WPSLL's benefits by pointing out that workers in some other

6   industries, such as railroads and construction, are exempt from WPSLL, suggesting that it is not

7   essential to the Law's purpose that every category of worker be covered. However, it is not this

8   Court's role to "second-guess the empirical judgments of lawmakers" regarding WPSLL's scope.

9   *See Pac. Nw. Venison Producers v. Smitch*, 20 F.3d 1008, 1017 (9th Cir. 1994) (quoting *CTS*

10  *Corp.*, 481 U.S. at 92). Given the heightened potential for spreading disease on crowded

11  airplanes, it is entirely possible that the Washington Legislature considered airline workers one

12  of the *most* important classes to cover under the Law. Weighing these benefits against the limited

13  burden on interstate commerce, WPSLL does not violate the Dormant Commerce Clause.

14  **3.     Preemption under the Airline Deregulation Act**

15       The Airlines' second argument against applying WPSLL to flight crew relies on the

16  ADA's preemption clause. The ADA was passed in 1978 to "promote 'efficiency, innovation,

17  and low prices' in the airline industry through 'maximum reliance on competitive market forces

18  and on actual and potential competition.'" *Nw., Inc. v. Ginsberg*, 572 U.S. 273, 280 (2014)

19  (quoting 49 U.S.C. §§ 40101(a)(6), (12)(A)). To further that end, Congress included a provision

20  preempting any state law "related to a price, route, or service of an air carrier." 49 U.S.C.

21  § 41713(b)(1). The words "related to" express a "broad pre-emptive purpose." *Morales v. Trans*

22  *World Airlines, Inc.*, 504 U.S. 374, 383 (1992). The Supreme Court has supplied the following

23  instructions for ADA preemption analysis:

24

> (1) that "[s]tate enforcement actions having a connection with, or reference to," carrier "rates, routes, or service are pre-empted;" (2) that such pre-emption may occur even if a state law's effect on rates, routes, or services "is only indirect;" (3) that, in respect to pre-emption, it makes no difference whether a state law is "consistent" or "inconsistent" with federal regulation; and (4) that pre-emption occurs at least where state laws have a "significant impact" related to Congress' deregulatory and pre-emption-related objectives.

*Rowe v. New Hampshire Motor Transp. Ass'n*, 552 U.S. 364, 370-71 (2008) (quoting *Morales*, 504 U.S. at 384, 386-87, & 390) (internal citations omitted). Nonetheless, "federal law might not pre-empt state laws that affect fares in only a 'tenuous, remote, or peripheral . . . manner.'" *Id.* (quoting *Morales*, 504 U.S. at 390).

Ninth Circuit precedent provides more guidance on how to determine when a law's impact is too tenuous for preemption. "[I]n 'borderline cases' in which a law does not refer directly to rates, routes, or services, 'the proper inquiry is whether the provision, directly or indirectly, binds the carrier to a particular price, route or service and thereby interferes with the competitive market forces within the industry.'" *Dilts v. Penske Logistics*, LLC, 769 F.3d 637, 646 (9th Cir. 2014) (quoting *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 660 F.3d 384, 397 (9th Cir. 2011)). [10] "Laws are more likely to be preempted when they operate at the point where carriers provide services to customers at specific prices" and less likely to be preempted when they operate "several steps removed" from that point. *Id.* (citing *S.C. Johnson & Son v. Transp. Corp. of Am.*, 697 F.3d 544, 558 (7th Cir. 2012) & *DiFiore v. Am. Airlines, Inc.*, 646 F.3d 81, 88 (1st Cir. 2011)). It is not enough that a law regulating some aspect of a company's operations indirectly increases consumer prices. *Id.* Finally, "the scope of the pre-emption must be tempered

---

[10] Although *Dilts* involved the Federal Aviation Administration Authorization Act, that statute's preemption provision is "nearly identical" to the ADA and therefore the same analytical framework applies for both statutes. *See* 769 F.3d at 644.

1   by the presumption against the pre-emption of state police power regulations." *California*

2   *Trucking Ass'n v. Su*, 903 F.3d 953, 961 (9th Cir. 2018) (quoting *Dilts*, 769 F.3d at 643).

3   Here, WPSLL's effects are too far removed from the point of sale for ADA preemption.

4   WPSLL does not dictate what routes and services the Airlines provide or the prices they charge

5   for them. Instead, Washington's Law controls how the Airlines must treat their employees, but

6   the Ninth Circuit has upheld similar labor laws before. *See Dilts*, 769 F.3d at 647 (holding that

7   California's meal and rest break laws were not preempted as applied to truckers); *Californians*

8   *For Safe & Competitive Dump Truck Transp. v. Mendonca*, 152 F.3d 1184, 1189 (9th Cir. 1998)

9   (holding that California's minimum wage law was not preempted); *see also Bernstein*, 227 F.

10   Supp. 3d at 1073 (relying on *Dilts* and rejecting Virgin's argument that the ADA preempts meal

11   and rest break claims). Given that laws governing employee benefits like sick leave are within

12   the state's traditional police power, WPSLL's indirect effects are not enough to defeat the

13   presumption against preemption.

14   Even considering those indirect effects, the Airlines do not show that WPSLL has a

15   "significant impact" on routes, prices, or services. *See Rowe*, 552 U.S. at 371. The Airlines put

16   forward the generic argument that WPSLL will increase labor costs, which will in turn cause the

17   Airlines to increase fares or reduce routes. But these types of arguments, which would invalidate

18   almost any form of safety or health-related regulations, are "foreclose[d]" under Ninth Circuit

19   precedent. *Su*, 903 F.3d at 965. In any case, the Airlines have not shown that complying with

20   WPSLL will significantly affect prices.

21   The Airlines also argue that WPSLL will force companies to shuttle more flight crew

22   between airports to cover absences and that carriers will have to schedule more ground time

23   between flights and longer minimum connection times to reduce the likelihood of delays. But the

24

1   Airlines have not demonstrated a causal link between laws like WPSLL and substantial

2   performance impacts. Rather, it appears more likely that the Airlines' own decisions about

3   expenditures will determine whether paid sick leave laws have any limited effects on delays and

4   cancellations. Under these circumstances, WPSLL is not preempted by the ADA.

5   **4.      Due Process Clause of the Fourteenth Amendment**

6          Finally, in a footnote, the Airlines briefly argue that applying WPSLL to flight crew

7   violates the Fourteenth Amendment's Due Process Clause. To comport with Due Process, a state

8   "must have a significant contact or significant aggregation of contacts" to activity in a foreign

9   jurisdiction before it can apply its law extraterritorially. *Phillips Petroleum Co. v. Shutts*, 472

10  U.S. 797, 818 (1985); *see also, e.g., Alaska Packers Ass'n v. Indus. Acc. Comm'n*, 294 U.S. 532,

11  542 (1935) (upholding application of California law where injury occurred in Alaska, the

12  plaintiff was from Mexico, but the contract originated in California). A constitutional violation

13  occurs when a state applies its own substantive law in a manner "so arbitrary or unreasonable as

14  to amount to a denial of due process." *AT & T Mobility LLC v. AU Optronics Corp.*, 707 F.3d

15  1106, 1110 (9th Cir. 2013) (quoting *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312–13 (1981)).

16  Under this standard, "[a] state court is rarely forbidden by the Constitution to apply its own

17  state's law." *Sullivan v. Oracle Corp.*, 662 F.3d 1265, 1271 (9th Cir. 2011).

18         WPSLL does not violate the Due Process Clause. The multi-factor analysis that L&I uses

19  to determine if an employee is Washington-based has *Shutts*'s "significant contact" requirement

20  baked in. *See Bostain*, 159 Wash. 2d at 720 (holding that applying the Minimum Wage Act to

21  Washington-based employees who perform interstate work did not create unconstitutional

22  extraterritorial effects); *Mendis*, 2016 WL 6650992, at *5 (holding that Washington's rest break

23

24

law was not unconstitutionally extraterritorial as applied to airline workers). Because WPSLL only applies to employees with strong ties to Washington State, it is not unconstitutional.

**CONCLUSION**

For these reasons, the Airlines' Motion for Summary Judgment is DENIED. L&I and AFA's Motions for Summary Judgment are GRANTED.

IT IS SO ORDERED.

Dated this 11th day of October, 2019.

Ronald B. Leighton
United States District Judge